## No.  23-1091

# In the United States Court of Appeals
# For the Seventh Judicial Circuit

---

GARY HICKS,                                  ) Appeal from the United States
                                             ) District Court for the Central
     Plaintiff-Appellant,            ) District of Illinois, Springfield
                                             ) Division
    v.                              )
                                             ) Case No. 20-cv-3099
ILLINOIS DEPARTMENT OF CORRECTIONS,          )
Et. Al.,                                     ) Hon.  Sue E. Myerscough,
                                             ) Judge Presiding
     Defendants-Appellees.           )

---

# Initial Brief of the Appellant

---

## ORAL ARGUMENT REQUESTED

**JOHN A. BAKER**
Bar #:  6244334
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield,  Illinois   62701
Telephone:  (217) 522-3445
Facsimile:  (217) 522-8234
Email:  jab@bbklegal.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1091

Short Caption: Gary Hicks v. Illinois Department of Corrections et.al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Gary Hicks

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Baker, Baker & Krajewski, LLC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    n/a

Attorney's Signature: /s/ John A. Baker    Date: 02/22/23

Attorney's Printed Name: John A. Baker

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ✓    No ☐

Address: Baker, Baker & Krajewski, LLC

    415 South Seventh Street, Springfield, Illinois   62701

Phone Number: (217) 522-3445    Fax Number: (217) 522-8234

E-Mail Address: jab@bbklegal.com

rev. 12/19 AK

## TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................1

TABLE OF AUTHORITIES ............................................................4

JURISDICTIONAL STATEMENT ..................................................7

A.    Hicks' initial complaint................................................................7

B.    Hicks' Amended Complaint ........................................................8

C.    Competing Motions for Summary Judgment.............................8

D.    Order on the competing motions for summary judgment .....................9

E.    Notice of Appeal ........................................................................9

ISSUES PRESENTED FOR REVIEW ..........................................11

STATEMENT OF THE CASE ........................................................12

A.    Hicks' social media postings ...................................................13

   1. Meme post about Ilhan Omar ...............................................13

   2. Post about a possible civil war .............................................15

   3. Post about the Devil ..............................................................16

   4. Meme post about Rashida Tlaib............................................16

   5. Post about Jewish people ......................................................18

B.    Emily Hoerner article................................................................19

C.    Investigation and Discipline.....................................................20

D.    Relevant policies of the DOC at the time of Hicks' postings.............21

E.    Justifications offered by the DOC for disciplining Hicks ...............23

F.    Jeffreys could not explain what types of postings would violate the DOC's policies..........................................................................24

**G.    DOC establishes a new social media policy after Hicks' discipline ...27**

**H.    Hicks' performance as a DOC employee .....................................27**

**SUMMARY OF ARGUMENT......................................................29**

**ARGUMENT ...............................................................................31**

**A.    This Court's review of the district court's order is *de novo* and summary judgment is only appropriate when no jury could reasonably find for the non-moving party..............................................................31**

**B.    Hicks' Facebook postings were protected by the First Amendment..31**

**1. The alternative analysis embraced by this Court in *Harnishfeger* is the most logical way to analyze Hicks' claims and under this methodology his social media posts were protected under the First Amendment.........33**

**2. Under the traditional *Pickering* analysis Hicks' speech touches upon matters of public concern and is entitled to the protection of the First Amendment. ................................................................................38**

**3. The DOC has no legitimate interest in restricting Hicks' speech that outweighs his interest in commenting on political and religious matters. ................................................................................................43**

**C.    As applied to Hicks, the rules used to discipline Hicks were too vague and could not be enforced without offending his rights under the Fourteenth Amendment..........................................................................53**

**D.    The Individual Defendants violated rights that were well known and are not entitled to qualified immunity..................................................58**

**CONCLUSION ...........................................................................61**

**CIRCUIT RULE 31(E) CERTIFICATION....................................62**

**CIRCUIT RULE 30(D) STATEMENT .........................................63**

**COMPLIANCE WITH TYPE LIMITATIONS ..............................64**

**CERTIFICATE OF SERVICE ....................................................65**

**TABLE OF CONTENTS TO SHORT APPENDIX** .................................................**66**

## TABLE OF AUTHORITIES

**Cases**

*Bence v. Breier*, 501 F.2d 1185  (7th Cir. 1974) .....................................................55, 59

*Bland v. Roberts*, 730 F.3d 368 (4th Cir. 2013) ........................................................34

*Brown v. Bd. of Educ. of City of Chicago,* 84 F. Supp. 3d 784 (N.D. Ill. 2015) ..........54

*Cantwell v. State of Connecticut,* 310 U.S. 296,60 S. Ct. 900 (1940).........................40

*Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 115 S.Ct. 2440 (1995)........................................................................................................................40

*City of San Diego, Cal. v. Roe*, 543 U.S. 77, 125 S. Ct. 521 (2004) ................34, 35, 41

*Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) .............32, 41

*Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110 (7th Cir. 2013) ..............35, 36

*Denius v. Dunlap*, 209 F.3d 944 (7th Cir. 2000).........................................................60

*Dodge v. Evergreen School District #14*, 56 F.4th 767 (9th Cir. 2022)...........47, 48, 59

*Erznoznik v. City of Jacksonville*, 422 U.S. 205, 95 S. Ct. 2268 (1975) .....................41

*FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 132 S.Ct. 2307  (2012) .........................54

FCC v. Pacifica Foundation, 438 U.S. 726, 98 S.Ct. 3026 (1978)...............................40

*Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 127 S. Ct. 2652 (2007)........................................................................................................................39

*Gazarkiewicz v. Town of Kingsford Heights, Indiana,* 359 F.3d 933 (7th Cir. 2004) 44

*Goza v. Memphis Light, Gas & Water Div.,* 398 F. Supp. 3d 303  (W.D. Tenn. 2019) ....................................................................................................................................48

*Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294 (1972)......................54

*Greer v. Amesqua*, 212 F.3d 358  (7th Cir. 2000) ......................................................57

*Gustafson v. Jones*, 290 F.3d 895 (7th Cir. 2002).......................................................44

*Harnishfeger v. United States*, 943 F.3d 1105 (7th Cir. 2019) .......................... passim

*Houskins v. Sheahan*, 549 F.3d 480 (7th Cir. 2008)................................................31

*Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston, Inc.,* 515 U.S. 557, 115 S.Ct. 2338 (1995) ..................................................................................40

*Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 108 S.Ct. 876 (1988) ......................40

*Hynes v. Mayor & Council of Oradell*, 425 U.S. 610, 96 S.Ct. 1755 (1976). ..............55

*Kristofek v. Vill. of Orland Hills*, 832 F.3d 785 (7th Cir. 2016)................................45

*Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012) .............................................34

*Lane v. Franks*, 573 U.S. 228, 134 S.Ct. 2369 (2014)................................................40

*Liverman v. City of Petersburg*, 844 F.3d 400 (4th Cir. 2016) ......................34, 50, 59

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy,* 141 S. Ct. 2038  (2021)....40, 42

*Matal v. Tam*, 137 S.Ct. 1744 (2017) .....................................................................40

*McAuliffe v. Mayor of New Bedford,* 155 Mass. 216, 220, 29 N.E. 517, 517 (1892)...29

*McGreal v. Village of Orland Park*, 850 F.3d 308 (7th Cir. 2017)............................31

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 115 S.Ct. 1511 (1995)...............40

*New York Times Co. v. Sullivan, 376 U.S. 254, 84 S. Ct. 710*  (1964).......................39

*O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 717, 116 S. Ct. 2353, 2356–57 (1996) ...................................................................................................29

*Ovadal v. City of Madison, Wisconsin*, 416 F.3d 531 (7th Cir. 2005)..................41, 53

*Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731 (1968)............32, 44, 51

*Pyles v. Fahim*, 771 F.3d 403 (7th Cir. 2014) ..........................................................31

*Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244 (1984) ....................54

*Schenck v. Pro-Choice Network of Western N. Y.*, 519 U.S. 357, 117 S.Ct. 855 (1997) ..........................................................................................................................40

*Smith v. Finkley*, 10 F.4th 725 (7th Cir. 2021)..........................................................58

*Snyder v. Phelps*, 562 U.S. 443, 451, 131 S. Ct. 1207, 1215 (2011)...........................41

*Street v. New York*, 394 U.S. 576, 89 S.Ct. 1354 (1969) ...............................................41

*Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533 (1989) ...............................................40

*United States v. National Treasury Employees Union*, 513 U.S. 454, 115 S.Ct. 1003 (1995)..............................................................................................................33, 34

*United States v. Williams,* 553 U.S. 285, 128 S.Ct. 1830 (2008); ...............................54

*Waters v. Churchill*, 511 U.S. 661, 114 S.Ct. 1878 (1994) ...........................................44

*Whittaker v. N. Illinois Univ.*, 424 F.3d 640 (7th Cir. 2005) .....................................31

*Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440 (1976)...............40

*Zorzi v. County of Putnam*, 30 F.3d 885 (7th Cir.1994) ...............................................41

## Statutes

42 U.S.C. § 1983 .............................................................................................................5

## Rules

Fed.R.App.4(a)(2) ...........................................................................................................8

Fed.R.Civ.P. 12(b)(6) ....................................................................................................6

Fed.R.Civ.P. 56..............................................................................................................7

## JURISDICTIONAL STATEMENT

**A. Hicks' initial complaint**

On April 7, 2020, Gary Hicks filed a complaint in the United States District Court for the Central District of Illinois. Doc. 1. Hicks' lawsuit was originally broken into three separate claims.

In Count I he alleged that he had engaged in activity protected by the First Amendment and that he had been retaliated against because of his protected expressions. The claim was brought under 42 U.S.C. § 1983 against Michelle Neese, Josh Yargus, and Rob Jeffreys.

In Count II Hicks alleged that his rights to due process under the Fourteenth Amendment had been violated and it was again brought under 42 U.S.C. § 1983 against Neese, Yargus, and Jeffreys.

In Count III Hicks sought declaratory relief as to Jeffreys, the Director of the Illinois Department of Corrections (the "DOC"). He argued that the social media policies implemented by the DOC were impermissibly broad and vague and violated the First Amendment. Again, it was brought in Jeffrey's official capacity under 42 U.S.C. § 1983.

The Original Defendants answered the complaint on August 27, 2020. Doc. 6. In a separate filing the DOC filed a motion under Fed.R.Civ.P. 12(b)(6) to dismiss any claims against it. Doc. 7, 8. In response to the DOC's motion, Hicks filed a pleading agreeing that the DOC was not properly a defendant in the proceedings. Doc. 10. On

February 16, 2021, the district court granted a motion to dismiss the DOC as a defendant in the proceedings. Doc. 15.

## B. Hicks' Amended Complaint

On September 28, 2021, Hicks filed a motion seeking leave to amend his complaint. Doc. 18. Through a docket entry, an order was entered granting Hicks leave to do so on October 25, 2021. Hicks' First Amended Complaint was filed that same day. Doc. 21. In his amended complaint Hicks disposed of his third count because he was no longer employed by the DOC and thus had no standing to seek to have its policies altered. The amended complaint modified the first two counts by adding John Eilers and Nikki Robinson as defendants to both. Doc. 21.

On December 3, 2021, the Individual Defendants – with the exception of Robinson – answered the amended complaint. Doc. 26. Robinson was never served with the complaint and is not a party to this proceeding.

## C. Competing Motions for Summary Judgment

At the close of discovery both sides moved for summary judgment under Fed.R.Civ.P. 56. In his motion Hicks sought a finding that the Individual Defendants had violated his First Amendment rights as alleged in Count I, that they had also violated his due process rights as alleged in Count II and requested that the case be set for a trial solely as to the issue of damages. Doc. 33, 34. The Individual Defendants sought summary judgment as to all of Hicks' claims. Doc. 35.

The parties both submitted responses and replies to the competing motions for summary judgment. Docs. 40, 41, 44, 45.

**D. Order on the competing motions for summary judgment**

On December 13, 2022, the district court entered its opinion denying Hicks' motion for summary judgment and granting the Individual Defendants' competing motion in its entirety. App. 4-29. In so doing the court found that: (1) Hicks did not speak on a matter of public concern; (2) that under the alternative methodology for establishing a First Amendment violation Hicks could not succeed; (3) even if Hicks had engaged in protected activity the interests of the DOC in restricting his speech outweighed his interests in engaging in the speech; (4) that the Individual Defendants were entitled to qualified immunity as to the issue of damages as it relates to Hicks' First Amendment claims; (5) Hicks' discipline did not run afoul of the Fourteenth Amendment; and (6) the Individual Defendants were entitled to qualified immunity as to Hicks' claims for damages under the Fourteenth Amendment.

**E. Notice of Appeal**

On January 12, 2023, Hicks filed a notice of appeal. App.2. The notice was filed on the thirtieth day after the district court ruled on the motions for summary judgment but before the court had entered judgment. In the notice Hicks indicated that the district court's order "indicates a judgment is to be entered, however, no such judgment has yet been filed" and cited specifically to Fed.R.App.4(a)(2). App. 2. On January 13, 2022, the district court entered judgment in favor of the Individual Defendants and against Hicks. App. 1.

On January 14, 2023, Hicks filed an amended docketing statement in this Court explaining that the district court had entered judgment.

This appeal is brough against Neese, Yargus, Jeffreys, and Eilers (collectively the "Individual Defendants").

## ISSUES PRESENTED FOR REVIEW

Hicks posted several "memes" to his personal Facebook page. Those postings were made off-duty and in no way dealt with his job duties for the DOC. Rather, the postings reflected his "personal opinions" about politics and religion. Once they were posted he was disciplined under the DOC's general prohibition against unbecoming conduct. The Individual Defendants punished him largely because they found his statements to be offensive. The issues presented by this appeal are:

> 1. When a public employee posts on his personal social media account outside of the workplace about issues that constitute his personal views on topics of a political or religious nature can an employer discipline the employee simply because some might find the statements offensive?

> 2.  Must the rules governing public employment be clear enough so that an employee would understand that his actions might subject him to discipline?

## STATEMENT OF THE CASE

Hicks began his employment with the DOC as a Correctional Officer Trainee on April 23, 2001. Doc. 34-7 at 1. On March 1, 2018, he was promoted to the position of Correctional Sergeant. Doc. 34-8 at 6. Hicks retired while his claim was pending before the district court. Doc. 18. With the exception of four months where he worked at the Lawrenceville Correctional Center, Hicks was assigned to the Robinson Correctional Center throughout his tenure with the DOC. Doc. 35-2 at 2, Hicks dep. at 7.

Jeffreys is the Director of the DOC. Doc. 34-1 at 79-80, Jeffreys dep. at 4-5. In this capacity he is responsible for 27 facilities, 28,000 inmates, and oversees 13,000 staff members. Doc. 34-1 at 4, Jeffreys dep. at 4.

Eilers has been employed by the DOC for more than two decades. Doc. 34-1 at 39, Eilers dep. at 7. Of import here, he worked as the DOC's Chief of Operations where he was responsible for the oversight of all of the prisons housing male inmates. *Id.* Between August of 2019 and December 1, 2019, Eilers was additionally temporarily assigned to handle some of the duties of the position of Chief of Staff. Doc. 34-1 at 40, Eilers dep. at 8.

After a career of 28 years, Neese retired from the DOC on December 31, 2020. Doc. 34-1 at 118, Neese dep. at 7. From September of 2018 through December 1, 2020, Neese served as the Acting Warden at the Robinson Correctional Center. Doc. 34-1 at 119, Neese dep. at 8. In this capacity she was responsible for the day-to-day

operations of the Robinson Correctional Center and reported to the DOC's deputy director. Doc. 34-1 at 119, Neese dep. at 8.

Yargus has been employed by the DOC for 21 years and has worked exclusively at the Robinson Correctional Center. Doc. 34-1 at 171, Yargus dep. at 6-7. From July of 2018 until January of 2020 Yargus was assigned to work in internal affairs at the Robinson Correctional Center. *Id.* While working in internal affairs Yargus was responsible for investigations into incidents involving both staff and inmates and reported directly to the warden *Id.* at Yargus dep. 8-9.

## A.  Hicks' social media postings

Hicks maintains a personal Facebook page. App. 44. Posting to Facebook was never a part of Hicks' job duties and he had no responsibility for social media at the DOC. Doc. 26, Answer at ¶ 13, Doc. 28, Answer at ¶ 13. Hicks made five separate postings on his Facebook page that ultimately got him into hot water with the DOC. None of these posting were made at work nor were they in any fashion related to Hicks' work with the DOC. App. 39. In none of them did he identify himself as being employed by the DOC nor did he any way indicate that he was speaking on behalf of the DOC in making these postings. Doc. 26, Answer at ¶ 20, Doc. 28, Answer at ¶ 20, 21.

### 1. Meme post about Ilhan Omar

The May 20, 2019, Hicks posted a meme to his Facebook account indicating that U.S. Representative Ilhan Omar had sent a "Shawarma" to her Republican colleagues and indicated that she should be arrested. App. 32.



This particular meme was not created by Hicks and its creators intended it to be satirical.[1] Shawarma is a Middle Eastern dish consisting of meat cut into thin strips.[2] The explanation to give them a "taste of her culture" seemingly makes it clear that it was referring to food.

In 2019 Rep. Omar was constantly in the news owing to statements she had made about Israel and its supporters in the United States. Those comments were condemned by both Democrats and Republicans.[3] In March of that year the *New*

---

[1] https://checkyourfact.com/2020/01/17/fact-check-ilhan-omar-threatened-republican-shawarma/ (Last Visited April 20, 2022). This website gives some history of this particular meme and indicates that it was satirical and had been shared more than 100,000 times on social media.

[2] https://en.wikipedia.org/wiki/Shawarma (Last visited April 20, 2022).

[3] https://www.vox.com/policy-and-politics/2019/3/6/18251639/ilhan-omar-israel-anti-semitism-jews (Last visited April 20, 2022); https://www.npr.org/2019/03/07/700901834/minnesota-congresswoman-ignites-debate-on-israel-and-anti-semitism (Last visited April 24, 2022)

*York Times* ran an editorial stating that Rep. Omar disliked Israel and suggested she might be anti-Semitic.[4]  Many, including the Anti-Defamation League, went further and actually accused her of being anti-Semitic.[5] This posting was Hicks' political commentary regarding an elected official who had received significant attention in the national news in 2019 regarding her views on Israel and the Jewish people. App. 39-40.

### 2. Post about a possible civil war

On May 22, 2019, Hicks posted the following meme comment on Facebook:

> Dear Lord, if there must be a civil war or a government overthrow, please let it happen before I am dead or too old to fight in it. Amen. App. 30.

When Hicks was interviewed by internal affairs the report indicates that he explained that the post "was political in nature and if something did happen where history repeated itself, he would rather be involved than his grandkids be involved." App. 39. Hicks never indicated that he was hoping for a civil war.

Again, this was not some statement that came out of nowhere or was part of some fringe movement to overthrow the government. In 2019 there had been a lot of conversation in the mainstream national news surrounding the possibility of a second Civil War. In March of 2019 the *Washington Post* weighed in with a story

---

[4] https://www.nytimes.com/2019/03/07/opinion/ilhan-omar-anti-semitism.html (Last visited April 24, 2022).

[5] https://www.usatoday.com/story/opinion/2019/03/06/ilhan-omars-comments-were-anti-semitic-rhetoric-says-adl-talker/3078821002/ (Last visited April 24, 2022).

about this issue explaining how there had been a lot of discussion about the possibility of a civil war coming from both sides of the political spectrum.[6]

### 3. Post about the Devil

On July 6, 2019, Hicks posted this meme about his religious beliefs.



App. 36. This was a statement made regarding Hicks' religious beliefs. App. 39.

### 4. Meme post about Rashida Tlaib

The July 24, 2019, post was a reference to U.S. Representative Rashida Tlaib. App. 31. The meme indicated that if she didn't like the United States she was free to "Tlaib." The meme also requested the reader to "Please Vote Trump." *Id*.

---

[6] https://www.washingtonpost.com/politics/in-america-talk-turns-to-something-unspoken-for-150-years-civil-war/2019/02/28/b3733af8-3ae4-11e9-a2cd-307b06d0257b_story.html (Last Visited April 24, 2022).



At that time this meme was posted there was a political disagreement between President Trump and Representative Tlaib. According to a *Politico* article, on July 14, 2019, President Trump had referenced Tlaib and others when he stated, "Why don't they go back and help fix the totally broken and crime infested places from which they came."[7] President Trump apparently went on to say:

> "So interesting to see 'Progressive' Democrat Congresswomen, who originally came from countries whose governments are a complete and total catastrophe, the worst, most corrupt and inept anywhere in the world (if they even have a functioning government at all), now loudly and viciously telling the people of the United States, the greatest and most powerful Nation on earth, how our government is to be run . . . "

---

[7] https://www.politico.com/story/2019/07/14/trump-congress-go-back-where-they-came-from-1415692 (Last visited April 19, 2022).

Earlier that year Rep. Tlaib had referred to Trump as a "mother*****."[8]

### 5. Post about Jewish people

On March 11, 2019, Hicks posted the following meme on his Facebook page:



> **Things We Don't See Jews Doing.**
>
> 1. **Flying Planes Into Buildings.**
> 2. **Supporting Terrorism.**
> 3. **Forcing Young Girls To Marry Old Men.**
> 4. **Mutilating Females Genitalia.**
> 5. **Beheading People.**
> 6. **Trying To Dominate The World.**
> 7. **Stonings.**
> 8. **Canings.**
> 9. **Lashings.**
> 10. **Trying To Destroy America.**

App. 35; Doc. 40-1 at 1-2, Hicks dec. at ¶ 3.

This statement was about religion and about his support for Jewish people. App. 39. As the post about Rep. Omar made clear, there was much discussion in March of 2019 about anti-Semitism that appeared in the news. The *New York Times* editorial condemning Rep. Omar's comments, *see supra* at n.4, was written only four days

---

[8] https://www.vox.com/policy-and-politics/2019/1/4/18168157/rashida-tlaib-trump-impeachment-motherfucker (Last visited May 9, 2022).

beforehand, on March 7, 2019. That same day, as a result of Rep. Omar's comments, the United States House of Representatives voted 407-23 to condemn anti-Semitism.[9]

## B. Emily Hoerner article

On September 4, 2019, Emily Hoerner, a reporter from Injustice Watch, published an article titled "On Facebook, Illinois prison guards, accused of abuses by transgender inmates, mocked LGBTQ community."[10]  Doc. 35-3 at 1-3. The article references different lawsuits brought against DOC employees and conflates Hicks with a different Sergeant Hicks who was being sued by a transgender inmate at the Shawnee Correctional Center. Doc. 35-3 at 2-3.

Hoerner falsely claimed that Hicks called a transgender inmate a "homophobic slur" and used other inappropriate language towards an inmate. Doc. 35-3. No such allegation had ever been made against Hicks and he had never been the source of any litigation. Hoerner also falsely contended that Hicks had "shared an image of soldiers standing in front of a military tank draped in the confederate flag." Doc. 35-3 at 3.[11]

---

[9] https://www.npr.org/2019/03/07/701074291/house-votes-to-condemn-anti-semitism-after-rep-omars-comments (Last Visited May 4, 2022).

[10] According to its website, Injustice Watch is "a nonpartisan, nonprofit journalism organization that conducts in-depth research exposing institutional failures that obstruct justice and equality." *See* https://www.injusticewatch.org/about/mission/ (Last Visited April 29, 2022). Neese referred to it as a "watchdog organization." Doc. 35-5 t 18, Neese dep. at 18. Hoerner had apparently contacted the DOC on August 26, 2019. App. 40.

[11] The Individual Defendants have acknowledged that the Hoerner article was erroneous. *See* Doc. 35 at p. 5, ¶ 17.

## C. Investigation and Discipline

On September 3, 2019, Hicks was interviewed by DOC investigator Josh Cheek.

During that interview Hicks acknowledged that he had posted the Facebook

messages to his personal account. Doc. 26, Answer at ¶ 22; Doc. 28, Answer at ¶ 22.

Hicks explained that the Facebook memes constituted his personal political and

religious views and that his views has never impacted his work for the DOC and

that he has never been biased against anyone in carrying out his workplace duties.

Doc. 26, Answer at ¶ 23; Doc. 28; Answer at ¶ 23; *see also* App. 39-40.

On September 3, 2019, Eilers issued a directive locking Hicks out of the

Robinson Correctional Center because an investigation into his Facebook postings

had been launched. Doc. 28, Answer at ¶ 23; Doc. 34-1 at 122, Neese dep. at 11.

Neese testified that before she learned of the investigation into Hicks' postings she

had not heard anything about them. Doc. 34-1 at 127, Neese dep. at 16. When Neese

received the directive she called her supervisors and told them that the "watchdog

organization" had made a mistake in its reporting and had identified the wrong

Gary Hicks. Doc. 34-1 at 129, Neese dep. at 18. Nonetheless, she was directed that

the lockout was to continue. Doc. 34-1 at 130, Neese dep. at 19.

On October 3, 2019, Yargus was told to make a recommendation to Neese that

Hicks be referred for disciplinary action as a result of the posts. Doc. 34-1 at 174,

Yargus dep. at 18-19. That memorandum concluded that:

> . . . Correctional Sergeant Gary Hicks violated Conduct of
> an Individual when he made a post on his Facebook
> account in which he shared "memes" to reflect his
> personal views on topics of a political or religious nature

> that reflected negatively on the Department as well as the
> Department's overall mission.

App. 42. Neese concurred with the directive that Hicks be referred for discipline for

his Facebook posts. App. 42.

On October 3, 2019, Hicks was notified via memorandum from Neese Sarah

Venema would conduct a pre-disciplinary on October 15, 2019. App. 43. Venema

conducted the administrative hearing as scheduled and concluded that Hicks'

memos violated DOC policy and recommended that he be suspended for a period of

ten days. App. 44-45. The official disciplinary documentation explained:

> The Hearing Officer has reviewed the information provided and
> it is this Hearing Officer's opinion that Correctional Sergeant
> Gary Hicks violated the above cited Administrative Directive
> 03.02.108, Standards of Conduct, Institutional Directive
> 03.02.108 Standards of Conduct, and Departmental Rule 120.

App. 45. Neese approved the recommendation of a 10-day suspension.  App. 45. She

forwarded that recommendation to the DOC Director's office. Doc. 34-1 at 142-43,

Neese dep. at 31-32.

On or about October 20, 2019, Eilers, in conjunction with Jeffreys and others,

made the final decision that Hicks would be suspended without pay for a period of

ten days for his Facebook postings. Doc. 28, Answer at ¶ 30.

## D. Relevant policies of the DOC at the time of Hicks' postings

The policies of the DOC that were used to discipline Hicks were quite general

and effectively provided that employees shall engage in no behavior that places the

DOC in a bad light. Administrative Directive 03.02.108, as it existed in 2019 doesn't

mention social media or comments made outside of the workplace. App. 46-53. The

portion of Administrative Directive 03.02.108 that was utilized to discipline Hicks provides:

> The Department shall require employees to conduct themselves in a professional manner and, whether on duty or not, not engage in conduct unbecoming of a State employee or that may reflect unfavorably on or impair operations of the Department.

App. 46.

While the generalized policy statement provision of Administrative Directive 03.02.108 that were used to discipline Hicks provide simply that employees must not engage in conduct unbecoming or conduct that reflects negatively on the DOC, the directive goes into greater detail as to a number of different behaviors or actions that would constitute violations. For example, it provides that employees are not to violate the law (App. 47), must report any arrest promptly (App. 47), must report any protective order that is entered against the employee (App. 48), must only use state resources for official purposes (App. 48), must not get secondary employment without approval (App. 49), cannot socialize with offenders (App. 49), cannot accept gifts from certain individuals (App. 49), can't engage in a conflict of interest (App. 49), and can't provide false information during an internal investigation (App. 51-52).

Like the Administrative Directive, Institutional Directive 03.02.108 doesn't mention social media and doesn't prohibit an employee from posting anything on his own social media account. App. 54-68. The portion of Institutional Directive 03.02.108 that was utilized to discipline Hicks provides:

> It is the policy of the Robinson Correctional Center to require all employees to conduct themselves in a professional manner and, whether on duty or not, not engage in conduct unbecoming of a State employee or that may reflect unfavorably on or impair operations of the Department. Failure to comply with any of the standards of conduct may result in discipline. App. 54.

## E. Justifications offered by the DOC for disciplining Hicks

The DOC concluded that even though Hicks' statements dealt with his personal views on politics and religion, they violated DOC policies because they "reflect negatively on the department as well as the departments overall mission." App. 40. Outside of this conclusory statement there was nothing to explain how the DOC was negatively impacted nor was there any contemporaneous documentation that outlines how Hicks' actions purportedly reflected negatively upon the DOC.

The hearing officer's conclusions provide even less insight into how Hicks' statements impacted the DOC. App. 44-45. In the conclusion it simply finds that the statements did violate the policies and offers no explanation as to how they did so.

In his interrogatories Jeffreys was asked to explain this in greater detail and responded:

> **Interrogatory 1.**  Explain in detail how posting the memes that lead to Hicks' suspension impacted the operations of the Department?

> **Answer:**     . . . posting memes that are disparaging of others due to their religious views or sexuality reflect negatively on the Department as well as the Department's overall mission. For example, Plaintiff posted memes that were disparaging towards Muslims. IDOC employs and houses Muslim individuals. The statements in the memes shared by Plaintiff reflect an inability for him to carry out the

> duties required equally and regardless of religious
> affiliation of others. Additionally, these actions sow
> mistrust and unrest among the offender population,
> thereby threatening the safety and security of the
> facility and IDOC. Doc. 34-6 at 8, ¶ 1.

Nowhere in his interrogatory answers was there any reference to the civil war meme.

When asked about his concerns regarding Hicks' posts, Eilers stated that "And when posts like this are made, it has the appearance that our staff don't agree with certain individuals and how they carry themselves or how they have identified." Doc. 34-1 at 63, Eilers dep. p. 31. When asked what he meant about how individuals have "identified," Eilers referenced "our transgender population." *Id.* He then acknowledged that Hicks never said anything about transgender individuals. *Id.*

## F. Jeffreys could not explain what types of postings would violate the DOC's policies

During discovery Jeffreys was asked repeatedly about different scenarios and whether they would violate DOC's policies. Despite the fact that he is the Director of the DOC he struggled with answering these questions.

During his deposition he testified that DOC's view was that anytime an employee said something that offends someone else it is a violation of policy:

> Q. So was your concern more about referring to specific, I
> mean, are we talking about statements about specific
> inmates or are we talking about any statement that might
> potentially offend someone?
>
> A. Any statement that might potentially offend somebody
> while you're employed with IDOC.

Doc. 34-1 at 85-86, Jeffreys dep. at 10-11.

Jeffreys was then provided with a hypothetical situation and was asked whether it would be a violation of the policy.

> Q. Okay.  What if I said inmate A is homosexual and I think he's going to rot in hell because of that?
>
> A.  I can't make that decision, but what somebody will do is if somebody writes an incident report for you, it would be investigated, and based on the investigation if it comes out that it has merit, then you will be disciplined. That's the process.

Doc. 34-1 at 87, Jeffreys dep. at 12.

Jeffreys was given another scenario and asked the same questions.

> Q. All right. So let me ask you this, Director. If I make a general statement. If I say something along the lines of all Muslims are bad. Without referencing anybody either employed by the Department or referencing anybody in custody of the Department, is that a violation of the policy?
>
> A.  I mean, that's a general statement. I mean, if you make that statement in reference to our employees or our staff, I mean, our individuals in custody, that what our concern is right now. I mean, I can't make that determination. It depends on how somebody feels, I mean, how the investigation goes. I mean, the outcome of the investigation, if they find merit, then they will be able to, you know, issue discipline, go through with the process, but I can't make that call. That's not my – that's not my job to make the call.

Doc. 34-1 at 88, Jeffreys dep. at 13. There was a follow-up to this question:

> Q.  Okay. So again, going back to my hypothetical, if I'm an employee, a correctional guard, let's say I work at [incorrectly transcribed correctional facility] and I go home tonight and 2 a.m. and I make a post that all Muslims are horrible people. Does that violate the policy?

> A.  What that does is somebody views that post, takes offense to it, and writes a 434 with it, it will be turned into the Warden and everything and then an investigation will start based on your comment. And then on that outcome of that comment will be discipline or what have you.
>
> Q.  So it would violate the policy?
>
> A.  Like I said, I can't tell you if it did or didn't until the investigation.
>
> Q.  But I told you what the comment is. I mean, does the comment itself violate the policy or not violate the policy?
>
> A.  Like I said, I'll let the investigation tell me what the outcome's going to be, sir.

Doc. 34-1 at 89, Jeffreys dep. at 14.

Jeffreys acknowledged that discipline is appropriate if someone, somewhere is subjectively offended by a social media posting.

> Q.  So the standard, then, for an investigation is, is somebody offended by the statement that I've made?
>
> A.  If somebody writes it up and it is, you know, viewed as offensive based on the outcome of the investigation, then, I mean, that's what happens, sir.
>
> Q.  But when you say view as offensive. Offensive to who? Are we talking about offensive to the person who has read it or are we talking about objectively offensive?
>
> A.  Yes, offensive to the person who reads it.
>
> Q.  So if I write something that is offensive to somebody in the State of Illinois that they find personally offensive, that can subject me to discipline?
>
> A.  If you're employed with the Illinois Department of Corrections, yes, sir.

Doc. 34-1 at 91-92, Jeffreys dep. at 16-17.

Despite the fact that Hicks was speaking on his own on social media, Eilers did not believe that a DOC employee had the right to voice their political views on social media.

> Q. Do you believe in general that Mr. Hicks has a right to express his political opinions on Facebook?
>
> A. Not on social media, no, while he's employed with the department.

Doc. 34-1 at 64, Eilers dep. at 32.

## G. DOC establishes a new social media policy after Hicks is disciplined

After Hicks was disciplined the DOC issued a new social media policy that was authorized by Jeffreys. App. 74-76. That social media policy became effective on November 1, 2019, and it outlines the DOC's policies regarding social media. Id. Jeffreys thought it was important for a policy to be instituted because he believed that staff were making derogatory statements online about specific inmates. Doc. 34-1 at 85, Jeffreys dep. at 10.

## H. Hicks' performance as a DOC employee

Prior to his discipline that is outlined in this complaint Hicks had not been disciplined in his more than 18 years of employment with the DOC. Doc. 26, Answer at ¶ 38. A performance evaluation was performed on Hicks for the time period of March 1, 2019, through March 1, 2020, where he was ranked as exceeding expectations in 5 categories and meeting expectations in the other 5 categories. Doc. 34-8 at 7-14. His supervisor wrote:

For this reporting period Sergeant Hicks, Gary is currently assigned to the 3-11 shift as a relief Sergeant. Sgt. Hicks has a positive attitude and works very well with both his peers and Supervisors. Sgt. Hicks needs little to no supervision, is very knowledgeable about his job requirements, has excellent communication and problem-solving skills, follows direction, and can be depended on to complete any task given accurately. Sgt. Hicks is an asset to the facility as well as the Department.

The evaluation was signed off on by Jeffreys. Doc. 34-8 at 7-14.

## SUMMARY OF ARGUMENT

For most of the history of American jurisprudence it was clear that a public employee surrendered his First Amendment rights in exchange for accepting a governmental job. The classic formulation of this position was Justice Holmes' observation: "A policeman may have a constitutional right to talk politics, but he has no constitutional right to be a policeman."[12]  Since the 1950's and 1960's, however, the Supreme Court has made it clear that requiring an employee to surrender all of his First Amendment protections was not something that a governmental employer could mandate as a condition of employment. Quite simply, a State may not condition public employment on an employee's exercise of his or her First Amendment rights. In *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 717, 116 S. Ct. 2353, 2356–57 (1996), the Court summarized the First Amendment protections for governmental employees:

> [I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not  command directly.' Such interference with constitutional rights is impermissible. Absent some reasonably appropriate requirement, government may not make public employment subject to the express condition of political beliefs or prescribed expression. (Internal Citations Omitted).

The Individual Defendants now seek to turn back the clock to the days when public employees were not allowed to openly discuss their political views. Eilers, the DOC's Chief of Operations made this clear in his testimony:

---

[12] *McAuliffe v. Mayor of New Bedford,* 155 Mass. 216, 220, 29 N.E. 517, 517 (1892).

> Q. Do you believe in general that Mr. Hicks has a right to express his political opinions on Facebook?
>
> A. Not on social media, no, while he's employed with the department.

While away from work Hicks posted his personal political and religious opinions on Facebook. Those views in no way related or linked to is work with the Department. According to Director Jeffreys, the Department's perspective is that if an employee posts something that someone, somewhere might find offensive they are subject to discipline. Explaining this viewpoint he testified:

> Q. If I say something that offends someone else, I subject myself to discipline?
>
> A. Yes, sir.

If the Department had a rule that precluded employees from discussing politics outside of the workplace this case might be different. Given that no such policy existed, the Individual Defendants punished Hicks using a policy that generally prohibits an employee from engaging in conduct that is unbecoming or that impairs its operations.

As these rules were applied to Hicks they were overly vague and thus impermissible under the Fourteenth Amendment. Hicks had no way of knowing that the posting of his personal political views would subject him to discipline.

For these reasons the grant of summary judgment should be reversed.

## ARGUMENT

**A.  This Court's review of the district court's order is *de novo* and summary judgment is only appropriate when no jury could reasonably find for the non-moving party.**

Hicks is seeking to have this Court reverse the district court's decision granting summary judgment and to remand with directions that summary judgment – as to both of his claims – be entered in his favor. Review of a grant of summary judgment *de novo*. *Pyles v. Fahim*, 771 F.3d 403,408 (7th Cir. 2014). The question of whether speech is protected under the First Amendment is a question of law. *Houskins v. Sheahan,* 549 F.3d 480, 489 (7th Cir. 2008).

**B.  Hicks' Facebook postings were protected by the First Amendment.**

A plaintiff pursuing a First Amendment retaliation claim must show that: (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the defendants' decision to take the retaliatory action. *McGreal v. Village of Orland Park*, 850 F.3d 308, 312 (7th Cir. 2017). Here there is no dispute as to the second and third prongs of this analysis. It is clear what, where, when, and how Hicks said what he said and that he was disciplined for those comments. *Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 647 (7th Cir. 2005)(explaining that a suspension is an adverse employment action under Title VII). As to his First Amendment claim, the only issue is whether his speech was protected under the First Amendment and, if so, whether the Individual Defendants' interests in restricting his speech outweighed his interests in speaking.

The genesis of modern First Amendment jurisprudence in the employment context is *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731 (1968). *Pickering* and subsequent decisions have made it clear that a governmental employer can only restrict speech that touches upon a matter of public concern and that does not owe its existence to an employee's employment when it can establish that its need to restrict the speech outweighs the interests of the employee who has engaged in the speech.

The *Pickering* analysis makes sense when evaluating employee speech that is critical of his employer or addresses issues in the workplace. *Pickering* itself involved the case of a teacher who had written a letter to the editor that was critical of how the school board he worked for had prioritized funding. In a case like this one where there is no link between Hicks' employment and his speech, there is another analytical path that can and should be taken but the district court didn't take it. While the traditional analysis of public employee speech involves the question of whether that speech touches upon a "matter of public concern," *see Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684 (1983), that is not necessarily always the case. This Court has explained that there is a different path that an employee can take when challenging an infringement of his First Amendment rights. In *Harnishfeger v. United States*, 943 F.3d 1105, 1113 (7th Cir. 2019), the Court discussed speech that "is neither at work nor about work" and how this speech can be analyzed differently.

Under either the traditional approach of assessing whether the speech was on a matter of public concern or under the approach embraced in *Harnishfeger*, Hicks' comments were protected.

**1. The alternative analysis embraced by this Court in *Harnishfeger* is the most logical way to analyze Hicks' claims and under this methodology his social media posts were protected under the First Amendment.**

*Harnishfeger* relied heavily upon the Supreme Court's holding in *United States v. National Treasury Employees Union*, 513 U.S. 454, 115 S.Ct. 1003 (1995) ("NTEU"). This Court explained the analysis this way:

> The key issues under *NTEU* are whether the employee's speech is "made outside the workplace,"; "involve[s] content largely unrelated to [her] government employment,"; and is "addressed to a public audience,", or, what amounts to the same thing, involves "any matter for which there is potentially a public." If the employee shows these elements, and if the employer cannot show the employee's speech was linked by her "deliberate steps" to the employer's mission, purpose, or image, then *NTEU*, not *Connick*, controls, and *Pickering* balancing applies. *Harnishfeger*, 943 F.3d 1105 at 1113-1114.

The Court explained that when speech is made off-duty the *NTEU* decision "offers an easier and clearer path to decision" than analyzing the case as "citizen speech on a matter of public concern." *Id.* at 1114.

Here, the *Harnishfeger/NTEU* analysis is easy to apply. Hicks spoke outside of the workplace on his own Facebook page. The next question is whether the speech involves matters that are "largely unrelated" to their government work. Hicks makes absolutely no mention of anything related to the DOC. He references matters of politics and religion that had nothing to do directly or indirectly with the DOC.

33

*Harnishfeger* is helpful in analyzing this question. There the Court made it clear that the mere fact that it is known that the speaker is employed by a governing unit would undermine *NTEU*'s meaning by explaining that the test is meant to preclude the employee from "trading on her public employment while claiming the speech is entirely unrelated." *Id.*

The final question under the *Harnishfeger/NTEU* analysis is whether it involves a matter in which there is potentially a public. Here there clearly was a public. Hicks outlined his view in a public forum. *See Liverman v. City of Petersburg*, 844 F.3d 400, 409-410 (4th Cir. 2016)(explaining that "Facebook is a dynamic medium through which users can interact and share news stories or opinions with members of their community."); *see also Lane v. Facebook, Inc.,* 696 F.3d 811, 816 (9th Cir. 2012); *Bland v. Roberts*, 730 F.3d 368, 385 (4th Cir. 2013).

The district court rejected Hicks' contention that he satisfied this analysis because it concluded that he had taken "deliberate steps to link himself and his posts to his employer." App. 20. The court explained:

> His Facebook page was set to public viewing, and he listed the Illinois Department of Corrections as his employer, and included a photo of him in his uniform on the page. His profile did not include any disclaimer that it was his personal account or that the views posted there were his own and not those of the Department. App. 20.

In support of its position the district court found that because Hicks tied his opinions to the DOC it was comparable to the facts in *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 84, 125 S. Ct. 521, 526 (2004). Such a conclusion is flawed both factually and legally. There the Supreme Court found that the plaintiff's speech was

"designed to exploit his employer's image." *Id.* In *Roe* the plaintiff, a police officer, created and sold a pornographic video of himself stripping off his police uniform. Tellingly the plaintiff also sold police equipment, including official police uniforms.

This Court has addressed conduct similar to *Roe* in *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110 (7th Cir. 2013). Like the facts of *Roe*, the facts of the *Craig* case are not remotely similar to Hicks' social media posting here. There the plaintiff was a high school guidance counselor who also coached several different women's sports teams. He authored a book titled "*It's Her Fault*" and the school district terminated his employment as a result. The book was highly provocative, made comments that suggested that women needed to be promiscuous and outlined how women can gain the upper hand in their relationship with a man. The Court explained that at one point in the book the author "delves into a comparative analysis of the female genitalia of various races which goes into an excruciating degree of graphic detail." In *Harnishfeger*, the Court subsequently described *It's Her Fault*, as a "hypersexualized" tract dedicated to the proposition that, when men and women experience difficulties in romantic relationships, "it's her fault." 943 F.3d at 1114.

The *Craig* plaintiff specifically linked his book to his work as a guidance counselor. In differentiating Craig's speech, in *Harnishfeger* this Court explained:

> Craig had taken deliberate steps to link' his book with his work
> as a guidance counselor .... Craig's book cited his work as a
> counselor and coach as the basis for his claimed expertise;
> thanked his "students and clients" in the acknowledgments;
> contained a foreword written by a teacher at Craig's school; and
> described the counseling Craig had provided "to thousands of

35

> students, parents, clients, and friends." We held this material
> reflected Craig's conscious choice to connect '*It's Her Fault*' to his
> counseling position, taking his book outside *NTEU*'s
> protection. 943 F.3d at 1114–15 (7th Cir. 2019)(internal
> citations omitted).

"The point of *Craig* is that the speaker-employee cannot deliberately trade on her public employment while claiming the speech is entirely unrelated." *Harnishfeger*, 943 F.3d 1105, 1115 (7th Cir. 2019). The *Harnishfeger* decision went to great lengths to differentiate the facts of the two cases. In *Harnishfeger* the plaintiff had written a book called *Conversations with Monsters*. The book was about her experiences working as a phone-sex worker. When her bosses at the Indiana National Guard learned of the book they terminated her employment because it demonstrated she was not capable of performing her job duties and it damaged the image of the National Guard. *Id.* at 1116. In contrasting the two cases this Court focused heavily upon the link between the books and the nature of the work that the plaintiffs were doing. In *Craig* the plaintiff clearly had taken "deliberate steps" to link his book to his work and the speech clearly and explicitly related to his work with high school girls. 736 F.3d at 1118. In *Harnishfeger* the plaintiff, like Hicks, had a couple of posts on her Facebook account indicating she worked for the National Guard. Also like Hicks she had never attempted to tie her work or experience with the National Guard to her writings.

Of the two cases Hicks' speech is much more like *Harnishfeger* than it is *Craig*. Hicks' speech in no way addresses his work, it doesn't address inmates, it doesn't address the DOC or prisons in general, it doesn't even address the criminal justice

system. Rather it discusses politics and religion in a much broader context. In short, Hicks' postings have absolutely nothing to do with his work. Hicks was not trading on his work as a correctional officer and did nothing to link his posts to his work with the DOC. While Hicks' main Facebook page indicated he was employed by the DOC, it didn't provide much in the way of details other than stating he was employed as a Correctional Sergeant. Doc. 35-1 at 5. The picture of Hicks in his uniform had been posted many years in the past. Hicks was a prolific poster on Facebook. In the year before the investigation was launched he had posted more than 350 different items to his timeline. Doc. 40-1 at 1, Hicks dec. at ¶ 1. Not one of those items mentioned the DOC or his work as a correctional officer.

Hicks' speech is entitled to even greater protection that the speech in *Harnishfeger* because of the nature of the speech. Hicks was commenting on matters of ongoing public debate of a political nature. Conversely, the *Harnishfeger* plaintiff was speaking about her own personal experiences working in the adult entertainment industry.

Here there is nothing linking these posts to Hicks' work at the DOC. The reference the district court made to the fact that his Facebook profile indicated he was an employee of the DOC is correct, however, merely stating he was an employee is not the same thing at trading on his employment. The only other indication anywhere on his account that he was a DOC employee was a picture of him in his work shirt that had been posted at least three years beforehand. Doc. 40-1 at 2, Hicks dec. at ¶ 4. Hicks never posted anything about the functioning of the DOC,

his job duties at the DOC, any inmates at the DOC, any criticisms of the DOC on Facebook. *Id.*

The district court's conclusion suggests that anytime someone simply mentions that they are employed by a governmental entity their governmental employer has an interest in restricting that speech. Such a conclusion would almost entirely eviscerate *NTEU*. No one looking at Hicks' Facebook posts could possibly think that these statements reflected the viewpoint of the DOC or that Hicks' expertise as a correctional employee had somehow guided his opinions.

### 2. Under the traditional *Pickering* analysis Hicks' speech touches upon matters of public concern and is entitled to the protection of the First Amendment.

The district court concluded that Hicks' speech did not touch upon matters of public concern. App. 17. The court concluded that Hicks' speech "does nothing to advance the debate of any serious issue among the public and only reflects [his] private or personal interest." App. 18. The court further explained that it was clear from the record that Hicks' statements were "not designed to advance any kind of public discussion but only to express [his] personal views." *Id.* It is hard to understand anything more fundamental to the First Amendment than the right of a person to express his own political views.

The district court regrettably seems to have adopted the conclusion that was argued by the Individual Defendants that Hicks' speech was offensive and thus not protected. Doc. 35 at 10-11. They had argued to the district court that Hicks' speech

did nothing to "advance political or religious discourse" and they "reflected ignorance, sexism, and racism, and promoted violence." Doc. 35 at 11.

The district court's conclusion that Hicks' speech was not on a matter of public concern reflects a gross distortion of the type of speech protected by the First Amendment. Instead it reflects a hostility to speech that the DOC found to be disagreeable. Indeed they had previously indicated that if a statement has the potential to offend someone it isn't protected under the First Amendment. *Supra* at 26-27.

While there is nothing inherently offensive about Hicks' speech, it has long been understood that offensive speech is protected under the First Amendment. In expressing the fundamental goal of the First Amendment, the Supreme Court has explained that it reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan, 376 U.S. 254, 271, 84 S. Ct. 710, 721* (1964). Thus, when reviewing restrictions on political speech, "the First Amendment requires us to err on the side of protecting political speech rather than suppressing it." *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.,* 551 U.S. 449, 457, 127 S. Ct. 2652, 2659 (2007).

More than eighty years ago the Supreme Court addressed speech that has the propensity to offend the listener. This was speech that challenged the religious beliefs of certain people and the listeners remarked that they were, in fact, deeply

offended by what they had heard. In reversing a conviction for breach of the peace

the Court explained the importance of debate in our free society:

> In the realm of religious faith, and in that of political belief,
> sharp differences arise. In both fields the tenets of one man may
> seem the rankest error to his neighbor. To persuade others to his
> own point of view, the pleader, as we know, at times, resorts to
> exaggeration, to vilification of men who have been, or are,
> prominent in church or state, and even to false statement. But
> the people of this nation have ordained in the light of history,
> that, in spite of the probability of excesses and abuses, these
> liberties are, in the long view, essential to enlightened opinion
> and right conduct on the part of the citizens of a democracy.
> *Cantwell v. State of Connecticut,* 310 U.S. 296, 310, 60 S. Ct.
> 900, 906 (1940).[13]

---

[13] *See also Mahanoy Area Sch. Dist. v. B. L. by & through Levy,* 141 S. Ct. 2038,
2046 (2021)("This free exchange facilitates an informed public opinion, which, when
transmitted to lawmakers, helps produce laws that reflect the People's will.
That protection must include the protection of unpopular ideas, for popular ideas
have less need for protection."); *Matal* v. *Tam,* 137 S.Ct. 1744, 1751 (2017)
("Speech may not be banned on the ground that it expresses ideas that
offend"); *Lane v. Franks*, 573 U.S. 228, 235, 134 S.Ct. 2369 (2014) ("Speech by
citizens on matters of public concern lies at the heart of the First Amendment");
*Schenck v. Pro-Choice Network of Western N. Y.*, 519 U.S. 357, 377, 117 S.Ct. 855
(1997)("Leafletting and commenting on matters of public concern are classic forms
of speech that lie at the heart of the First Amendment"); *Capitol Square Review and
Advisory Bd. v. Pinette*, 515 U.S. 753, 760, 115 S.Ct. 2440 (1995)("[A] free-
speech clause without religion would be Hamlet without the prince"); *McIntyre v.
Ohio Elections Comm'n*, 514 U.S. 334, 347, 115 S.Ct. 1511(1995)("[A]dvocacy of
a politically controversial viewpoint ... is the essence of First Amendment
expression"); *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston,
Inc.,* 515 U.S. 557, 574, 115 S.Ct. 2338 (1995); *Texas v. Johnson,* 491 U.S. 397, 414,
109 S.Ct. 2533 (1989)("If there is a bedrock principle underlying the First
Amendment, it is that the government may not prohibit the expression of an idea
simply because society finds the idea itself offensive or disagreeable."); *Hustler
Magazine, Inc. v. Falwell*, 485 U.S. 46, 50, 108 S.Ct. 876 (1988)("At the heart of the
First Amendment is the recognition of the fundamental importance of the free flow
of ideas and opinions on matters of public interest and concern"); *FCC v. Pacifica
Foundation*, 438 U.S. 726, 745, 98 S.Ct. 3026 (1978) (opinion of Stevens, J.) ("[T]he
fact that society may find speech offensive is not a sufficient reason for suppressing
it"); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 63–64, 96 S.Ct. 2440
(1976)("Nor may speech be curtailed because it invites dispute, creates

In *Snyder v. Phelps*, 562 U.S. 443, 451, 131 S. Ct. 1207, 1215 (2011), the

Supreme Court addressed the idea of whether offensive speech is protected under

the First Amendment.[14]  The circumstances in that case were so extreme that it is

hard to understand how any speech could be any more objectionable. That case

involved members of the Westboro Baptist Church who had protested a military

funeral. Outside of the funeral they held up signs that included the following: "God

Hates the USA/Thank God for 9/11," "America is Doomed," "Don't Pray for the

USA," "Thank God for IEDs," "Fag Troops," "Semper Fi Fags," "God Hates Fags,"

"Maryland Taliban," "Fags Doom Nations," "Not Blessed Just Cursed," "Thank God

for Dead Soldiers," "Pope in Hell," "Priests Rape Boys," "You're Going to Hell," and

---

dissatisfaction with conditions the way they are, or even stirs people to anger");
*Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209, 95 S. Ct. 2268, 2272 (1975)
("But when the government, acting as censor, undertakes selectively to shield the
public from some kinds of speech on the ground that they are more offensive than
others, the First Amendment strictly limits its power."); *Street v. New York*, 394
U.S. 576, 592, 89 S.Ct. 1354 (1969) ("It is firmly settled that under our Constitution
the public expression of ideas may not be prohibited merely because the ideas are
themselves offensive to some of their hearers"); *Ovadal v. City of Madison,
Wisconsin*, 416 F.3d 531, 536-537 (7th Cir. 2005) ("Speech cannot ... be punished or
banned, simply because it might offend" those who hear it."); *Coady v. Steil*, 187
F.3d 727, 731 (7th Cir. 1999) ("political speech . . . clearly fits the definition of "a
matter of public concern."); *Zorzi v. County of Putnam*, 30 F.3d 885, 896 (7th
Cir.1994)("political speech is clearly a matter of public concern.")

[14] In *Snyder* the question did not involve public employee speech. It dealt with
speech of a private citizen. That, however, is irrelevant to the question of whether
speech touches upon a matter of public concern. The Court made it clear that its
analysis was guided by public employee cases. Its opinion specifically relied
upon *City of San Diego v. Roe,* 543 U.S. 77, 83, 125 S.Ct. 521 (2004); *Rankin v.
McPherson,* 483 U.S. 378, 387, 107 S.Ct. 2891 (1987); and *Connick v. Myers,* 461
U.S. 138, 145, 103 S.Ct. 1684 (1983)

"God Hates You." Recognizing that the statements were offensive both by what they said and by the fact that they were used to picket a funeral, the Court nonetheless found that they were matters of public concern and protected speech under the First Amendment. The Court concluded its opinion by explaining:

> Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and—as it did here—inflict great pain. On the facts before us, we cannot react to that pain by punishing the speaker. As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate. That choice requires that we shield Westboro from tort liability for its picketing in this case. *Snyder*, 562 U.S. at 460–61, 131 S. Ct. at 1220.

In *Rankin v. McPherson*, 483 U.S. 378, 384, 107 S. Ct. 2891, 2897 (1987), the Supreme Court addressed offensive speech in the context of public employment. In that case an employee in the constable's office, upon hearing that President Reagan had been shot, remarked that "if they go for him again, I hope they get him." The statement was made in the workplace and she was terminated for her statements. In concluding that statement was on a matter of public concern the Court explained:

> The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern. "[D]ebate on public issues should be uninhibited, robust, and wide-open, and ... may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." 483 U.S. at 387, 107 S.Ct. at 2898.

In *Mahanoy Area Sch. Dist. v. B. L. by & through Levy,* 141 S. Ct. 2038, 2044 (2021), the Supreme Court addressed a student's use of social media while outside of school. The student had posted statements on social media, including vulgarity, that were critical of her cheerleading team, its coaches, and her school. When the

school suspended the student from the cheerleading team she brought a lawsuit claiming that doing so violated her First Amendment rights. The Court explained that like it does in regulating the conduct of public employees, the government has a greater interest in regulating the conduct of public-school students than it does in regulating the conduct of the general citizenry. Despite the fact that the statements were "superfluous," the student was still entitled to the protections of the First Amendment with her postings.

Using these cases as a guide, there can be little question but that Hicks' speech was on a matter of public concern. The comments were his personal views on matters of politics and religion.[15]  While his views might not be universally accepted, that doesn't mean that they are not protected speech.

### 3. The DOC has no legitimate interest in restricting Hicks' speech that outweighs his interest in commenting on political and religious matters.

Even when an employee speaks out on matters that would typically be constitutionally protected there are times when an employer has a legitimate interest in restraining or limiting that speech. Those instances, however, are limited to those when the employer can carry its burden of proving that the interest of the public employee as a citizen in commenting on the matter is outweighed by the interest of the state, as employer, in promoting effective and efficient public

---

[15] This point is not in dispute. During his deposition John Eilers was specifically asked if he agreed that these were Hicks' "personal views on topics of a political or religious nature."  He stated he agreed with that characterization. Doc. 34-1 at 62-63, Eilers dep. at 30-31.

service. *See Pickering*, 391 U.S. at 568, 88 S.Ct. 1731; *Waters v. Churchill*, 511 U.S. 661, 675, 114 S.Ct. 1878 (1994). The greater the interest an employee has in speaking out the more challenging the government's burden becomes in establishing it can lawfully restrict that speech. *Waters*, 511 U.S. at 675, 114 S.Ct. 1878; *Gustafson v. Jones*, 290 F.3d 895, 909 (7th Cir. 2002).

In *Harnishfeger*, 943 F.3d at 1115-1116 (7th Cir. 2019), this Court explained that an employer has the burden of proof on this issue by a preponderance of the evidence and that it is a burden of "persuasion, not merely production, in the nature of an affirmative defense." That decision explained:

> When a public employer moves for summary judgment on the *Pickering* balancing defense, therefore, it must "lay out the elements of the [defense], cite the facts which it believes satisf[y] these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant" on the defense. *Id.*

In performing this analysis it is also clear that not all protected speech is treated equally. The stronger the employee's interest in speaking the more substantial a showing the employer must make. *Gustafson v. Jones*, 290 F.3d 895, 909 (7th Cir. 2002); *Gazarkiewicz v. Town of Kingsford Heights, Indiana,* 359 F.3d 933, 944 (7th Cir. 2004). As outlined at length *supra*, Hicks' speech was political commentary and addressed religious matters. Those issues are entitled to the highest rung of First Amendment protection.

A defendant is not entitled to concoct a viable justification for their decision after the fact. In *Gustafson v. Jones*, 290 F.3d at 909-910, this Court explained that the employer must present evidence of what actually motivated its decisions and not

merely identify a hypothetical concern that an employer could have had at the time. The Court explained that the review was not akin to a "rational basis" review of state legislation. *Id.* Rather, the question is what was the specific rationale utilized by the employer? *Id.* An employer cannot articulate justifications that it might have considered at the time unless there is evidence that they actually did. *Id.*

In balancing a public employee's free speech interest with a government employer's efficiency and management interests, the following factors are considered:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public. *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 795-96 (7th Cir. 2016).

The district court erroneously found that this balancing clearly favored the defendants. App. 22-23. In so doing the court did exactly what *Gustafson* counseled against when it relied upon factors that were never identified by the defendants as concerns when they made their actual decisions.

The district court concluded that the defendants were "concerned about negative public exposure" from the Emily Hoerner article. App. 22. The entirety of the support for this conclusion comes from the report written by the internal affairs investigator. App. 39-40. In the investigatory report it does note the fact that the

story ran, however, it doesn't indicate that this caused any problems for the DOC. None of the defendants in this case mentioned the news article as creating any problems for the DOC.

The district court next found that Hicks' posts "also clearly impact the Department's employee harmony and necessity of some form of loyalty to the Department." App. 23. There is certainly no evidence of this in the record. If anyone had the ability to explain how these statements impacted the harmony of the facility it would have been Neese. She testified that despite the fact that the statements had been posted to Facebook many months before, she hadn't even heard about them. Doc. 34-1 at 127, Neese dep. at 16. Given that the warden hadn't even heard about Hicks' posts the suggestion that they caused disharmony in the workplace is simply not true and not supported by any evidence. Further, Hicks was considered to be a model employee and there is no evidence that anyone at work saw the posts, complained about the posts, was offended by the posts, or that it had any potential to impact his ability to work with his colleagues or with inmates.

The district court concluded that the postings would have discouraged his subordinates "from approaching him and performing their jobs to the best of their ability for fear of discrimination by Plaintiff." App. 23. This statement is devoid of any factual basis and there is nothing to suggest that the defendants were concerned about this factor when they suspended Hicks. Again, Neese didn't even know that these were posted and there is nothing in the record to indicate that one co-worker knew about or had any concerns about these statements. Further, there

is nothing to suggest that co-workers had any fear that Hicks would retaliate or discriminate against them, much less is there any evidence that such a fear would be reasonable.

This purported concern about co-workers being upset by the speech of an employee was recently addressed by the Ninth Circuit in *Dodge v. Evergreen School District #14*, 56 F.4th 767 (9th Cir. 2022). In *Dodge* the plaintiff was a teacher who attended a "cultural sensitivity and racial bias" seminar with many colleagues from his school district. He wore a red MAGA hat that he placed on his desk during the seminar. After the first day of the seminar the instructor leading the seminar told the principal that she "felt intimidated and traumatized" by the hat. Other teachers cried about the hat and felt it was "threatening." Multiple teachers ultimately complained about the hat. The plaintiff was told about these concerns and asked not to bring the hat back for future sessions. The principal told him that "some people take [the MAGA hat] as a symbol of hate and bigotry." The teacher ignored the directive not to wear the hat again and did the same thing the following day.

The Ninth Circuit reversed a grant of summary judgment in favor of the defendants in that case despite the fact that there were actual people who had complained about being outraged and offended by the MAGA hat that the teacher wore to the training. The Court explained that because "some may not like the political message being conveyed is par for the course and cannot itself be a basis for finding disruption of a kind that outweighs the speaker's First Amendment rights." *Id.* at 783. The Court explained that "political speech is the quintessential

example of protected speech, and it is inherently controversial." *Id. Dodge*, of course, is different from this case because in that case there were co-workers who were actually upset and the concerns were not simply theoretical. *Dodge* also differs because there the plaintiff was engaged in speech at a work event whereas Hicks' actions took place entirely outside of work. *See also Goza v. Memphis Light, Gas & Water Div.,* 398 F. Supp. 3d 303, 320 (W.D. Tenn. 2019)(" The idea that the government should be permitted to censor speech in order to avoid public outcry was raised and dismissed in the Civil Rights era.").

Finally the district court here concluded that the speech was not protected because Hicks owed loyalty to the DOC and his statement that he "would like to participate in a government overthrow or civil war" demonstrates his lack of loyalty to the DOC. App. 23. One can scour the record to try and find this as a justification offered by any of the defendants for what the discipline that they imposed and that search will reveal nothing. Quite simply there is nothing to suggest that this was a factor whatsoever. *Supra* at 24-27. Second, Hicks didn't state that he wanted to overthrow the government or launch a civil war. As the DOC's own internal reporting indicates, Hicks felt that if there was going to be a civil war he hoped it would be in his lifetime so that his children and grandchildren wouldn't have to be involved. *Supra* at 15. There is nothing to suggest that any of the defendants believed that Hicks wanted to overthrow the government. The district court's statement that Hicks' remark expresses "a personal wish to participate in a war against other Americans or against the government" is hyperbolic and simply not

an accurate reading of the comment nor is it an accurate reading of how the Individual Defendants took the comment.

The question then becomes what was the rationale that actually motivated the actions of the Individual Defendants at the time. Throughout discovery Hicks attempted to get a full understanding of what was the actual justification for the discipline. The best place to look for this information would be the disciplinary documentation that outlined the basis at the time. At the pre-disciplinary hearing the DOC merely indicated that Hicks had posted his own personal views of "a political or religious nature" and that those statements "reflected negatively on the Department as well as the Department's overall mission. " *Supra* at 21-22.  This is a generalized statement without any real evidentiary support. To more fully flush out the justification Hicks requested additional information on this point in discovery.

In his interrogatory answers the Director indicated that Hicks' statements were derogatory and reflected "an inability for him to carry out the duties required equally and regardless of religious affiliation of others." *Supra* at 23-24. By the time of his deposition, Director Jeffreys had made it clear that the simple act of posting something that someone, somewhere found offensive was violative of the rules and subjected an employee to discipline. *Supra* at 26.

The suggestion that Hicks's posting rendered him incapable of performing his job duties has no basis in fact nor is it remotely logical. For starters, throughout his lengthy career at the DOC no inmate ever complained about Hicks. *Supra* at 27.

Further, Hicks' evaluations from this time demonstrate that this statement is simply not true. *Supra* at 27-28. Prior to this incident Hicks had never once been disciplined for anything in his lengthy career. *Supra* at 27.

Analyzing the seven factors it is clear that they heavily weigh in favor of Hicks. The first factor of this analysis weighs strongly in Hicks' favor. Outside of pure speculation by the district court, there is no evidence that would suggest that Hicks's comments created issues in maintaining discipline or harmony amongst employees or that they were likely to do that. These are the exact type of speculative generalizations that the *Liverman* court concluded could not be countenanced. 844 F.3d at 408-409.

The second factor addresses the nature of the employment relationship. This factor is of limited utility here because Hicks' statements have nothing to do with the DOC or the functioning of prisons.

The third factor asks whether Hicks's abilities to perform his job were impeded. There is nothing in the record to suggest that they were.

The fourth factor looks at the time and place where the speech was made. This factor unmistakably favors Hicks. Hicks made the comments on his own time and on his own personal Facebook account.

The fifth factor assesses the context in which the dispute arose. The context was a posting on a Facebook page and had nothing to do with an employment dispute. As noted above, Facebook is a forum for people to express their views as to a number of different issues.

The sixth factor asks whether the speech addressed a matter on which debate was important. These statements were clearly being debated in the public at the time. The comments are comparable to statements that were made by President Trump during his presidency. It is hard to conceive of how comments that parroted the statements of the president weren't of import.

The seventh and final factor asks whether Hicks would be considered a member of the general public for the speech. Unmistakably he would be. He was not speaking about anything related to his job and posted on Facebook. The Supreme Court explained its holding in *Pickering* as follows:

> What we do have before us is a case in which a teacher has made erroneous public statements upon issues then currently the subject of public attention, which are critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally. In these circumstances we conclude that the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public. *Pickering*, 391 U.S. at 572–73, 88 S. Ct. at 1737.

The same is true here. There is nothing that could plausibly suggest that Hicks' memes could have impacted his ability to perform his job duties.

The statements of Eilers and Jeffreys make it clear that the DOC believes that it can censor any outside of work political comments made by its employees because those comments might potentially offend the sensibilities of others. Using this logic they can effectively strip the right of any employee to comment on any political

matter regardless of where those comments are made. Such a view offends the basic guarantees of the First Amendment.

The reality in this case is that the Defendants simply don't like the political views that Hicks expressed. Hicks' views are certainly aligned with a more conservative brand of politics and that doesn't fit the DOC's current political narrative. Any suggestion made by the DOC that Hicks' comments were harmful to its image is belied by the official posts it has made. For example the DOC has posted to its public Twitter account about the Black Lives Matter movement:



Illinois Department of Correc... ···
@IDOC_Illinois

Men and women in IDOC custody are proud their voices will be heard at the Black Lives March on Washington! They created posters that will be used at the protests next week. Thank you @RepChrisWelch for partnering with us on this project!



10:30 AM · 8/20/20 · Twitter for iPhone

This particular tweet includes images of Colin Kaepernick, a polarizing former athlete. This post was made to its official Twitter account on August 20, 2020. One

month prior to that Black Lives Matter had posted a statement demanding that the police be defunded and stated: "We know that police don't keep us safe — and as long as we continue to pump money into our corrupt criminal justice system at the expense of housing, health, and education investments — we will never be truly safe."[16] Given that the DOC is an integral part of the justice system in this country, endorsing an organization that defines the system as "corrupt" would certainly suggest that the DOC is engaging in hypocrisy when it suggests that Hicks' statements are harmful to its mission. If the DOC can make a politically divisive post that endorses a controversial position it is hard to understand how it could have any credibility in arguing that it was inappropriate for Hicks to make political statements when he was not speaking for the DOC. It bears repeating that a public employer may not "use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *Rankin*, 483 U.S. at 384, 107 S.Ct. 2891.

## C. As applied to Hicks, the rules used to discipline Hicks were too vague and could not be enforced without offending his rights under the Fourteenth Amendment.

"A law or policy is void for vagueness if it 'either forbids or requires the doing of an act in terms so vague that people of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Ovadal v. City of Madison*, 416 F.3d 531, 535–36 (7th Cir. 2005). In other words, the government must "articulate its

---

[16] https://blacklivesmatter.com/what-defunding-the-police-really-means/ (Last Visited May 5, 2022).

aims with a reasonable degree of clarity," *Roberts v. United States Jaycees*, 468 U.S. 609, 629, 104 S.Ct. 3244 (1984), and ensure any prohibitions are "clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294 (1972). This doctrine exists because "[a] fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 132 S.Ct. 2307, 2317 (2012). The vagueness doctrine derives from the Due Process Clause. *United States v. Williams,* 553 U.S. 285, 304, 128 S.Ct. 1830 (2008); *see also Brown v. Bd. of Educ. of City of Chicago,* 84 F. Supp. 3d 784, 791 (N.D. Ill. 2015).

In *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S. Ct. 2294, 2298–99, (1972), the Supreme Court explained:

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute 'abut(s) upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of (those) freedoms.' Uncertain meanings inevitably lead citizens to "steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked.'

The Supreme Court has also explained that "[I]in the First Amendment area 'government may regulate...only with narrow specificity.'...The general test of vagueness applies with particular force in review of laws dealing with speech." *Hynes v. Mayor & Council of Oradell*, 425 U.S. 610, 620, 96 S.Ct. 1755 (1976). In an as-applied challenge, if the context of the case leads one to guess at whether the rule applies to the conduct, then the rule is void for vagueness. *Gentile v. State Bar of Nev.,* 501 U.S. 1030, 1048–49, 111 S.Ct. 2720 (1991).

In *Coates v. City of Cincinnati*, 402 U.S. 611, 615, 91 S. Ct. 1686, 1689 (1971), the Supreme Court addressed a municipal ordinance that made it a violation for three or more people to congregate on the sidewalk "in a manner annoying to persons passing by." The Court had no problem finding that the ordinance was unconstitutionally vague on its face:

> Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. 402 U.S. at 614, 91 S. Ct. at 1688.

This is, in effect, what the Defendants have done here. Director Jeffreys has made it clear that he can't demonstrate what conduct would violate the policy. *Supra* at 24-27. He testified that the only way to know would be for an investigation to be conducted. *Supra* at 25-26. This is precisely the problem with how the rule was applied to Hicks in this case. It provided him with no fair warning that his conduct might have violated policy.

In *Bence v. Breier*, 501 F.2d 1185, 1186 (7th Cir. 1974), this Court addressed a

rule of the Milwaukee police department that prohibited employees from engaging

in "conduct unbecoming a member." The Court, finding that the police department

was a homogenous group of individuals, concluded that as it was applied in that

case, the rule was unconstitutionally vague. The Court explained:

> On its face, the rule proscribes only conduct which is both
> 'unbecoming' and 'detrimental to the service.' It is obvious,
> however, that any apparent limitation on the prohibited conduct
> through the use of these qualifying terms is illusory, for
> 'unbecoming' and 'detrimental to the service' have no inherent,
> objective content from which ascertainable standards defining
> the proscribed conduct could be fashioned. Like beauty, their
> content exists only in the eye of the beholder. The subjectivity
> implicit in the language of the rule permits police officials to
> enforce the rule with unfettered discretion, and it is precisely
> this potential for arbitrary enforcement which is abhorrent to
> the Due Process Clause. Further, where, as here, a rule contains
> no ascertainable standards for enforcement, administrative and
> judicial review can be only a meaningless gesture. There is
> simply no benchmark against which the validity of the
> application of the rule in any particular disciplinary action can
> be tested. The language of the rule additionally offers no
> guidance to those conscientious members of the Department who
> seek to avoid the rule's proscription. Assuming that the
> Department (A) formulated the rule to apply to specific acts
> which it might constitutionally regulate, while (B) choosing not
> to regulate or to regulate in the remaining thirty prohibitions
> other acts which it might also constitutionally regulate, given
> the language of the rule, whether any particular act could be
> classified as (A) or (B) would be purely a matter of guesswork for
> policemen seeking to abide by the Department's rules. Thus, the
> rule at issue conforms with the classic definition of vagueness.
> *Id.* at 1190.

Hicks, of course, was disciplined under a nearly identical rule that generally

prohibits unbecoming conduct. There is no conceivable way that Hicks could have

known that posting his political and religious views on Facebook where he doesn't

reference his position with the DOC nor does he mention the DOC, any employees,

or any inmates could cause him to be disciplined. The director's deposition made it clear that the standard to be used is impossible to understand. Jeffreys repeatedly testified that he could not say if specific examples would constitute a violation of policy. *Supra* at 25-27. If the director – the ultimate enforcer of the policies – doesn't know how could anyone else be expected to know? The standard seems to be that if you post something about politics or religion that subjectively offends anyone in the State of Illinois you are subject to discipline.

The ability to utilize the policy to discipline a person simply because there Facebook post might offend someone in the State of Illinois is impossible. Anytime someone posts about politics it is likely to offend someone. The policy that Hicks was disciplined under give the DOC far too much discretion to simply determine what postings they don't like and punish those.

The district court ignored the *Bence* decision and focused its analysis almost exclusively upon this Court's holding in *Greer v. Amesqua*, 212 F.3d 358, 369 (7th Cir. 2000). App. 26-28. The suggestion implicit in the district court's holding seems to be that a general policy prohibiting an employee from engaging in in unbecoming conduct is always sufficient. That, however, isn't what this Court held in *Greer*. In *Greer* the plaintiff, a firefighter, had a long history of discipline when he sent out a self-styled "news release" that was very critical of the police chief and accused her of engaging in misconduct because of her homosexual lifestyle. The news release clearly criticized the department and its chief. This Court explained that while the policies used to discipline the plaintiff were somewhat generalized, under the facts

of the case they were quite clear to the plaintiff that his behavior was not

acceptable. The Court explained that the rules made it clear to the Plaintiff that his

news release could lead to discipline. *Id.*

**D. The Individual Defendants violated rights that were well known and are not entitled to qualified immunity.**

Like all defendants in § 1983 litigation, the Individual Defendants contend that

they are entitled to qualified immunity. The district court erred in finding they were

so entitled. Whether qualified immunity applies turns on two questions: first,

whether the facts presented, taken in the light most favorable to the plaintiff,

describe a violation of a constitutional right; and second, whether the federal right

at issue was clearly established at the time of the alleged violation. *Smith v.*

*Finkley*, 10 F.4th 725, 737 (7th Cir. 2021).

Hicks' First Amendment claim is that he shared his own personal political views.

He never claimed to be speaking on behalf of the DOC and his statements could not

be personally linked to his employment with the DOC.  Indeed, the statements had

nothing to do with his employment. As the lengthy list of cases Hicks has cited

*supra* demonstrate, speech on political matters is entitled to the highest rung of

protection under the First Amendment. This is not a novel idea. In *Coady v. Steil*,

187 F.3d 727, 733 (7th Cir. 1999), this Court made it clear that political speech

made by a governmental employee when off duty was protected under the First

Amendment. In that case a City of Springfield firefighter had a political sign

endorsing a mayoral candidate on the top of his vehicle that was parked next to the

fire department during the Saint Patrick's Day parade. The Court, relying upon the

fact that it was political speech that was made off duty, easily concluded that the speech was protected under the First Amendment.

The fact that Hicks' speech was made on social media doesn't change the analysis. In *Liverman v. City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016), the Fourth Circuit explained that while free speech issues involving social media "may appear to present novel issues" ultimately the "attributes of social media fit comfortably within the existing balancing inquiry."

In *Dodge v. Evergreen School District #114*, 56 F.4th 767, 784 (9th Cir. 2022), the Court went into great detail analyzing the issue of whether qualified immunity would shield a defendant for suppressing political speech at a school event. The Court explained that precedent from the Supreme Court made it clear that "restrictions on disfavored on unpopular speech in the name of preventing disruption, when the only disruption was the effect of the controversial speech has on those who disagree with it because they disagree with it" was unlawful. *Id.* at 786.

Further, this is not a case where the Department was concerned about the First Amendment rights of its employees and engaged in a careful analysis. Both Jeffreys and Eilers made it clear that they were not the least bit concerned about Hicks' First Amendment rights. *Supra* at 27.

Hicks' Due Process claim is the same. This Court's ruling in *Bence v. Breier*, 501 F.2d 1185, 1186 (7th Cir. 1974), long ago made it clear that an employee has to be given a fair idea of whether his conduct is going to subject him to discipline. That

case made it clear that vague employment policies can't be applied against employees if they are required to guess at whether there conduct would violate the rule. Director Jeffreys' testimony demonstrates that it is impossible for a Department employee to know whether there statements would violate the rules. *Supra* at 25-27.

Hicks also has requested equitable relief in this case. As to both of his claims he has sought to have his records entirely purged of his disciplinary records. Doc. 21, First Amended Complaint at 9-10. The doctrine of qualified immunity, of course, does not apply to claims for equitable relief. *Denius v. Dunlap*, 209 F.3d 944, 959 (7th Cir. 2000).

## CONCLUSION

For the foregoing reasons, Hicks requests that this Court reverse the district court's grant of summary judgment and remand with directions that the district court enter summary judgment as to both of Hicks' claims and set the matter for trial as to the issue of damages.

*Gary Hicks*
Dated:     FEBRUARY 22, 2023

By: /s/ John A. Baker
   His Attorney

John A. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone:     (217) 522-3445
Facsimile:     (217) 522-8234
Email:     jab@bbklegal.com

## CIRCUIT RULE 31(E) CERTIFICATION

The undersigned hereby certifies that I have filed electronically pursuant to Circuit Rule 31(e), all of the appendix items that are available in non-scanned PDF format.

*Gary Hicks*
Dated:     FEBRUARY 22, 2023


By: /s/ John A. Baker
    His Attorney

John A. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone:         (217) 522-3445
Facsimile:         (217) 522-8234
Email:             jab@bbklegal.com

## CIRCUIT RULE 30(D) STATEMENT

Pursuant to Circuit Rule 30(d), the undersigned certifies that all materials required by Circuit Rule 30(a) and (b) are included in the appendix.

*Gary Hicks*
Dated:    FEBRUARY 22, 2023


By: /s/ John A. Baker
    His Attorney

John A. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone:        (217) 522-3445
Facsimile:        (217) 522-8234
Email:            jab@bbklegal.com

## COMPLIANCE WITH TYPE LIMITATIONS

Circuit Rule 32(c) provides that a principal brief is acceptable if it contains no more than 14,000 words. With the exception of those items excluded from the word count under Fed.R.App.P. 32(f), this brief is 13,989 words.

*Gary Hicks*
Dated:    FEBRUARY 22, 2023

By: /s/ John A. Baker
    His Attorney

John A. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone:        (217) 522-3445
Facsimile:        (217) 522-8234
Email:            jab@bbklegal.com

## CERTIFICATE OF SERVICE

Gary Hicks certifies that on February 22, 2023, he initially submitted an electronic copy of his initial brief and required short appendix and that they were delivered to all counsel of record via this Court's ECF system. No copies have been served via any alternative means of service.

*Gary Hicks*
Dated:    FEBRUARY 22, 2023


By: /s/ John A. Baker
      His Attorney

John A. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone:        (217) 522-3445
Facsimile:        (217) 522-8234
Email:              jab@bbklegal.com

## TABLE OF CONTENTS TO SHORT APPENDIX

Judgment entered January 13, 2023                                             1

Notice of Appeal dated January 12, 2023                                       2

Opinion and Order dated December 13, 2022                                     4

Facebook postings                                                            30

    May 22 "Civil War" post                             30

    July 24 Rep. Tlaib post                             31

    May Rep Omar post                                   32

    Undated Facebook photo of Hicks                     33

    Facebook homepage of Hicks                          34

    Religious post                                      35

    Devil post                                          36

September 11, 2019, Investigatory Memo                                       37

Final Report of Internal Investigation                                       39

October 2, 2019, notification of completed investigation                    41

October 3, 2019, ERB referral                                               42

Notice of ERB hearing                                                       43

Report of ERB Hearing dated October 15, 2019                                44

DOC Administrative Directive 03.02.108                                      46

Robinson Institutional Directive 03.02.108                                  54

20 Ill.Admin.Code 120                                                       69

DOC Administrative Directive 03.02.113                                      74

E-FILED
Friday, 13 January, 2023  05:17:44 PM
Clerk, U.S. District Court, ILCD

FILED
JAN 1 3 2023
CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

# UNITED STATES DISTRICT COURT

for the

Central District of Illinois

| | |
|---|---|
| Gary Hicks, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Case Number: 20-3099 |
| Illinois Department of Corrections, | ) |
| Michelle Neese, Josh Yargus, Rob | ) |
| Jeffreys, John Eilers, and Nikki | ) |
| Robinson, | ) |
| | ) |
| Defendants. | ) |

## JUDGMENT IN A CIVIL CASE

☐ **JURY VERDICT**.    This action came before the Court for a trial by jury.    The issues have been tried and the jury has rendered its verdict.

☒ **DECISION BY THE COURT**.    This action came before the Court, and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** in favor of Defendants in all Counts.

**Dated: January 13, 2023**

s/ Shig Yasunaga
Shig Yasunaga
Clerk, U.S. District Court

Approved:    s/ Sue E. Myerscough
Sue E. Myerscough
U.S. District Judge

**APPENDIX 001**

E-FILED
Thursday, 12 January, 2023  03:06:16 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

GARY HICKS,                          )
                                     )
            Plaintiff,               )
                                     )
     v.                              )     Case No.      20-3099-SEM-TSH
                                     )
ILLINOIS DEPARTMENT OF               )
CORRECTIONS, ET AL.,                 )
                                     )
            Defendants.              )

# Notice of Appeal

The Plaintiff, Gary Hicks, hereby appeals to the United States Court of

Appeals for the Seventh Judicial Circuit from an order that was entered by the

District Court on December 13, 2022 (Dkt. 47). The order indicates that a judgment

is to be entered, however, no such judgment has yet been filed. See Fed.R.App.

4(a)(2). Hicks seeks reversal of the judgment and also seeks an order directing that

judgment be entered in his favor.


                                    Gary Hicks

                                    By: /s/ John A. Baker
                                           His Attorney

John A. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone:        (217) 522-3445
Facsimile:        (217) 522-8234
Email:            jab@bbklegal.com

**APPENDIX 002**

## Certificate of Service

This document was filed utilizing the Court's ECF system.  A copy will automatically be sent to all counsel of record.  No copies have been served utilizing any other method of service.

Gary Hicks

By: /s/ John A. Baker
His Attorney

John A. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone:          (217) 522-3445
Facsimile:          (217) 522-8234
Email:              jab@bbklegal.com

2

**Appendix 003**

Case: 23-1091    Document: 8    Filed: 02/22/2023    Pages: 144

E-FILED
Tuesday, 13 December, 2022 02:56:24 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **GARY HICKS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 20-3099** |
| | ) | |
| **ILLINOIS DEPARTMENT OF** | ) | |
| **CORRECTIONS, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

**SUE E. MYERSCOUGH, U.S. DISTRICT JUDGE:**

Before the Court is a Motion for Partial Summary Judgment
submitted by Plaintiff Gary Hicks (d/e 33) and a Motion for
Summary Judgment in full submitted by Defendants John Eilers,
Rob Jeffreys, Michelle Neese, Josh Yargus.  (d/e 35).  Plaintiff Hicks
has also filed a Motion to Strike Exhibit 20 to Defendants' Motion.
(d/e 37).  Defendants did not violate the First Amendment when
they suspended Plaintiff after finding he violated the Illinois
Department of Corrections' ("the Department") Code of Conduct
because Plaintiff did not speak on matters of public concern,
because Plaintiff identified himself as an employee of the

**APPENDIX 004**

Department when speaking, and because Plaintiff's interest in speaking did not outweigh the Department's interest in performing its functions. Defendant's actions also did not violate the Fourteenth Amendment because the Code of Conduct was not impermissibly vague. Further, Defendants are entitled to the affirmative defense of qualified immunity as to the damages requested in both of Plaintiff's Counts because Defendants' actions did not violate clearly established law. Therefore, Plaintiff's Motion for Partial Summary Judgment (d/e 33) is denied, and Defendants' Motion for Summary Judgment (d/e 35) is granted. Plaintiff's Motion to Strike (d/e 37) is denied as moot because the Court does not consider the material in Exhibit 20 in reaching this decision.

## I.   FACTS

The Court draws the following facts from the parties' statements of material facts, taking into account each party's objections thereto. Any fact unobjected to is deemed admitted. The Court discusses material factual disputes, if any, in its analysis.

Plaintiff Gary Hicks was an employee of the Illinois Department of Corrections at the Robinson Correctional Center beginning in 2001 as a Correctional Officer Trainee until his

retirement as a Correctional Sergeant in 2021.  Pl.'s Mem. (d/e 34) pp. 1, 6; Defs.' Mot. (d/e 35) pp. 1, 3, 9.  Defendant Rob Jeffreys has been the Director of the Department since June 1, 2021; Defendant John Eilers has been the Chief of Operations for the Department since March 30, 2019; Defendant Michelle Neese was Acting Warden at the Robinson Correctional Center, a Department facility, during the events in this case; and Defendant Josh Yargus has been a Correctional Lieutenant at the Robinson Correctional Center since July 2018, and was assigned to internal affairs there from then until January 2020.  Pl.'s Mem. pp. 6–8.  Named Defendant Nikki Robinson was Deputy Director of the Department, but she has since retired and has not been served with the Amended Complaint.  See Pl.'s Mem. p. 5, n. 1.

As an employee of the Department, Plaintiff was subject to various employment and employee behavior policies.  One such policy was Administrative Directive 03.02.108 ("AD 03.02.108"), effective October 1, 2013, which stated that Department employees were required "to conduct themselves in a professional manner and, whether on duty or off duty, not engage in conduct that is unbecoming of a State employee or that may reflect unfavorably on

or impair operations of the Department."  Defs.' Ex. 7 p. 1.

Robinson Correctional Center had a corresponding Institutional

Directive 03.02.108 ("ID 03.02.108") which included identical

language to AD 03.02.108 as well as a nondiscrimination

subsection.  Defs.' Ex. 8 pp. 1, 15.  That subsection prohibited

Robinson Correctional Center employees from discriminating

against other employees or offenders housed at Robinson on the

basis of "race, color, sex, religion, age, arrest record, national

ancestry, or origin, physical or mental disability, marital status,

sexual orientation, citizenship status, or unfavorable discharge

from the military services."  Id. p. 15.  Employees who violated

either AD 03.02.108 or ID 03.02.108 were subject to discipline.

Defs.' Ex. 7 p. 1; Ex. 8 p. 1.  Lastly, Departmental Rule 120 stated

that all Department employees "shall conduct themselves in a

manner that will not reflect unfavorably on the Department and

shall not engage in conduct that is unbecoming of an employee or

that may reflect unfavorably on or impair the operations of the

Department."[1]  Defs.' Ex. 9.  The Department did not have a social

---

[1] Administrative Directive 03.02.108, Institutional Directive 03.02.108, and Departmental Rule 120 are collectively referred to as the Department's "Code of Conduct" throughout.

**Appendix 007**

media policy during the events that gave rise to this suit.  Defs.'

Mot. p. 6.

Plaintiff, like many people, also maintained a personal online

social media presence via a Facebook profile.  Pl.'s Mem. p. 8; Defs.'

Mot. p. 4.  Plaintiff's profile was publicly accessible and

unrestricted, that is, anyone could view Plaintiff's profile and see all

content he either posted or shared.  Defs.' Mot. p. 4.  Plaintiff listed

as his occupation "Corrections Sergeant at Illinois Department of

Corrections" on his profile and his profile included a photo of him in

Department uniform.  Defs.' Ex. 1 pp. 4 & 5.

In the spring and summer of 2019, Plaintiff either shared

posts authored or created by others or authored posts himself

which he then published to his Facebook page.  Two shared posts

included images of U.S. Congresswomen: one with an image of U.S.

Representative Ilhan Omar with superimposed text reading,

> Musslamic [sic] Democrat, Ilhan Omar, has
> threatened Members of Congress. She's told
> several Republicans that she'll send them
> 'shawarma,' to give them a taste of her culture.
> Share to say arrest her now!

Pl.'s ex. 1 p. 3.  Another displayed an image of U.S. Representative

Rashida Tlaib edited to depict her wearing a sombrero with the

word "Mexico" on the brim and text superimposed across the image

reading,

> Mexican word of the day: Tlaib. If you don't
> like the USA you are welcome Tlaib.

Id. p. 2.

Two other shared posts included only text.  One read,

> The devil is a liar. Abortion is murder
> homosexuality is sin and Allah is not God!

Id. p. 7.  The other read,

> Things We Don't See Jews Doing. 1. Flying
> Planes Into Buildings. 2. Supporting
> Terrorism. 3. Forcing Young Girls To Marry
> Old Men. 4. Mutilating Females [sic] Genitalia.
> 5. Beheading People. 6. Trying To Dominate
> The World. 7. Stonings. 8. Canings. 9.
> Lashings. 10. Trying To Destroy America.

Id. p. 6.  Plaintiff also authored one post in which he stated,

> Dear Lord, if there must be a civil war or a
> government overthrow, please let it happen
> before I am dead or too old to fight in it.
> Amen.

Id. p. 1.  Plaintiff asserts, and Defendants do not dispute, that the

posts were not made while Plaintiff was at work and that none of

them mentioned the Department or his employment.  Pl.'s Mem. p.
10; Defs.' Resp. (d/e 41) p. 4.[2]

At some point in early September 2019, a reporter contacted
Lindsey Hess, the Department's public information officer, to
discuss several Facebook posts made by various Department
employees, including Plaintiff's.  Defs.' Ex. 11, 11:11–14; Pl.'s Ex. 2,
p. 3.  That prompted Josh Creek, an investigator with the
Department, to interview Plaintiff about his Facebook posts on
September 3, 2019.  Defs.' Ex. 12, p. 3.  Plaintiff admitted the posts
were his own and that, in his view, the posts only reflected his own
beliefs.  Pl.'s Mem. p. 12.  Plaintiff also stated that his views never
impacted his work with the Department.  Id.

The next day, an article about Facebook posts of various
Department employees was published in the Chicago Sun Times.
Defs.' Ex. 3.  The article included Plaintiff's post about participating
in any future civil war or government overthrow and called his other
posts "homophobic" and "Islamophobic."  Id.   The article also noted

---

[2] While Defendants repeatedly state in the Undisputed Immaterial Facts section of their
Response (d/e 41) that the Facebook posts "were made during the course of [Plaintiff's]
employment," pages 9–14, Defendants neither offer clarity on what they mean by "course of
employment" nor offer citation to evidence to support that statement.

that all the individuals referenced, including Plaintiff, identified themselves as Department employees in their Facebook profiles. Id.; Defs.' Mot. p. 4.

Investigator Creek included references to the article in his final Investigation Report. Defs.' Ex. 12. He then concluded that the Facebook posts, while reflecting Plaintiff's personal views, violated the Department's Code of Conduct as reflected in AD 03.02.108, ID 03.02.108, and Departmental Rule 120 because Plaintiff's posts "reflect[ed] negatively on the [D]epartment as well as the [D]epartment's overall mission." Id. Mark Delia, the Department's Chief of Investigation and Intelligence, then sent Michelle Neese, Acting Warden of Robinson Correctional Center, a Memorandum on September 11, 2019 restating Creek's conclusion. Id. pp. 1–2. On October 2, 2019, Neese sent Plaintiff a Memorandum notifying him of the completion of the investigation and stating that there would be further disposition of the investigation. Defs.' Ex. 13. On October 3, Josh Yargus, Correctional Lieutenant in Internal Affairs, sent Neese a Memorandum requesting Plaintiff's matter be referred to the Employee Review Board. Defs.' Ex. 14. Neese concurred with that request and Plaintiff was notified that an Employee

**Appendix 011**

Review Hearing was scheduled for October 15, 2019.  Defs.' Exs. 14–16.

At the October 15 hearing, the charges of violating Code of Conduct were read again, and the hearing officer heard statements from Plaintiff, his Union Representative, and the Management Representative.  Defs.' Ex. 16.  The hearing officer then concluded that Plaintiff violated the Code of Conduct and recommended Plaintiff be suspended for ten days.  Id.  Director Jeffreys eventually approved the ten-day suspension, effective November 4, 2019 through November 14, 2019, a decision also approved by Chief of Operations Eilers.  Defs.' Ex. 19; Defs.' Mot. p. 7.  This was Plaintiff's first and only discipline in his 18 years of employment with the Department.  Pl.'s Mem. p. 16.  Since then, Plaintiff retired from the Department and does not intend to return to employment.  Pl.'s Mem. p. 6; Defs.' Mot. p. 9.

Plaintiff filed suit against Defendants on April 7, 2020.  See Compl. (d/e 1).  He filed an Amended Complaint on October 25, 2021, in which he alleged that Defendants' actions in suspending his employment and the subsequent records of such suspension amount to violations of his First and Fourteenth Amendment rights

to free speech and due process.  Id.  Plaintiff now moves for partial summary judgment while Defendants move for summary judgment in full.

## II.   LEGAL STANDARD

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The movant bears the initial responsibility of informing the Court of the basis for the motion and identifying the evidence the movant believes demonstrates the absence of any genuine dispute of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[S]ummary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events."  Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003).

On that evidence, the Court must determine whether a genuine dispute of material facts exists.  A genuine dispute of material fact exists if a reasonable trier of fact could find in favor of the nonmoving party.  Carroll v. Lynch, 698 F.3d 561, 564 (7th Cir. 2012).  When ruling on a motion for summary judgment, the Court

must construe facts in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor.  <u>Woodruff v. Mason</u>, 542 F.3d 545, 550 (7th Cir. 2008).

The above-stated standards for summary judgment remain unchanged when considering cross-motions for summary judgment: the Court must "construe all inferences in favor of the party against whom the motion under consideration is made." <u>Oneida Nation v. Vill. of Hobart, Wis.</u>, 371 F. Supp. 3d 500, 508 (E.D. Wis. 2019) (quoting <u>Metro. Life Ins. Co. v. Johnson</u>, 297 F.3d 558, 561–62 (7th Cir. 2002)).

## III.   ANALYSIS

Plaintiff alleges that the Defendants' actions suspending Plaintiff for ten days amount to a violation of his rights under the First Amendment in that Defendants retaliated against Plaintiff because of his personal, political, and religious beliefs.  Plaintiff also argues that the Code of Conduct is unconstitutionally vague as applied to his Facebook posts in violation of the Fourteenth Amendment.

**Appendix 014**

a. **Defendants did not violate the First Amendment because Plaintiff's speech was not protected speech under the First Amendment and because Plaintiff's interest in speaking was outweighed by Defendants' interest in maintaining effective public service.**

"To make out a prima facie claim for a violation of First Amendment rights, public employees must present evidence that (1) their speech was constitutionally protected; (2) they suffered a deprivation likely to deter free speech; and (3) their speech was at least a motivating factor in the employer's actions." Bless v. Cook Cty. Sheriff's Office, 9 F.4th 565, 571 (7th Cir. 2021) (quoting Yahnke v. Kane Cty., 823 F.3d 1066, 1070 (7th Cir. 2016)); Harnishfeger v. United States, 943 F.3d 1105, 1112–13 (7th Cir. 2019). The parties do not dispute that Plaintiff can satisfy the second and third elements—he was indisputably suspended because of the Facebook posts. Instead, the parties focus only on whether Plaintiff's speech as portrayed in the Facebook posts was constitutionally protected.

"Whether a public employee's speech is constitutionally protected is a question of law." Harnishfeger, 943 F.3d at 1113. The answer to this question is controlled by a number of steps culminating in the balancing test set out in Pickering v. Board of

Education, 391 U.S. 563 (1968).  The first step, though, requires the plaintiff to satisfy one or both of two threshold inquiries. Harnishfeger, 943 F.3d at 1113.  Plaintiff asserts his case passes both threshold inquiries.

The first inquiry requires a plaintiff to show that he spoke as a citizen rather than an employee, Garcetti v. Ceballos, 547 U.S. 410, 418 (2006), and that he spoke on a matter of public concern and not a matter of personal interest, Connick v. Myers, 461 U.S. 138, 147 (1983).  The second inquiry requires a plaintiff to show that his speech was neither at work nor about work and that the employee did not take deliberate steps linking himself and his speech to his employer.  United States v. National Treasury Employees Union, 513 U.S. 454, 466 (1995) ("NTEU"); City of San Diego v. Roe, 543 U.S. 77, 81 (2004).

As to the first inquiry, the parties' dispute centers on whether Plaintiff's speech in the Facebook posts was about matters of public concern.  "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of

Appendix 016

value and concern to the public." <u>Snyder v. Phelps</u>, 562 U.S. 443, 453 (2011) (citations and internal quotation marks omitted).  In deciding whether speech is of public concern, courts look to the "content, form, and context of that speech as revealed by the whole record." <u>Id.</u> (citations and internal quotation marks omitted).  No one factor is dispositive, and all circumstances of the speech must be considered, "including what was said, where it was said, and how it was said." <u>Id.</u>  The content of the speech, however, "remains the most important factor in determining whether speech addresses a matter of public concern." <u>Kristofek v. Vill. of Orland Hills</u>, 712 F.3d 979, 984 (7th Cir. 2013).  "[S]peech that addresses 'a private or personal interest'" is not speech of public concern.  <u>Valetino v. Vill. of S. Chicago Heights</u>, 575 F.3d 664, 671 (7th Cir. 2009) (quoting <u>Spiegla v. Hull</u>, 371 F.3d 928, 935 (7th Cir. 2004)).

Plaintiff's speech here was not on matters of public concern. None of the Facebooks posts shared by Plaintiff addressed "a subject of general interest and value and concern to the public." <u>Snyder</u>, 562 U.S. at 453.  The posts about the Congresswomen were not directed towards any stance, initiative, or policy position held, nor were they directed toward their respective campaigns.  Instead,

Appendix 017

the post about Congresswoman Omar falsely accused her of
threatening other members of congress and encouraged her arrest.
Pl.'s Mem. p. 30.  The post about Congresswoman Tlaib altered her
image and incorrectly branded her name as a "Mexican word of the
day" and suggested anyone who did not "like the USA" to "Tlaib,"
evidently rhyming the Congresswoman's last name with "to leave."
Id. at 34.  This post, Plaintiff admits, related to former President
Trump's 2019 suggestion that Congresswoman Tlaib and others "go
back and help fix the totally broke and crime infested places from
which they came."  Id.[3]  Such speech does nothing to advance the
debate of any serious issue among the public and only reflects
Plaintiff's "private or personal interest" in the Congresswomen.
Spiegla, 371 F.3d at 935.  The content, form, and context of the two
Facebook posts about Representatives Omar and Tlaib, when
viewed in light of the whole record, clearly show that the posts were
not designed to advance any kind of public discussion but only to
express Plaintiff's personal views.

---

[3] Plaintiff's Memorandum quotes the article by Bianca Quilantan and David Cohen titled *Trump tells Dem congresswomen: Go back where you came from* as published in Politico on July 14, 2019, at 9:15 AM and available at https://www.politico.com/story/2019/07/14/trump-congress-go-back-where-they-came-from-1415692.

Plaintiff also wrote "if there must be a civil war or government overthrow," he wished it would "happen before [he was] dead or too old to fight in it."  Pl.'s Ex. 1, p. 1.  Like the posts expressing personal interest in Representatives Omar and Tlaib, that is not a statement advancing a subject of legitimate news interest.  Rather, it is an incendiary remark expressing a personal wish to participate in a war against other Americans or against the government.  The post does nothing to raise awareness of any general societal concern in Plaintiff's community, nor is it a discussion of the merits of any an issue.  Indeed, as Plaintiff admits, both his shared and authored posts were about "his personal political and religious views."  Pl.'s Mem. (d/e 34) p. 12; see also id. pp. 25, 28, 34.  Such speech is outside the definition of speech involving a matter of public concern.  As such, Plaintiff's claim does not pass the first threshold inquiry under Connick and Garcetti.

Plaintiff's claim also does not pass the second, alternative inquiry under United States v. National Treasury Employees Union, 513 U.S. 454, 466 (1995) ("NTEU").  Under the NTEU inquiry, a plaintiff must show that the speech was (1) made outside the workplace, (2) involved content largely unrelated to his government

Appendix 019

employment, and (3) is addressed to a public audience or involves

any matter for which there is a potential public audience.

Harnishfeger, 943 F.3d at 1114.  Importantly, the employee must

not have taken "deliberate steps" to link himself and his speech to

"the employer's mission, purpose, or image."  Id. (additional

quotation omitted).  If the employee did so, then the speech will not

be protected, and the Pickering balance will not apply.

While Plaintiff's speech was outside the workplace and was

addressed to a large public audience, albeit an online audience,

Plaintiff also took deliberate steps to link himself and his posts to

his employer.  His Facebook page was set to public viewing, and he

listed the Illinois Department of Corrections as his employer,

Corrections Sergeant as his title, and included a photo of him in his

uniform on the page.  His profile did not include any disclaimer that

it was his personal account or that the views posted there were his

own and not those of the Department.  The information listed on

Plaintiff's Facebook page and the uniformed photo tied his page and

the views stated there to the Department's image.  See generally

Roe, 543 U.S. at 84 (police officer's off-duty conduct in which he

wore his uniform "linked [his expression] to his official status as a

**Appendix 020**

police officer.")  Indeed, that the author of the Chicago Sun Times article could easily identify Plaintiff as a Department employee makes clear that he linked his profile and his posts to his work. Def.'s Ex. 3.  Because Plaintiff linked, both by word and image, his speech as expressed in the Facebook posts to his status as a Correctional Sergeant with the Illinois Department of Corrections, his claim cannot pass the second alternative threshold inquiry under NTEU.

Even if Plaintiff's claim could pass either of the alternative threshold inquiries of Connick-Garcetti or NTEU, the balancing test set out in Pickering weighs against his claim.  In Pickering, the Supreme Court held that a public employee's speech is subject to a "balanc[ing] between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest in the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  Id. at 568.  Several factors are considered in this balancing, none of which is dispositive alone, including:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment

> relationship is one in which personal loyalty
> and confidence are necessary; (3) whether the
> speech impeded the employee's ability to
> perform her responsibilities; (4) the time, place
> and manner of the speech; (5) the context in
> which the underlying dispute arose; (6)
> whether the matter was one on which debate
> was vital to informed decisionmaking; and (7)
> whether the speaker should be regarded as a
> member of the general public.

Harnishfeger, 943 F.3d at 1115.  The public employer bears the burden of persuasion by a preponderance of the evidence that the balance weighs in favor of allowing the employer's conduct.  Id. at 1115–16.  The employer must come forth with actual evidence of what its concerns "really were" when it acted.  Id. at 1116.

On the evidence in the record, the Pickering balancing here favors the Department.  Investigator Creek's report makes clear that the Department was concerned about the negative public exposure to which the Department was subjected as a result of Plaintiff's posts.  Def.'s Ex. 12.  Creek's report relied heavily on the Chicago Sun Times article which included a screenshot of Plaintiff's post about a possible civil war or government overthrow as well as references to his posts about his beliefs on religion and human sexuality.  Def.'s Ex. 3.  The report concluded by stating that the

posts reflected negatively on the Department and its overall mission.  Id.

Plaintiff's posts also clearly impact the Department's employee harmony and necessity of some form of loyalty to the Department. As the Department points out, Plaintiff was responsible for supervising other correctional officers at Robinson Correctional Center and his posts regarding religion and human sexuality would deter, at bottom, those under his supervision from approaching him and performing their jobs to the best of their ability for fear of discrimination by Plaintiff.

Moreover, Plaintiff's role as a Correctional Sergeant in the Illinois prison system necessitates at least some form of loyalty to the Department.  Plaintiff's statement that he, as a government employee, would like to participate in a government overthrow or civil war plainly undermines the loyalty the Department is entitled to expect of employees.  Defendant's interest in maintaining the function of the Department plainly outweighed Plaintiff's interest in expressing his wish to participate in a government overthrow or civil war.  On the facts of this case, the Pickering balancing favors the

Department.  Therefore, Defendants are entitled to summary judgment on the merits of Count I.

Defendants also raise the affirmative defense of qualified immunity to Plaintiff's request for damages suffered as a result of the alleged First Amendment violation.  Generally, government officials performing discretionary functions may raise qualified immunity as a shield when faced with a suit for damages under 42 U.S.C. § 1983.  Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Qualified immunity "protects all but the plainly incompetent and those who knowingly violate the law."  Kemp v. Liebel, 877 F.3d 346, 350 (7th Cir. 2017).  Government officials are entitled to qualified immunity unless the plaintiff can show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."  Id.

Defendants here are entitled to qualified immunity.  "It is 'an undeniable fact'" that balancing tests like Pickering's "'produce a wide gray area between the clearly legal and clearly illegal, and the rules of qualified immunity require giving the benefit of the doubt to the reasonable public official if the particular case falls within that

gray area.'" <u>Harnishfeger</u>, 943 F.3d at 1120 (quoting <u>Gustafson v. Jones</u>, 117 F.3d 1015, 1021 (7th Cir. 1997)).  Defendants' actions in suspending Plaintiff for speech that threatened to disrupt the Department's ability to render efficient and effective public service certainly fell at least within the gray area <u>Pickering</u>'s balancing test creates.  Under clearly established law as stated in <u>Pickering</u>, Defendants satisfied their burden by producing evidence that Plaintiff's speech would have undermined the Department's ability to effectively serve the public.  Therefore, Defendants here are entitled to the protections of qualified immunity as to the damages requested in Count I.

**b.   The Department's Code of Conduct was not impermissibly vague under the Fourteenth Amendment because the Code of Conduct sufficiently defined a range of acceptable conduct from which Plaintiff's conduct deviated.**

Plaintiff also brings an as-applied challenge to the Department's Code of Conduct under the Fourteenth Amendment. Defendants raise, and are entitled to, the qualified immunity defense as to this claim because the Department's Code of Conduct did not violate clearly established law.

**Appendix 025**

Generally, laws or regulations promulgated by the government and applicable to the public at large violate the Due Process Clause of the Fourteenth Amendment "if people of common intelligence must necessarily guess at [the law's] meaning and differ as to its application." Greer v. Amesqua, 212 F.3d 358, 369 (7th Cir. 2000) (citing Grayned v. City of Rockford, 108 U.S. 108–09 (1972). However, regulations or policies promulgated by the government as a function of the government's role as an employer are held to a lower standard. Id. (quoting Keen v. Penson, 970 F.2d 252, 259 (7th Cir.1992) ("The Department need not have adopted 'a quasi-criminal code' in establishing employment regulations.")  Instead, such employment policies will only violate the Due Process Clause if they do not "sufficiently define a range of inappropriate conduct which a reasonable employee would understand" or "convey adequate warning" that particular conduct will result in discipline. Greer, 212 F.3d at 369.

Under Seventh Circuit precedent in Greer, Defendant's actions here did not violate clearly established law.  In Greer, the Seventh Circuit rejected a government employee's void-for-vagueness argument as it related to the City of Madison, Wisconsin's Fire

Page **23** of **26**

**Appendix 026**

Department policies.  Those policies required employees to "conduct
themselves so as not to bring the Department into disrepute; treat
their superiors with respect [and] conform to the rules and
regulations of the Department; conform to and promptly and
cheerfully obey all laws, ordinances, rules, regulations, and orders;
not [to] harass co-employees because of their sexual orientation;
and not to engage in harassment on the basis of race, sex, religion,
color, age, disability, national origin or sexual orientation."  Id.
(internal quotation and additional citation omitted).

The Code of Conduct here as applied to Plaintiff is
substantially similar to the policies in Greer.  Like the Greer
policies, AD 03.02.108, ID 03.02.108, and Department Rule 120
each directed Department employees, including Plaintiff, "to
conduct themselves in a professional manner and, whether on duty
or off duty, not engage in conduct that is unbecoming of a State
employee or that may reflect unfavorably on or impair operations of
the Department."  Defs.' Ex. 7 p. 1; see also Defs.' Ex. 8 pp. 1 &
Def.'s Ex. 9.  A subsection of ID 03.02.108 provided Department
employees further direction, just as the Greer policies did,
prohibiting Department employees from discriminating against

other employees or offenders on the basis of "race, color, sex, religion, age, arrest record, national ancestry, or origin, physical or mental disability, marital status, sexual orientation, citizenship status, or unfavorable discharge from the military services."  Def.'s Ex. 8 p. 15.  And while the Code of Conduct here is written "in general language" applicable to a variety of scenarios, AD 03.02.108, ID 03.02.108, and Department Rule 120 sufficiently define a range of standard conduct by which an employee would be measured.  Greer, 212 F.3d at 369.  Defendant's actions in suspending Plaintiff for deviating from that range of appropriate conduct when Plaintiff made statements that reflected poorly on the Department was not in violation of the Due Process Clause or clearly established law under Greer.  Accordingly, Defendants are entitled to qualified immunity on Count II and summary judgment on the merits as to the injunctive relief requested.

## IV.   CONCLUSION

Defendants' actions in suspending Plaintiff following an investigation into remarks Plaintiff made while identifying himself to the public as an employee of the Illinois Department of Corrections did not violate Plaintiff's rights under the First Amendment.  The

Appendix 028

Department's Code of Conduct also does not violate the Fourteenth

Amendment's requirements against vagueness.  The Court reaches

these conclusions without considering the material contained in

Exhibit 20 to Defendant's Motion for Summary Judgment.

Accordingly, Plaintiff's Motion for Partial Summary Judgment (d/e

33) is denied, Defendant's Motion for Summary Judgment (d/e 35)

is granted, and Plaintiff's Motion to Strike Exhibit 20 (d/e 37) is

denied.  The Clerk is directed to enter judgment in favor of

Defendants on all Counts.

**IT IS SO ORDERED.**
**ENTERED: December 8, 2022.**
**FOR THE COURT**

*/s/ Sue E. Myerscough*
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**

**Appendix 029**

Gary Hicks
May 22

Lord, if there must be a civil war or a government overthrow,
please let it happen before I am dead or to old to fight in it. Amen.

18                                                    2 Comme

👍 Like              💬 Comment              ↪ Share

Jack Webb Like wise
Like   Reply   13w

Pat Burnett Amen
Like   Reply   13w

**PLAINTIFF'S EXHIBIT**
**1**

Attachment _2_
page _1_ of _7_

Hicks v. Jefferys et al. (20-3099) Document No.:     000051

**APPENDIX 030**

E-FILED
Monday, 28 March, 2022 04:47:23 PM
Clerk, U.S. District Court, ILCD



Attachment ___2___
page ___2___ of ___7___

Hicks v. Jefferys et al. (20-3099) Document No.:     000052

APPENDIX 031



Attachment ___2___

page ___3___ of __7__

Hicks v. Jefferys et al. (20-3099) Document No.:      000053

APPENDIX 032



Attachment ___2___
page ___4___ of ___7___

**APPENDIX 033**



Attachment __2__

page __5__ of __7__

Hicks v. Jefferys et al. (20-3099) Document No.:     000055

APPENDIX 034



**Things We Don't See Jews Doing.**

1. Flying Planes Into Buildings.
2. Supporting Terrorism.
3. Forcing Young Girls To Marry Old Men.
4. Mutilating Females Genitalia.
5. Beheading People.
6. Trying To Dominate The World.
7. Stonings.
8. Canings.
9. Lashings.
10. Trying To Destroy America.



Attachment ___2___
page ___6___ of ___7___

Hicks v. Jefferys et al. (20-3099) Document No.:   000056



Attachment 2

page 7 of 7

Hicks v. Jefferys et al. (20-3099) Document No.: 000057

APPENDIX 036

JB Pritzker
Governor

Rob Jeffreys
Acting Director

## The Illinois Department of Corrections

Investigations and Intelligence Unit
19551 W. Division Street • Lockport, IL  60441 • (815) 727-3607, x7861

## M E M O R A N D U M

DATE:       September 11, 2019                 IN REPLY, REFER TO
                                              CASE C19-ROB-296

TO:         Michelle Neese, Acting Warden
            Robinson Correctional Center

FROM:       Mark A. Delia, Chief
            Investigations and Intelligence

SUBJECT:    Case Number C19-ROB-296 (HICKS, GARY O., Correctional Sergeant) Conduct of
            Individual

Our office recently conducted an Investigation after Senior Public Service Administrator LINDSEY
N. HESS received information about Facebook photographs or posts which were published or
shared by Correctional Sergeant GARY O. HICKS in an inappropriate manner. The photographs
or posts received by HESS indicated they were obtained after a review of what appeared to be
HICKS' Facebook account.

Based on direct evidence, the charge Correctional Sergeant GARY O. HICKS violated Conduct
of Individual is substantiated. HICKS admitted to making the post to or from his Facebook Account
in which he shared "memes" to reflect his personal views on topics of a political or religious nature.
However, the posts do reflect negatively on the department as well as the departments overall
mission.

A report of administrative action taken regarding Correctional Sergeant GARY O. HICKS is required.
Information from this investigation has been entered into the Department's computerized retrieval
system and it is essential you forward a copy of such action taken (including dismissal of any or all
charges) to this office within 60 days of receipt of this correspondence.

In the event disciplinary action is taken against an employee, other than the issuance of an oral
reprimand, a copy of this investigative report shall be forwarded to the employee and their respective
Union.  **This communication may contain confidential information therefore further
dissemination is prohibited.**

In addition, if the subject of the investigation is an employee please ensure that they are notified in
writing that the investigation has been concluded per Administrative Directive 01.12.120.

*Mission: To serve justice in Illinois and increase public safety by promoting positive change in
offender behavior, operating successful reentry programs, and reducing victimization.*



***www.illinois.gov/idoc***
Hicks v. Jefferys et al. (20-3099) Document No.:      000045

**APPENDIX 037**

Attachments

cc:    Nikki Robinson, Chief Public Safety Officer
       John Eilers, Chief of Operations
       Camile Lindsay, Chief Legal Counsel
       Kim Smith, Region 3 Deputy Director
       Deborah Baker, Agency Ethics Officer
       Josh Cheek, Investigator
       File

Hicks v. Jefferys et al. (20-3099) Document No.:    000046

APPENDIX 038

ILLINOIS DEPARTMENT OF CORRECTIONS

**Report of Investigation**

| Case Number<br>C19-ROB-296 | Institution<br>Robinson Correctional Center | | Case Investigator<br>CHEEK |
|---|---|---|---|
| **Time, Date, and Nature of Incident**<br>Various, Various, Conduct of Individual | | | |

| Subject Name (Last, First, Middle)<br>HICKS, GARY O. | ☐ Complainant  ☐ Victim  ☐ Inmate<br>☐ Offender  ☐ Witness  ☒ Employee |
|---|---|

| Employee Job Title/Offender ID #<br>Correctional Sergeant | Nickname(s) |
|---|---|

| **REPORT STATUS:** | ☒ Initial Open | ☒ Final | ☐ Supplemental |
|---|---|---|---|

**Interviewed:**
1. HICKS, GARY O., Correctional Sergeant

**Case Summary:**
This investigation was conducted after Senior Public Service Administrator LINDSEY N. HESS received information about Facebook photographs or posts which were published or shared by Correctional Sergeant GARY O. HICKS in an inappropriate manner. The photographs or posts received by HESS indicated they were obtained after a review of what appeared to be HICKS' Facebook account (Attachment #1).

Copies of the photographs indicated HICKS had posted or shared various pictures described as memes and made a comment on his Facebook account referring to a civil war and if one should occur, that he hoped he was not dead or too old to participate in it. The comment appeared to be a prayer by starting with Dear Lord and ending in Amen. The photographs of the Facebook posts did not include a date range but listed specific months and days in which the post or meme was made or shared. The photographs of the posts shared by HICKS reflected views of a political and religious nature but included references to homosexuality, Jews, Muslims, and immigration as it pertained to the United States of America (Attachment #2).

Correctional Sergeant GARY O. HICKS stated most of the post shared from his account reflected or were derived from his political and religious views. HICKS stated he did not recall sharing the post about Congresswoman ILHAN OMAR but that it would have been consistent with his views because he disagreed with a lot of the statements she had made. HICKS stated the posts which related to his religious views was the one referencing the devil and the one referencing the Jews (HICKS referred to the Jews as God's people from the Bible). HICKS stated the account did appear to be his or at least the photographs may have been things he had previously shared. HICKS stated the post referencing the civil war or a government overthrow was political in nature and if something did happen where history repeated itself, he would rather be involved than his grandchildren be involved. HICKS stated at the time he shared the post referencing Mexicans (Mexican word of the Day: TLAIB), he was in support of federal policy regarding immigration concerning all individuals. HICKS stated the post was also political in nature. HICKS stated the only thing he agreed with was if "you don't like the USA, you're welcome TLAIB" (to leave). HICKS stated he was and has remained impartial while working for the Illinois Department of Corrections for 18 years. HICKS stated he treats every offender the same and in accordance with departmental policy. HICKS stated he did not believe he had ever received a complaint whether formally or informally which would have indicated he was bias. HICKS stated he did not bring his political or religious views into work with him or let it effect any manner of his work (Attachment #3).

A news article from Injusticewatch.org authored by Reporter EMILY HOERNER was obtained. The article reflected in was posted on September 4, 2019 and referred to HICKS as well as two other staff members who had made Facebook posts by comments, shares, or memes in which negative or derogatory indications were made. The article reflected HICKS had been named in a lawsuit in which the defendant

Distribution:  Case File
Page 1 of 2
*Printed on Recycled Paper*
DOC 0262 (Rev. 3/2005)

Hicks v. Jefferys et al. (20-3099) Document No.:  000047

**APPENDIX 039**

Continued

| Case Number | Subject's Name (Last, First, Middle) | Employee Job Title/Offender ID # | Institution |
|---|---|---|---|
| C19-ROB-296 | HICKS, GARY O. | Correctional Sergeant | ROBINSON CC |

had asked HICKS to be let out of the cell and HICKS denied the request and did not let the inmate author a grievance. The new article included the Facebook photographs or post made by HICKS (Attachment #4).

**Conclusion:**
Based on direct evidence, the charge Correctional Sergeant GARY O. HICKS violated Conduct of Individual is substantiated. HICKS admitted to making the post to or from his Facebook Account in which he shared "memes" to reflect his personal views on topics of a political or religious nature. However, the posts do reflect negatively on the department as well as the departments overall mission.

**Attachments:**
1. Email, HOERNER, 8-26-19
2. Photographs, HICKS, Various
3. Interview, HICKS, 9-3-19
4. News Article, HOERNER, 9-4-19

JC

Reviewed By: JB/LS

Distribution: Case File

Page 2 of 2
Printed on Recycled Paper

DOC 0262 (Rev. 3/2005)

Hicks v. Jefferys et al. (20-3099) Document No.: 000048

APPENDIX 040

JB Pritzker
Governor



Rob Jeffreys
Acting Director

## The Illinois Department of Corrections

Robinson Correctional Center
13423 E. 1150th Avenue • Robinson, IL  62454 • (618) 546-5659 TDD: (800) 526-0844

<u>MEMORANDUM</u>

**Date:**     October 2, 2019

**To:**     Sgt. Gary Hicks
                        Employee's Name

**From:**     Michelle Neese, Acting Warden
                        Chief Administrative Officer

**Subject:**     Employee Notification of Completed Investigation

                   Investigation #:     C19-ROB-296

Be advised, by notice of this memorandum, the above referenced investigation has been completed and (check **one** of the below boxes):

☐ No charges are being filed at this time.

☒ You will be advised of the disposition for this investigation.

By signing below, I acknowledge receipt of this notice and understand that this investigation has been completed.

_____                    10/7/19
        Employee's Signature                                          Date

Distribution:   Chief Administrative Officer; Bargaining Unit (as appropriate);          DOC 0127 (Rev. 4/2010)
                      Internal Affairs; Investigations File

*Printed on Recycled Paper*

*Mission: To serve justice in Illinois and increase public safety by promoting positive change in offender behavior, operating successful reentry programs, and reducing victimization.*



Hicks v. Jefferys et al. (20-3099) Document No.:      000009

**Appendix 041**

JB Pritzker
Governor



Rob Jeffreys
Acting Director

### The Illinois Department of Corrections

Robinson Correctional Center
13423 E. 1150th Avenue • Robinson, IL  62454 • (618) 546-5659 TDD: (800) 526-0844

# MEMORANDUM

DATE:       October 3, 2019

TO:          Michelle Neese, Acting Warden

FROM:       Josh Yargus, Correctional Lieutenant
            Internal Affairs

SUBJECT:    ERB Referral – Departmental Rule 120, Section 120.30, AD 03.02.108 Standards
of Conduct, ID 03.02.108 Standards of Conduct

Correctional Sergeant Gary Hicks is being referred for violation of the following:

Departmental Rule Part 120, Rules of Conduct, Section 120.30, Conduct of Individuals: "Employees shall conduct themselves in a manner that will not reflect unfavorably on the Department and shall not engage in conduct that is unbecoming of an employee or that may reflect unfavorably on or impair the operations of the Department.

Administrative Directive 03.02.108 Standards of Conduct, Section G. 2. d.: "Employees shall comply with departmental rules, written procedures, bulletins and written or verbal orders issued by proper authorities."

Institutional Directive 03.02.108 Standards of Conduct, Section IV. A. 4: "It is the responsibility of each employee to be knowledgeable of and to comply with all Department Rules, Administrative Directives, Institutional Directives, written procedures and bulletins."

In that: External Investigation C19-ROB-296 concluded that Correctional Sergeant Gary Hicks violated Conduct of Individual when he made a post on his Facebook account in which he shared "memes" to reflect his personal views on topics of a political or religious nature that reflected negatively on the Department as well as the Department's overall mission.

I Concur/Do Not Concur

Michelle Neese, Acting Warden

SV/sav

---

*Mission: To serve justice in Illinois and increase public safety by promoting positive change in offender behavior, operating successful reentry programs, and reducing victimization.*

Hicks v. Jefferys et al. (20-3099) Document No.:      000014

**PLAINTIFF'S EXHIBIT 4**

**APPENDIX 042**

JB Pritzker
Governor



Rob Jeffreys
Acting Director

### The Illinois Department of Corrections

Robinson Correctional Center
13423 E. 1150th Avenue • Robinson, IL  62454 • (618) 546-5659 TDD: (800) 526-0844

# M E M O R A N D U M

DATE:      October 3, 2019

TO:          Gary Hicks, Correctional Sergeant
                3p-11p

FROM:     Michelle Neese, Acting Warden
                Robinson Correctional Center

SUBJECT:  Employee Review Hearing #19-19

CHARGES:   Departmental Rule 120.30 Conduct of Individuals, A.D. 03.02.108 Standards of
Conduct, I.D. 03.02.108 Standards of Conduct

An Employee Review Hearing has been scheduled for you pursuant to the provisions of Administrative
Directive 03.01.120, Employee Review Hearing.

The hearing will be conducted on **Tuesday, October 15, 2019 at 8:00am** in the Warden's Conference
Room in the Administration Building.  Administrative Assistant II, Sarah Venema will be the Hearing
Officer.  Enclosed you will find specific information regarding the charges and related documents which
will be presented at the hearing.

If you are unable to attend this hearing, Sarah Venema must be notified.  Unless granted a continuance by
Sarah Venema, your failure to appear at the hearing will result in the hearing being held without you
being present.  You may submit to Sarah Venema a written request for witnesses.  This request must be
made in writing at least twenty-four (24) hours prior to the scheduled hearing.  The request shall be
granted unless grounds exist for denial.  You may have a personal representative and in the case of
bargaining unit members, only a bargaining unit representative may be present at the hearing.


Michelle Neese
Acting Warden


Enclosures
cc:       AAII, Sarah Venema (Hearing Officer)
          Management Representative
          Personnel File, AFSCME Representative, File

*Mission: To serve justice in Illinois and increase public safety by promoting positive change in
offender behavior, operating successful reentry programs, and reducing victimization.*

Hicks v. Jefferys et al. (20-3099) Document No.:       000012



**PLAINTIFF'S
EXHIBIT
5**
www.exhibit.com

**APPENDIX 043**

ROBINSON CORRECTIONAL CENTER
EMPLOYEE REVIEW HEARING
NO. 19-19

| | |
|---|---|
| **EMPLOYEE:** | Gary Hicks, Correctional Sergeant |
| **HEARING DATE/TIME:** | October 15, 2019 @ 8:00a |
| **CHARGES:** | A.D. 03.02.108  Standards of Conduct<br>I.D. 03.02.108 Standards of Conduct<br>Departmental Rule 120 |
| **DATE OF VIOLATION:** | 9/4/19 |
| **PRESENT AT HEARING:** | Gary Hicks, Correctional Sergeant<br>Roger Hopper, AFSCME Representative<br>Kelly Richardson, Administrative Assistant II,  Management Representative |
| **WITNESS:** | None |
| **HEARING OFFICER:** | Sarah Venema, Administrative Assistant II |
| **DATE PREPARED:** | October 15, 2019 |

**HEARING/SUMMARY:**  Employee Review Board Hearing 19-19 was held to determine if Correctional Sergeant Gary Hicks was in violation of Administrative Directive 03.02.108 Standards of Conduct, Institutional Directive 03.02.108 Standards of Conduct, and Departmental Rule 120.  This Officer confirmed that timely notice was served upon Correctional Sergeant Gary Hicks and the Union.

The following charges were read:
A.D. 03.02.108  Standards of Conduct, Section II, Paragraph G.1.d:  "Employees shall comply with departmental rules, written procedures, bulletins and written or verbal orders issued by proper authorities."

Institutional Directive 03.02.108 Standards of Conduct, Section IV. A. 4: "It is the responsibility of each employee to be knowledgeable of and comply with all Departmental Rules, Administrative Directives, Institutional Directives, written procedures, and bulletins.

Departmental Rule 120, Rules of Conduct, Section 120.30, conduct of Individuals:  "Employees shall conduct themselves in a manner that will not reflect unfavorably on the Department and shall not engage in conduct that is unbecoming of an employee or that may reflect unfavorably on or impair the operations of the Department."

In that:
External Investigation C19-ROB-296 concluded that Correctional Sergeant Gary Hicks violated Conduct of Individual when he made a post on his Facebook account in which he shared "memes" to reflect his personal views on topics of a political or religious nature that reflected negatively on the Department as well as the Department's overall mission.

Management Representative/Kelly Richardson, Administrative Assistant II stated, "management stands on report as written, reserving the right for rebuttal."

Hicks v. Jefferys et al. (20-3099) Document No.:     000004

PLAINTIFF'S
EXHIBIT
6
www.exhibit.com

**Appendix 044**

Sgt Gary Hicks was asked if he wished to speak on his behalf, he stated "when I made the posts it was not my intent to offend anyone."

Roger Hopper, Union Representative was asked if he wished to make a statement , he provided the attached statement and also stated that there are pictures on the Department of Corrections Facebook page that show gang signs and can also be offensive to some in that it appears they are backing a certain gang. He went on to state that "everyone has something on their page that can be offensive to someone. These charges are over the top. The person the reporter was after was Sergeant Larry Hicks from Shawnee and when she found nothing on his page, it was easy for her to go to Gary Hick's page and single him out. Sergeant Hicks is well thought of from his fellow staff, is always willing to help and is a top-notch employee. This investigation is wrong at every step."

Management Representative, Administrative Assistant II was asked if she had a rebuttal statement to which she replied "No"

The Union was asked if they had anything further and he replied he did not.

This concludes Employee Review Hearing #19-19.

**FINDINGS/RECOMMENDATIONS:** This Hearing Officer has reviewed the information provided and it is this Hearing Officer's opinion that Correctional Sergeant Gary Hicks violated the above cited Administrative Directive 03.02.108 Standards of Conduct, Institutional Directive 03.02.108 Standards of Conduct, and Departmental Rule 120.

A review of Correctional Sergeant Gary Hicks' personnel file shows no prior discipline and that this is his 1st offense for Administrative Directive 03.02.108 Standards of Conduct, Institutional Directive 03.02.108 Standards of Conduct, and Departmental Rule 120

It is recommended that Correctional Sergeant Gary Hicks receive a 10-day physical suspension.

_____X___ I CONCUR         _____ I DO NOT CONCUR

_Sarah Venema_                    10-15-19
**Sarah Venema, Administrative Assistant II**        **DATE**
**Hearing Officer**

_Michelle Neese_                  10-15-19
**Michelle Neese, Acting Warden**              **DATE**

Hicks v. Jefferys et al. (20-3099) Document No.:     000005

**APPENDIX 045**

| **Illinois** Department of **Corrections** | ADMINISTRATIVE DIRECTIVE | Number | 03.02.108 |
| | | Page | 1 of 7 |
| | | Effective | 10/1/2013 |

| Section | 03 | Personnel and Labor Relations |
| Subsection | 02 | Personnel Standards |
| Subject | 108 | Standards of Conduct |

I.    POLICY

    A.    Authority

        5 ILCS 430/5-15 and 10-10

        430 ILCS 65/10

        730 ILCS 5/3-2-2

        18 U.S.C. 922

    B.    Policy Statement

        The Department shall require employees to conduct themselves in a professional manner and, whether on duty or off duty, not engage in conduct that is unbecoming of a State employee or that may reflect unfavorably on or impair operations of the Department.

II.    PROCEDURE

    A.    Purpose

        The purpose of this directive is to establish written personnel standards that the Department shall require each employee to maintain.  Failure to comply with any of the standards of conduct may result in discipline.

    B.    Applicability

        This directive is applicable to all facilities, program sites and offices within the Department.

    C.    Facility Review

        A facility review of this directive may be conducted in accordance with the facility audit schedule.

    D.    Designees

        Individuals specified in this directive may delegate stated responsibilities to another person or persons unless otherwise directed.

    E.    Definitions

        Chief Administrative Officer - for purposes of this directive, shall mean the highest ranking official



PLAINTIFF'S EXHIBIT
7

Hicks v. Jefferys et al. (20-3099) Document No.:    000020

*Illinois Department of Corrections*

| ADMINISTRATIVE DIRECTIVE | Effective 10/1/2013 | Page 2 of 7 | Number 03.02.108 |
|---|---|---|---|

of a correctional facility, of parole services or of the office, unit or program.

Chief Administrator - for purposes of this directive, shall mean the respective Deputy Director, Chief or Executive Staff.

Close associate - means any person other than a relative with whom the individual is residing or with whom the individual has frequent business contacts.

Relative - means spouse, parent, sibling, child, grandchild, grandparent, aunt, uncle, niece, nephew and cousin, including first line blood, step, half, foster or in-law relations.

F.   **General Provisions**

All employees shall be informed of the provisions of this directive and the directive shall be accessible to employees.

G.   **Requirements**

1.   **Compliance with Laws and Regulations**

a.   Employees shall obey all federal, State and local laws.

b.   Employees shall obey all applicable court decisions and orders related to the performance of their job duties.

c.   Employees shall verbally report as soon as possible; submit a written report within 5 working days; and submit the final disposition, when available, to his or her supervisor who shall forward a copy of the written report and the final disposition to the Background Investigations Unit for any:

(1)   Arrest, indictment or conviction for a felony or a misdemeanor, other than a minor traffic offense such as a parking ticket.  Driving under the influence is a reportable offense; it is not considered to be a minor offense.  The report shall specify the facts forming the basis for the arrest, indictment or conviction and the name of the case.

(a)   Any employee who is convicted after March 1, 1998 of a domestic violence crime as defined under the Federal Gun Control Act and who may be required to possess, transport or receive a weapon or ammunition in the performance of his or her duty shall be terminated from employment.  Any employee who failed to report a conviction of a domestic violence crime prior to March 1, 1998 and who may be required to possess, transport or receive a weapon or ammunition in the performance of his or her duty may be terminated from employment.

(b)   Any employee who is charged and convicted of a felony shall be terminated from employment.

(2)   Order of protection against the employee. The report shall specify the facts for the order of protection and include a caption of the case and the

Hicks v. Jefferys et al. (20-3099) Document No.:     000021

**APPENDIX 047**

| *ADMINISTRATIVE DIRECTIVE* | Effective 10/1/2013 | Page 3 of 7 | Number 03.02.108 |
|---|---|---|---|

length of the order.

    (a)    Any employee who has an order of protection against him or her shall provide a copy of the order of protection, emergency order of protection or amended order of protection with his or her written report or subsequent reports.

    (b)    Any employee who has an order of protection against him or her that prohibits the possession or use of firearms shall not be issued a weapon for the duration of the order.

    (c)    Employee's whose order of protection prohibits the possession or use of firearms and is for a length of time exceeding 90 days and who may be required to possess, transport or receive a weapon or ammunition in the performance of his or her duty shall be terminated from employment.

(3)    Admission as an inpatient in a mental hospital if the employee is a correctional officer, sergeant, lieutenant, shift commander, major, parole agent, K-9 specialist, internal investigator or other staff who are authorized to carry a firearm.

    (a)    Any employee who has been admitted as an inpatient in a mental health hospital in the last five years is prohibited from receiving a firearm or firearm ammunition.

    (b)    Following an admission as an inpatient in a mental hospital, employees authorized to carry a firearm shall submit either a court order or waiver from the State Police pursuant to 430 ILCS 65/10(c) lifting the prohibition from Unlawful Possession of a Firearm and Firearms Ammunition or be terminated.

d.    Employees shall comply with departmental rules, written procedures, bulletins and written or verbal orders issued by proper authorities.

e.    Employees shall utilize State equipment, property and services only as authorized for their job assignments.

f.    Employees shall not perform any prohibited political activity during any compensated time.  Employees shall not misappropriate state property or resources by engaging in prohibited political activity for the benefit of any campaign for elective office or any political organization.

g.    Employees shall respect the confidentiality of information and are prohibited from accessing or disclosing information such as, but not limited to, investigations, offender records and personnel issues, except to the extent needed in the performance of their job duties.

2.    **Secondary Employment**

a.    Full time employees shall not engage in secondary employment or accept other compensation or honorariums except as approved by the Director.

Hicks v. Jefferys et al. (20-3099) Document No.:    000022

**APPENDIX 048**

Illinois Department of Corrections

| ADMINISTRATIVE DIRECTIVE | Effective 10/1/2013 | Page 4 of 7 | Number 03.02.108 |
|---|---|---|---|

b. When hired, each new employee shall complete Section I and, if applicable, Section II of the Secondary Employment form, DOC 0007.

   (1) Section I shall **always** be completed, indicating whether or not the employee is currently employed elsewhere.

   (2) Section II shall **only** be completed in accordance with Paragraph II.G.2.c. if the new employee seeks to begin or to continue secondary employment.

   (3) If Section II is not completed, the DOC 0007 shall be filed in the employee's personnel file.

c. Any employee seeking approval for secondary employment shall complete Section II of the DOC 0007. The DOC 0007 shall be submitted to the Chief Administrative Officer who shall make a recommendation in Section III of the DOC 0007 and forward the DOC 0007 through chain of command to the Director or Chief Administrator for final approval or disapproval as set forth below. The Chief Administrative Officer's reasons for not recommending secondary employment shall be noted.

   (1) The Director's approval is required for Public Service Administrator positions or above.

   (2) All other requests shall be approved by the respective Chief Administrator of the facility, program site or office.

d. Factors to be considered in determining whether to grant approval shall include, but not be limited to:

   (1) The nature of the employee's job duties and responsibilities within the Department;

   (2) The employee's employment history;

   (3) Whether a conflict of interest or the appearance of a conflict of interest could develop;

   (4) Whether the tentative employment would interfere with the performance of the employee's job duties and responsibilities within the Department;

   (5) Whether an employee might be perceived to be an agent of the Department or to be representing the Department's policies or views without authorization of the Director; or

   (6) Whether the tentative employment would require the employee to carry and use a firearm.

      (a) Department training and qualification in firearms shall not be used as certification for use of firearms in any employment outside the Department.

Hicks v. Jefferys et al. (20-3099) Document No.:     000023

| ADMINISTRATIVE DIRECTIVE | Effective 10/1/2013 | Page 5 of 7 | Number 03.02.108 |
|---|---|---|---|

    (b)    Department issued firearms shall not be used in the performance of duties required of any employment outside the Department.

3.    **Socializing with Offenders or Releasees**

    a.    Employees shall not knowingly socialize with or engage in business transactions with any offender or releasee or a relative or known close associate of an offender or releasee except in the performance of an assignment or as approved in writing by the Director, Assistant Director or respective Deputy Director or Chief.

    b.    An employee shall notify his or her supervisor, using an Employee Notification of Offender or Releasee Acquaintance, DOC 0257, of any acquaintance or personal relationship such as marriage, engagement, dating or cohabitation with an offender or releasee that may or may not affect his or her job performance.

4.    **Bribes, Gifts and Gratuities**

    a.    Employees shall not accept or request anything of value from any offender, releasee, or any relative, friend or close associate of an offender or releasee.

    b.    Employees shall not accept any gifts or gratuities or offers of same:

        (1)    From any offender or releasee;

        (2)    From any relative, friend or close associate of an offender or releasee; or

        (3)    That is prohibited by State or federal laws, executive orders or departmental policies and procedures from anyone who has or expects to have business dealings with the Department or as otherwise prohibited by the Illinois State Officials and Employees Ethics Act.

    c.    All offers of bribes, gifts or gratuities shall be reported immediately in writing on an incident report to the employee's supervisor.

5.    **Trading or Trafficking**

Employees shall not trade or traffic with or aid, abet or solicit unauthorized actions by any offender or releasee.

6.    **Conflicts of Interest**

    a.    Employees shall not engage in conduct that impairs their ability to perform their duties and responsibilities in an impartial manner.

    b.    Every employee shall immediately report to his or her supervisor, verbally and in writing, any fact or situation that may give rise to or be construed as a possible conflict of interest. This shall include, but not be limited to, reporting anything that could impair the employee's performance of his or her duties in a fair and impartial manner, such as:

Hicks v. Jefferys et al. (20-3099) Document No.:    000024

**APPENDIX 050**

*Illinois Department of Corrections*

| ADMINISTRATIVE DIRECTIVE | Effective 10/1/2013 | Page 6 of 7 | Number 03.02.108 |
|---|---|---|---|

> (1) The name of any relative or close associate who is known to be seeking employment with the Department or who is known to be incarcerated or providing services within the Department;
>
> (2) A job reassignment, such as transfer, promotion or demotion that would place the employee under the direct or indirect supervision of a relative or close associate;
>
> (3) Any relative or close associate who has bid or is bidding on any contracts with the Department; or
>
> (4) Any relationship that develops during the course of employment that would place the employee under the direct or indirect supervision of a relative or close associate.
>
> c. Employees who have been subpoenaed or are scheduled to or anticipate testifying with respect to an offender in any proceeding before the Prisoner Review Board, whether in person or through a written statement, shall complete and submit a Notification of Employee Testimony, DOC 0268, upon receipt of the subpoena, notice or request to do so.

7. **Internal Investigations**

> a. All employees shall be required to cooperate with any internal investigation conducted by the facility Internal Affairs Office, Investigations and Intelligence Unit, Office of Affirmative Action or any other investigative authority including the Office of Executive Inspector General (OEIG). Employees shall provide documentation and testimonial evidence as required by law. Information pertaining to an internal or OEIG investigation shall be considered confidential and shall be disseminated on a need-to-know basis only. Employees shall not disclose or be asked to disclose:
>
> (1) The existence of an investigation;
>
> (2) The information requested during an investigation;
>
> (3) The subject matter or questions asked during an interview; or
>
> (4) The identity of the employees under investigation.
>
> b. Failure to cooperate with an investigation shall result in disciplinary action that may result in discharge.

8. **Giving False Information**

> Any employee who knowingly provides false information, including, but not limited to, false information provided in statements, incident reports, correspondence or an interview shall be subject to disciplinary action, including discharge.

Hicks v. Jefferys et al. (20-3099) Document No.:     000025

**APPENDIX 051**

| *ADMINISTRATIVE DIRECTIVE* | Effective      10/1/2013 | Page      7 of 7 | Number      03.02.108 |
|---|---|---|---|

**Authorized by:**

<u>*Original Authorized Copy on File*</u>
**S. A. Godinez**
**Director**

<u>Supercedes:</u>
<u>03.02.108</u>                    AD                    <u>5/1/2005</u>
<u>And as Amended 6/1/2006</u>

Hicks v. Jefferys et al. (20-3099) Document No.:      000026

**APPENDIX 052**

Hicks v. Jefferys et al. (20-3099) Document No.:     000027

APPENDIX 053

| ROBINSON CORRECTIONAL CENTER | Number: | 03.02.108 |
|---|---|---|
| INSTITUTIONAL DIRECTIVE | Page(s): | 1 of 15 |
| | Effective Date: | 01/01/18 |

| | | References: |
|---|---|---|
| **Section:** | 03 Personnel and Labor Relations | |
| **Subsection:** | 02 Personnel Standards | |
| **Subject:** | 108 Standards of Conduct | |

I.    POLICY

    A.    Authority

        5 ILCS 430/5-15 and 10-10
        430 ILCS 65/10
        730 ILCS 5/3-2-2
        Administrative Directive 03.02.108
        Department Rule 120
        18 USC 922

    B.    Policy Statement

        It is the policy of the Robinson Correctional Center to require all employees to conduct themselves in a professional and responsible manner at all times and whether on duty or off duty, not engage in conduct that is unbecoming of a State employee or that may reflect unfavorable on or impair operations of the Department.

II.    PROCEDURES

    A.    Purpose

        The purpose of this Institutional Directive is to publish the standards of conduct for all correctional employees employed at this facility.  Failure to comply with any of the standards of conduct may result in discipline.

    B.    Applicability

        This directive is applicable to all full time and part time employees and contractual employees (unless otherwise bound by other written policies) at the Robinson Correctional Center.

III.    DEFINITIONS

    Chief Administrative Officer – for purposes of this directive, shall mean the highest ranking official of Robinson Correctional Center.

    Chief Administrator – for purposes of this directive, shall mean the respective Deputy Director, Chief or Executive Staff.

    Close Associate – means any person other than a relative with whom the individual is residing or with whom the individual has frequent business contacts.

    Relative – means spouse, parent, sibling, child, grandchild, grandparent, aunt, uncle, niece, nephew, cousin, including first-line blood, step, half, foster, or in-law relationships.



**PLAINTIFF'S EXHIBIT**

**8**

Hicks v. Jefferys et al. (20-3099) Document No.:     000028

**APPENDIX 054**

| ROBINSON CORRECTIONAL CENTER | Number: | 03.02.108 |
|---|---|---|
| **INSTITUTIONAL DIRECTIVE** | Page(s): | 2 of 15 |
| | Effective Date: | 01/01/18 |

| Section: | 03  Personnel and Labor Relations | References: |
|---|---|---|
| Subsection: | 02 Personnel Standards | |
| Subject: | 108  Standards of Conduct | |

Contraband – Any item(s), which is forbidden by criminal law, departmental rules, or posted notices; items for which an offender has no authorization to possess; or property, which is in excess of what is authorized by the Robinson Correctional Center or the Department of Corrections.

Corporal Punishment – Physical contact intended to inflict pain for purposes of punishment.

IV.    STANDARDS OF CONDUCT

A.    Compliance with Laws and Regulations (D.R. 120, A.D. 03.02.108).

1.    Employees shall obey all Federal, State, and Local laws.

2.    Employees shall obey all applicable court decisions and orders related to the performance of their duties.

3.    Employees shall verbally report as soon as possible and submit a written report and official documentation (arrest record, bond papers, orders, etc.) within five (5) working days of any arrest, indictment, or conviction for a felony or a misdemeanor, other than a minor traffic offense, to their immediate supervisor. The report shall specify the facts forming the basis for the arrest, indictment, or conviction and the caption of the case

a.    Driving under the influence is a reportable offense; it is not considered to be a minor offense.

b.    Any employee who is convicted after March 1, 1998 of a domestic violence crime as defined under the Federal Gun Control Act and who may be required to possess, transport, or receive a weapon or ammunition in the performance of his or her duty shall be terminated from employment. Any employee who failed to report a conviction of a domestic violence crime prior to March 1, 1998 and who may be required to possess, transport, or receive a weapon or ammunition in the performance of his or her duty may be terminated from employment.

c.    Any employee who is charged and convicted of a felony shall be terminated from employment.

d.    Order of protection against the employee. The report shall specify the facts for the order of protection and include a caption of the case and the length of the order.

1)    Any employee who has an order of protection against him or her shall provide a copy of the order of protection or emergency or amended order of protection with his or her written report or subsequent reports.

2)    Any employee who has an order of protection against him or her that prohibits the possession of firearms shall not be issued a weapon for the duration of the order.

Hicks v. Jefferys et al. (20-3099) Document No.:     000029

**APPENDIX 055**

| ROBINSON CORRECTIONAL CENTER | Number: | 03.02.108 |
|---|---|---|
| **INSTITUTIONAL DIRECTIVE** | Page(s): | 3 of 15 |
| | Effective Date: | 01/01/18 |

| Section: | 03 Personnel and Labor Relations | References: |
|---|---|---|
| Subsection: | 02 Personnel Standards | |
| Subject: | 108 Standards of Conduct | |

    3)    Employees whose order of protection prohibits the possession of firearms and is for a length of time exceeding 90 days and who may be required to possess, transport, or receive a weapon or ammunition in the performance of his or her duty shall be terminated from employment.

    e.    Admission as an in-patient in a mental hospital if the employee's job title requires qualification with firearms or the employee is otherwise authorized to carry a firearm.

    1)    Any employee who has been admitted as an in-patient in a mental health hospital in the last five years is prohibited from receiving a firearm or firearm ammunition.

    2)    Following an admission as an in-patient in a mental hospital, employees authorized to carry a firearm shall submit either a court order or waiver from the State Police pursuant to 430 ILCS 65/10(c) lifting the prohibition from Unlawful Possession of a Firearm and Firearms Ammunition or be terminated.

4.    It is the responsibility of each employee to be knowledgeable of and to comply with all Department Rules, Administrative Directives, Institutional Directives, written procedures and bulletins.

5.    Employees shall obey all written and verbal orders issued by supervising employees. Failure to respond to a proper and lawful order may result in the initiation of disciplinary action

    a.    Responsibility for compliance with an order will remain with the supervising employee.

    b.    When given a direct order by a supervisor, which is countermanded by a second supervisor, the last order is followed. Compliance with an order will not be required when compliance would constitute the commission of an illegal act. Any higher-level employee who issues a countermanding order to an employee will assume responsibility for the order and its consequences.

6.    Employees shall utilize State equipment, property and services only as authorized for their job assignment.

    a.    State property may not be moved from one location to another without proper administrative approval. The movement of any equipment items must be reported to the Property Control Clerk. State property will not be removed from institutional grounds without approval of the Warden.

Hicks v. Jefferys et al. (20-3099) Document No.:    000030

**APPENDIX 056**

| ROBINSON CORRECTIONAL CENTER | Number: | 03.02.108 |
|---|---|---|
| **INSTITUTIONAL DIRECTIVE** | Page(s): | 4 of 15 |
| | Effective Date: | 01/01/18 |

| Section: | 03 Personnel and Labor Relations | References: |
|---|---|---|
| Subsection: | 02 Personnel Standards | |
| Subject: | 108 Standards of Conduct | |

b.  Unauthorized or personal use of State property such as equipment, credit cards, etc. is prohibited. Employees are also prohibited from willfully damaging or destroying State property, offender property, or other employee's property.

c.  Employees are responsible for immediately reporting loss or damage of equipment, including keys and tools, to their immediate supervisor. Depending on the circumstances involved, employees may be subject to disciplinary action due to deliberate destruction, negligence, or loss. (I.D. 05.02.101, I.D. 05.01.103, I.D. 01.12.105)

d.  Procedures for the inventory of tools must be followed. All employees on an assignment with tools are responsible for the supervision and inventory of the tools. Loss or miscount of tools must be reported immediately and documented by completing a DC 434 Report. (I.D. 05.02.101)

e.  Procedures for the control of keys must be followed as described by Institutional Directive. Employees are responsible for maintaining possession of all authorized keys and advising appropriate personnel when keys are transferred to another employee or if they are lost or misplaced. Keys and locks may be changed only upon authorization of the Duty Warden, Warden, Assistant Wardens, or Shift Commander. (I.D. 05.01.103)

f.  Employees may not duplicate institutional documents or remove any documents from the institution unless they first receive approval to do so from their supervisor. The use of any copying machine for personal business is not allowed.

g.  Employees may utilize the institutional telephone to make local telephone calls of personal and emergency nature, when public payphone is not accessible. Employees may not make long distance telephone calls of a personal nature utilizing institutional phones unless the call is a collect call to the outside party or the call is billed to the employee's home phone. All personal telephone calls are to be brief and should not interfere with the employees' performance of his/her duties. (I.D. 01.02.109)

7.  Employees shall not perform any prohibited political activity during any compensated time.  Employees shall not misappropriate state property or resources by engaging in prohibited political activity for the benefit of any campaign for elective office or any political organization.

8.  Employees shall respect the confidentiality of information and are prohibited from accessing or disclosing information such as but not limited to investigations, offender records, and personnel issues, except to the extent needed in the performance of their job duties.

**APPENDIX 057**

| **ROBINSON CORRECTIONAL CENTER** | Number: | 03.02.108 |
|---|---|---|
| **INSTITUTIONAL DIRECTIVE** | Page(s): | 5 of 15 |
| | Effective Date: | 01/01/18 |

| Section: | 03  Personnel and Labor Relations | References: |
|---|---|---|
| Subsection: | 02  Personnel Standards | |
| Subject: | 108  Standards of Conduct | |

9. Employees are strictly prohibited from bringing any type of contraband onto State property. All employees are subject to body and/or strip searches upon entering the institution. The Warden or Duty Warden with approval of the Director may only authorize strip searches. Strip searches of employees will not be conducted without the consent of the employee. Employees not consenting to a strip search will not be allowed to remain on State property and will be subject to disciplinary action.

Employees' possessions and personally owned automobiles are also subject to search. Major Contraband (for which there may be prosecution) includes alcohol, cannabis, controlled substances, hypodermic syringes or needles, weapons, knives, explosives, loaded or unloaded firearms and ammunition (excluding those covered by the Firearm Concealed Carry Act), hacksaw blades and key and lock picking devices. Items that do not fall into one of the above categories may be left in a vehicle while on State property only if the vehicle if locked and secured. Vehicles are to be locked and the windows rolled up at all times while on State property. Tools, gasoline. etc., which are unsecured in truck beds, exposed areas or unlocked vehicles, are considered contraband.

10. Departmental vehicles and equipment will be used only as defined in relative institutional directives. Employees must possess the proper classification of valid driver's license to operate department vehicles. Employees who have been issued a personally assigned vehicle and employees who request to be reimbursed for driving a personal vehicle for State Business shall carry the statutory minimum amount of liability insurance. Departmental vehicles shall be locked when not in use.

   a. Unassigned State Vehicle – any state owned vehicle that is not assigned to a specific employee shall not be used for the transportation of the employee unless one or more of the following conditions are met:

      1) The employee using the vehicle has a travel assignment that begins or ends at the employee's home.

      2) The employee using the vehicle must begin or end a travel assignment outside normal working hours.

      3) It is in the best interest of the State and approved by the Warden.

   b. Personal Use of State Vehicles – additionally, state owned vehicles, assigned or non-assigned, shall not be used for transportation to restaurants, shopping centers, or other types of personal use. Any employee who utilizes a state vehicle for personal use is subject to the following:

      1) The employee shall pay to the State for each mile or fractional mile of personal use the amounts the State reimburses employee for official travel.

Hicks v. Jefferys et al. (20-3099) Document No.:    000032

**APPENDIX 058**

| ROBINSON CORRECTIONAL CENTER INSTITUTIONAL DIRECTIVE | Number: 03.02.108 |
|---|---|
| | Page(s): 6 of 15 |
| | Effective Date: 01/01/18 |

| Section: 03 Personnel and Labor Relations | References: |
|---|---|
| Subsection: 02 Personnel Standards | |
| Subject: 108 Standards of Conduct | |

    2) The employee utilizing the vehicle does so solely at the risk of the employee and any personal injury or property to the employee, to the state, or to the person or property of others, is the personal responsibility of the employee.

    3) The employee may be subject to disciplinary action up to and including discharge absent mitigating factors.

  c. For those employees only who are on call or who are expected to respond to incidents and situations 24 hours a day/7 days a week (i.e., executive staff, duty wardens or administrators), state vehicles may be used for personal use, as long as the employee remains within a 60 mile radius of the employee's designated work location, so that they may respond in a timely manner. Under these circumstances only, use of the vehicle is considered to be related to the performance of State duties and incident to the employee's duties.

  d. Alcoholic Beverages/Illegal Drugs – pursuant to the Governor's Executive Order 1992-4, and as amended by 1999-3, the possession or consumption of alcoholic beverages or illegal drugs while operating a State vehicle is prohibited. Employees are further prohibited from operating a state vehicle while under the influence of alcohol, illegal drugs or a combination thereof.

  e. Alteration to State Vehicles/Compliance with Laws, Policies, and Direction – employees with state vehicles should further be advised that no alteration to the vehicle may be performed after receipt from the manufacturer without the written approval from the Director. Additionally, employees are required to adhere to all State and Federal laws regarding use of a vehicle.

11. Socializing with Offenders/Releases

  a. Employees shall not knowingly socialize with or engage in business transactions with any offender or releasee or a relative or known close associate of an offender or releasee except in performance of an assignment or as approved in writing by the Director, Assistant Director, or appropriate Deputy Director. Any relationship that existed prior to employment or offender incarceration must be reported to the Chief Administrative Officer.

  b. An employee may not visit an offender at another State Correctional Facility unless the offender is a member of the employee's immediate family and approval is granted in writing by the Director, Associate Director, or appropriate Deputy Director.

  c. An employee shall notify his or her supervisor of any acquaintance or personal relationship such as marriage, engagement, dating, or cohabitation with an offender or releasee that may or may not affect his or her job performance using an Employee Notification of Offender or Releasee Acquaintance, DOC 0257.

Hicks v. Jefferys et al. (20-3099) Document No.: 000033

APPENDIX 059

| ROBINSON CORRECTIONAL CENTER | Number: | 03.02.108 |
|---|---|---|
| **INSTITUTIONAL DIRECTIVE** | Page(s): | 7 of 15 |
| | Effective Date: 01/01/18 | |

| Section: | 03 Personnel and Labor Relations | References: |
|---|---|---|
| Subsection: | 02 Personnel Standards | |
| Subject: | 108 Standards of Conduct | |

12.   Bribes, Gifts, and Gratuities (A.D. 03.02.108)

  a.   Employees shall not accept or request anything of value from any offender, releasee, or any relative, friend, or close associate of an offender or releasee.

  b.   Employees shall not accept any gifts or gratuities or offers of same from offenders or releasees, any relative, friend or close associate of an offender or releasee, or that are prohibited by state or federal laws, executive orders, or departmental policies and procedures from anyone who has or expects to have business dealings with the Department or as otherwise prohibited by the Illinois State Officials and Employees Ethics Act.

  c.   Such offers shall be reported immediately in writing on the Incident Report.

13.   Secondary Employment

  a.   Full-time employees shall not engage any secondary employment or accept other compensation or honorariums except as approved by the Director.

  b.   When hired, each new employee shall complete Section I and if applicable, Section II of the Secondary Employment Form, DOC 0007.

    1)   Section I shall always be completed, indicating whether or not the employee is currently employed elsewhere.

    2)   Section II shall only be completed in accordance with Paragraph IV.A.13.c. if the new employee seeks to begin or continue secondary employment.

    3)   If Section II is not completed, the DOC 007 shall be filed in the employee's personnel file.

  c.   Any employee seeking approval for secondary employment shall complete Section II of the Secondary Employment Form, DOC 0007. The DOC 0007 shall be submitted to the Chief Administrative Officer who shall make a recommendation in Section III of the form and forward the form through the chain of command to the Director or Chief Administrator for final approval or disapproval as set forth below.   The Chief Administrative Officer's reasons for not recommending secondary employment shall be noted.

    1)   The Director's approval is required for any Public Service Administrators position or above.

Hicks v. Jefferys et al. (20-3099) Document No.:   000034

**APPENDIX 060**

| **ROBINSON CORRECTIONAL CENTER** **INSTITUTIONAL DIRECTIVE** | Number: 03.02.108 |
| --- | --- |
| | Page(s): 8 of 15 |
| | Effective Date: 01/01/18 |

| Section: | 03 Personnel and Labor Relations | References: |
| --- | --- | --- |
| Subsection: | 02 Personnel Standards | |
| Subject: | 108 Standards of Conduct | |

      2)    The respective Chief Administrator of the division, bureau, or office shall approve all other request.

    d.    Factors to be considered in determining whether to grant approval shall include, but not limited to:

      1)    The nature of the employee's job duties and responsibilities within the Department;

      2)    The employee's employment history;

      3)    Whether a conflict of interest or the appearance of a conflict of interest could develop.

      4)    Whether the tentative employment would interfere with the performance of the employee's job duties and responsibilities within the Department.

      5)    Whether an employee might be perceived to be an agent of the Department or to be representing the Department's policies or views without authorization of the Director; or

      6)    Whether the tentative employment would require the employee to carry and use a firearm.

        a)    Department training and qualification in firearms shall not be used as certification for use of firearms in any employment outside the Department.

        b)    Department issued firearms shall not be used in the performance of any duties required of any employment outside the Department.

    e.    Employees shall not conduct any business related to secondary employment during their tour of duty. This includes use of State equipment such as, copy machines, computers, etc.

14.    Trading or Trafficking (A.D. 03.02.108, D.R. 120)

    a.    Under no circumstances shall an employee fraternize, trade, or traffic with or improperly aid or abet an offender; neither shall he/she convey any message, written or verbal, from one offender to another or to any person outside the institution.

    b.    Employees are prohibited from buying for or giving to an offender any item (i.e., personal or commissary) without prior approval of the Chief Administrative Officer.

Hicks v. Jefferys et al. (20-3099) Document No.:    000035

**APPENDIX 061**

| ROBINSON CORRECTIONAL CENTER | Number: | 03.02.108 |
|---|---|---|
| **INSTITUTIONAL DIRECTIVE** | Page(s): | 9 of 15 |
| | Effective Date: | 01/01/18 |

| Section: | 03 Personnel and Labor Relations | References: |
|---|---|---|
| Subsection: | 02 Personnel Standards | |
| Subject: | 108 Standards of Conduct | |

15. Conflicts of Interest (A.D. 03.02.108, DR 120)

    a. Employees shall not engage in conduct that impairs their ability to perform their duties and responsibilities in an impartial manner.

    b. It shall be the responsibility of every employee to immediately report to his/her supervisor, verbally and in writing, any fact or situation, which may give rise to or be construed as a possible conflict of interest. This shall include, but not limited to, employees' performance of his/her duties in a fair and impartial manner.

16. Use of Force (DR 501)

Corporal punishment or mistreatment of offenders is strictly prohibited. This rule in no way prohibits any staff member from using necessary minimum force to protect him/herself from injury or injury to other employees or offenders, or prevent damage or escape. The Warden (Duty Warden) must be notified if the use of force is anticipated.

17. Use of Time (A.D. 03.01.301)

    a. Those employees who sign daily sign in/sign out sheets are required to document the exact time of arrival and departure from work as opposed to routinely filling in their shift hours.

    b. All employees not reporting to work on a scheduled work day must notify their supervisor or shift commander at least one hour prior to starting time, except in emergency situations. Absence of an employee for five (5) consecutive days without notification of the institution may be cause for discharge.

    c. All employees who are late due to emergencies, upon arrival, will report to their supervisor.

    d. If evidence exists to suggest possible abuse of sick time, an employee may be required to submit a medical practitioner's statement before or after being absent from work due to illness. The proof of absence must be in the form of a statement from a medical practitioner and must be signed by the medical practitioner.

    e. An employee must submit a doctor's statement after being absent from work due to illness for more than four (4) consecutive days.

    f. In the event of a service-connected injury, the following procedure shall be followed. (A.D. 02.05.103, A.D. 02.05.101)

        1) Employee reports to Health Care Unit. In the event of an emergency, Health Care staff will respond.

Hicks v. Jefferys et al. (20-3099) Document No.:    000036

**APPENDIX 062**

| ROBINSON CORRECTIONAL CENTER | Number: | 03.02.108 |
|---|---|---|
| **INSTITUTIONAL DIRECTIVE** | Page(s): | 10 of 15 |
| | Effective Date: 01/01/18 | |

| Section: | 03  Personnel and Labor Relations | References: |
|---|---|---|
| Subsection: | 02  Personnel Standards | |
| Subject: | 108  Standards of Conduct | |

  2) Employee or Health Care staff shall notify employee's supervisor.

  3) A determination is made by the Health Care staff and employee as to whether further medical attention is needed, i.e., emergency room examination.

  4) Health Care staff will furnish employee with Worker's Compensation Packet injury report form.  Employees with new work related injuries or illnesses must call the State of Illinois Injury Reporting hotline at the number provided in the Worker's Compensation Packet.

  5) Health Care staff and employee will complete report forms, which are submitted to employee's supervisor by the Health Care staff.

  6) The employee's supervisor will complete injury report form provided by Health Care staff. A DOC 0126 Notification of Absence will be completed by the employee and submitted to the supervisor on the day of the injury except in an emergency situation. The employee must have the supervisor's approval prior to leaving the institution. The supervisor will forward all injury reports and time slips to timekeeping.

  7) Injury reports are forwarded to the Division of Risk Management.

  8) If the employee expects to be off work for an extended period due to an occupational injury, he/she may request an occupational disability leave of absence. A written request for a leave of absence should be forwarded to the Personnel Office.

 g. If the employee requests a service connected or non-service connected leave of absence for an illness or injury, and in the case of non-service connected disability, all sick leave has been exhausted, the following procedure shall be followed:

  1) Employee informs Personnel of a request for a service or non-service connected leave of absence in writing.

  2) Personnel will furnish a Physician's Statement Form (CMS-95) to the employee.

  3) Employee will have his/her medical practitioner fill out the form with all sections completed.

  4) The completed Physician's Statement Form shall be returned to Personnel within one (1) week.

Hicks v. Jefferys et al. (20-3099) Document No.:    000037

**APPENDIX 063**

| ROBINSON CORRECTIONAL CENTER | | Number: | 03.02.108 |
| :--- | :--- | :--- | :--- |
| **INSTITUTIONAL DIRECTIVE** | | Page(s): | 11 of 15 |
| | | Effective Date: | 01/01/18 |

| Section: | 03 Personnel and Labor Relations | References: |
| :--- | :--- | :--- |
| Subsection: | 02 Personnel Standards | |
| Subject: | 108 Standards of Conduct | |

    5)    The request for disability leave will be submitted to the Warden for his/her approval.

    6)    The employee's supervisor shall be notified by Personnel of the request for disability leave.

    7)    The employee is required to submit to Personnel an updated Physician's Statement Form every 30 days during the period of disability.

    8)    Before returning to work, employees are required to submit to personnel a release from the medical practitioner to return to work (CMS-95). This release must be signed by the medical practitioner and processed through Personnel prior to the employee returning to his/her assignment.

    h.    Other requirements regarding use of time, proof status, and discipline for tardiness and unauthorized absence are outlined in A.D. 03.01.301, Affirmative Attendance, and current labor/management agreements.

18.    General Provisions

    a.    Upon being given an assignment, it shall be the duty of each employee to familiarize himself/herself with the special rules governing that assignment. Any questions about policy and procedures relating to a specific work assignment should be directed to the immediate supervisor. All uniformed security personnel must read the appropriate post description each time they assume a new post and sign and date the attached sheet. (A.D. 05.01.101)

    b.    Employees will show respect for fellow employees and maintain a professional manner at all times. Employees will refrain from gambling, horseplay, scuffling, boisterous attitudes, heated arguments and other acts, which might tend to disrupt normal operation of the facility. Any employee appearing on institutional property under the influence of drugs or alcoholic beverage will be subject to disciplinary action.

    c.    All staff are responsible for immediately reporting verbally to the Shift Commander and to their immediate supervisor any of the following incidents or significant events, whether they are a participant or a witness:

    1)    Any disturbance; an offender's physical assault on another offender; an offender's physical assault on an employee; an employee's physical assault on another employee; use of force by an employee on an offender; an offender's suicide attempt; escapes or unauthorized absences; offender or employee deaths; major property loss or damage; fires; and any offender or employee action which could lead to criminal charges. All such incidents must be properly reported in writing by the employee to his/her supervisor on the day of the incident. A report is

Hicks v. Jefferys et al. (20-3099) Document No.:     000038

**APPENDIX 064**

| ROBINSON CORRECTIONAL CENTER | Number: | 03.02.108 |
|---|---|---|
| **INSTITUTIONAL DIRECTIVE** | Page(s): | 12 of 15 |
| | Effective Date: 01/01/18 | |

| Section: | 03 Personnel and Labor Relations | References: |
|---|---|---|
| Subsection: | 02 Personnel Standards | |
| Subject: | 108 Standards of Conduct | |

required regardless of where the incident occurs, on grounds or away from the institution. These reports will then be properly forwarded through the chain of command to the Warden.

2) All employees are responsible for the safety, security and maintenance of order within the institution. Therefore, regardless of title or function, each employee must report any incident or information that comes to his/her attention that might affect the health, safety, welfare, good order, or security of offenders or other staff. All significant and/or unusual events or situations occurring on institutional property must be promptly reported to the immediate supervisor with appropriate written reports submitted. (A.D. 01.12.105) these reports must be dated and clearly state facts as differentiated from conclusions, hearsay, and personal interpretations.

3) Offender Disciplinary Reports must be written when an employee observes a serious rule violation or a violation of State or Federal laws by an offender. The report may be brief, but must contain specifics surrounding the violation. It must contain the correct name and badge number of the reporting employee. Such reports must be completed by the reporting employee before leaving duty on the date of the violation. Minor rule infractions may be handled by the employee counseling the offender, consistent with fairness and good judgment. (D.R. 504A)

4) Employees will not knowingly submit false or misleading information in any verbal or written report. Employees will not withhold any official reports, records, or evidence from proper authorities. Reports by employees will contain all available pertinent information. Intentionally falsifying or causing falsification of any institutional records will result in the initiation of disciplinary action.

5) Employees are required to keep confidential all records and personal business of offenders and employees. (A.D. 03.02.108)

6) All employees are required to cooperate with any internal investigation conducted by the facility Internal Affairs Office, Investigations and Intelligence Unit, Office of Affirmative Action, or any other investigative authority, including Investigations conducted by the Office of Executive Inspector General ("OEIG"). Cooperation includes providing documents and testimonial evidence as provided by law. Cooperation also includes ensuring the confidentiality of any internal or OEIG investigation. Information about an internal or OEIG investigation shall be considered confidential and shall only be disseminated on a need-to-know basis. Employees must not disclose, or be asked to disclose, the existence of an investigation, the information requested during an interview, the subject matter or questions asked during an interview or the identity of the employee(s) under investigation. Failure to comply with these

Hicks v. Jefferys et al. (20-3099) Document No.:    000039

| **ROBINSON CORRECTIONAL CENTER** | Number: | 03.02.108 |
|---|---|---|
| **INSTITUTIONAL DIRECTIVE** | Page(s): | 13 of 15 |
| | Effective Date: 01/01/18 | |

| | | References: |
|---|---|---|
| **Section:** | 03 Personnel and Labor Relations | |
| **Subsection:** | 02 Personnel Standards | |
| **Subject:** | 108 Standards of Conduct | |

requirements could result in disciplinary action up to and including discharge.

d.  Employees will not induce a witness or any other person who has knowledge regarding any issue under investigation by the Robinson Correctional Center, Department of Corrections, or any law enforcement agency to make statements, withhold information, or otherwise fail to cooperate with lawfully investigating authorities.

e.  Granting special privileges or showing partiality to an offender is prohibited. Special needs or problems of offenders are to be referred to the assigned counselor or other appropriate staff member.

f.  Uniformed employees must wear their uniforms exactly as prescribed including badge and issued nameplate. Uniformed employees shall be prohibited from wearing their uniforms away from work other than to and from. Grooming standards and dress code are addressed in A.D. 03.02.110 and 03.02.111.

g.  Each employee is issued an identification card which must be carried at all times. Non-uniformed employees must wear their ID card prominently displayed on their outer most garment at all times while on institutional property. No employee shall allow any other employee to use his/her identification card. Whenever the appearance of the employee changes so drastically as to render the identification purpose of the picture invalid (such as growing a mustache), the employee shall secure a new ID card. (A.D. 01.02.104)

h.  While on duty, all employees are to be alert at all times. No employee shall be asleep, dozing, or reclining in a relaxed position.

i.  Personal possessions, purses, wallets, and keys are not to be left in areas accessible to offenders. Desk and files should be locked at all times when they are not under direct supervision or control of an employee. Employees are not to bring large sums of currency into the institution.

j.  Employees and visitors are prohibited from bringing cameras or recording devices onto Correctional Center grounds without the written permission of the Warden, Assistant Warden, or Duty Warden.

k.  All inquiries occurring at the work site or in the community, concerning institutional business or offenders must be immediately directed to the Chief Administrative Officer. The Chief Administrative Officer and his/her designated representative are the only persons authorized to communicate with the media, i.e., newspapers, magazines, radio, television, etc.

l.  Employees are prohibited from willfully damaging or destroying offender's mail. Authorized personnel may read and spot check incoming and outgoing non-

Hicks v. Jefferys et al. (20-3099) Document No.:     000040

**APPENDIX 066**

| **ROBINSON CORRECTIONAL CENTER** | Number:        03.02.108 |
|---|---|
| **INSTITUTIONAL DIRECTIVE** | Page(s):       14   of   15 |
|  | Effective Date: 01/01/18 |

| Section: | 03 Personnel and Labor Relations | References: |
|---|---|---|
| Subsection: | 02 Personnel Standards | |
| Subject: | 108 Standards of Conduct | |

privileged mail for contraband and possible threats to the security and safety of the institution. Employees will not bring in or take out of the institution any offender's mail, with the exception of those individuals who are authorized to pick up and deliver institutional mail to the U.S. Post Office.

m.   Employees will not leave their assigned posts unless properly relieved or authorized by supervising employees.

n.   When searching an area, the employee must ensure that no damage is done to any property and will restore the area as close as possible to its original state after the shakedown is completed. (I.D. 05.01.111)

o.   Employees may bring into the institution on their person only that amount of prescription medication needed during their workday. Said medication should be accompanied by the prescription label or a copy of the prescription, and the employee must advise his/her supervisor of the medication being brought in. Any employee, who is taking medication that might adversely affect the employee's behavior, job performance, etc., must advise his/her supervisor.

If it is necessary to bring in prescription medication, employees should complete form ROB 0122 – Employee Medication, and deliver the form to their Supervisor.   The Supervisor should then mail the form in a confidential envelope to the Warden's Office, or hand deliver it, so that an Employee Medication Gate Pass can be prepared.

p.   All employees are prohibited from engaging in political activities during work hours or on institutional property. Employees are also prohibited from engaging in political activities while in uniform. This includes conducting meetings, soliciting money, selling or distributing tickets, literature, or petitions, as outlined by Executive Order Number 3 and the Hatch Act.

q.   Employees are required to provide the employer with his/her current telephone number and address. In the event of address or telephone number changes, employees are required to immediately report to personnel to report such information and sign various forms.

r.   Employees must possess the proper classification of valid driver's license to operate state owned vehicles. Any special instructions will be given to the employee when he/she signs for the vehicle. Departmental vehicles and equipment will be used only as defined in relevant Administrative or Institutional Directives.

s.   Smoking is permitted only in designated areas in accordance with negotiated smoking policy for Robinson Correctional Center. (I.D. 01.02.210)

Hicks v. Jefferys et al. (20-3099) Document No.:     000041

**APPENDIX 067**

| ROBINSON CORRECTIONAL CENTER | Number: | 03.02.108 |
|---|---|---|
| **INSTITUTIONAL DIRECTIVE** | Page(s): | 15  of  15 |
| | Effective Date: 01/01/18 | |

| | | References: |
|---|---|---|
| Section: | 03  Personnel and Labor Relations | |
| Subsection: | 02  Personnel Standards | |
| Subject: | 108  Standards of Conduct | |

    t.   Employees are permitted to bring food items into the facility; however, these items shall normally be for lunch only and shall be stored in the Employee Lounge and Employee Commissary. Food items for banquets or potlucks may be brought in with the Warden's approval and issuance of a gate pass.

    u.   Any employee wishing to bring visitors onto institutional grounds must have permission from the Warden or Duty Warden.

    v.   Employees entering or leaving the Reception or Sallyport will remove sunglasses, ski masks, or any other facial obstructions for identification purposes.

    w.   Employees are not to give offenders their home address or telephone number, or any other employee's home address or telephone number.

    x.   Discrimination against employees or offenders based on race, color, sex, religion, age, arrest record, national ancestry, or origin, physical or mental disability, marital status, sexual orientation, citizenship status, or unfavorable discharge from the military services is prohibited.

V.    **Facility Review**

A facility review will be conducted in accordance with the facility review schedule issued annually by the Chief Administrative Officer.

Authorized by:

           Michelle Neese, Acting Warden
           Robinson Correctional Center

Supersedes Institutional Directive 03.02.108 dated 11/01/13.

Hicks v. Jefferys et al. (20-3099) Document No.:   000042

**APPENDIX 068**

TITLE 20:  CORRECTIONS, CRIMINAL JUSTICE, AND LAW ENFORCEMENT
CHAPTER I:  DEPARTMENT OF CORRECTIONS
SUBCHAPTER a:  ADMINISTRATION AND RULES

PART 120
RULES OF CONDUCT

Section
120.10          Applicability
120.15          Responsibilities
120.20          Definitions
120.30          Conduct of Individuals
120.40          Compliance with Laws and Regulations
120.50          Socializing with Committed Persons
120.60          Bribes, Gifts, and Gratuities
120.70          Trading or Trafficking
120.80          Conflicts of Interest
120.90          Information to be Reported
120.95          Giving False Information
120.100         Violation of Rules

**AUTHORITY**:  Implementing Section 3-2-2 and authorized by Section 3-7-1 of the Unified Code of Corrections [730 ILCS 5/3-2-2 and 3-7-1] and Sections 5-15, 10-10, 10-15, and 20-70 of the State Officials and Employees Ethics Act [5 ILCS 430/5-15, 10-10, 10-15, and 20-70] and Section 922 of the Federal Gun Control Act [18 USC 922] and Section 24-3.1(4) of the Illinois Criminal Code of 1961 [720 ILCS 5/24-3.1(4)].

**SOURCE**:  Adopted at 11 Ill. Reg. 11517, effective July 1, 1987; amended at 30 Ill. Reg. 6329, effective April 1, 2006.

### Section 120.10  Applicability

This Part applies to all persons who provide personal services or delivery of services, including Department of Corrections (Department) employees, contractual employees, and volunteers.  Offender's visitors shall comply with the rules set forth in 20 Ill. Adm. Code 525.

(Source:  Amended at 30 Ill. Reg. 6329 effective April 1, 2006.)

### Section 120.15  Responsibilities

a)      Unless otherwise specified, the Director or Chief Administrative Officer may delegate responsibilities stated in this Part to another person or persons or designate another person or persons to perform the duties specified.

b)      No other individual may routinely perform duties whenever a Section in this Part specifically states the Director or Chief Administrative Officer shall personally perform

1 of 5

Hicks v. Jefferys et al. (20-3099) Document No.:     000015



the duties. However, the Director or Chief Administrative Officer may designate another person or persons to perform the duties during periods of his temporary absence or in an emergency.

## Section 120.20  Definitions

"Department" means the Department of Corrections.

"Employee" for the purposes of this Part, means persons who provide personal services or delivery of services, including Department employees, contractual employees, and volunteers.

"Offender" means any person committed to the custody of the Department, including those persons released on parole or mandatory supervised release.

(Source:  Amended at 30 Ill. Reg. 6329 effective April 1, 2006.)

## Section 120.30  Conduct of Individuals

Employees shall conduct themselves in a manner that will not reflect unfavorably on the Department and shall not engage in conduct that is unbecoming of an employee or that may reflect unfavorably on or impair the operations of the Department.

(Source:  Amended at 30 Ill. Reg. 6329 effective April 1, 2006.)

## Section 120.40  Compliance with Laws and Regulations

a) Employees shall obey all federal, State, and local laws and applicable court decisions and orders related to the performance of their services to the Department.

b) Employees shall verbally report as soon as possible and shall submit a written report within five working days after any:

   1) Arrest, indictment, or conviction for a felony or a misdemeanor, other than a minor traffic offense such as a parking ticket, to their immediate supervisor. Driving under the influence is a reportable offense. The report shall specify the facts forming the basis for the arrest, indictment, or conviction and the caption of the case.

      A) Any employee who is convicted after March 1, 1998 of a domestic violence crime as defined in the Federal Gun Control Act and who may be required to possess, transport, or receive a weapon or ammunition in the performance of his or her duties shall be terminated from employment.

      B) Any employee who is charged and convicted of a felony shall be terminated from employment.

**APPENDIX 070**

2)    Order of protection against any employee.  The report shall specify the facts for the order of protection and include a caption of the case and the length of the order.

   A)   Any employee who has an order of protection against him or her shall provide a copy of the order of protection or emergency or amended order of protection with his or her written report.

   B)   Any employee who has an order of protection against him or her that prohibits the possession or use of a firearm shall not be issued a weapon for the duration of the order.

   C)   Any employee whose order of protection prohibits the possession or use of firearms and is for a length of time exceeding 90 days and who may be required to possess, transport, or receive a weapon or ammunition in the performance of his or her duties shall be terminated from employment.

3)    Admission as an inpatient in a mental hospital if the employee is authorized to carry a firearm.

   A)   Any employee who has been admitted as an inpatient in a mental health hospital in the last five years is prohibited from receiving a firearm or ammunition.

   B)   Following an admission as an inpatient in a mental health hospital, employees authorized to carry a firearm shall submit either a court order or waiver from the State Police pursuant to 430 ILCS 65/10 (c) lifting the prohibition from possession of a firearm and firearms ammunition or be terminated.

c)    Employees shall comply with departmental rules, written procedures, bulletins and written or verbal orders issued by Department authorities.

d)    Employees shall utilize State equipment, property, or services only as authorized by the job assignment.

e)    Employees shall have a valid driver's license and, at minimum, be covered by liability insurance prior to transporting offenders in vehicles.

f)    Employees shall cooperate with any investigation conducted by internal investigators and other investigative authorities, including the Office of the Executive Inspector General.

g)    Employees shall respect the confidentiality of information and shall be prohibited from accessing or disclosing information such as, but not limited to, investigations, offender records, and personnel issues, except to the extent required in the performance of their job duties.

3 of 5

Hicks v. Jefferys et al. (20-3099) Document No.:    000017

APPENDIX 071

h) Employees shall not intentionally perform any prohibited political activity during any compensated time other than benefit time such as vacation, personal, holiday, compensatory, or equivalent earned time.  Employees shall not intentionally misappropriate any State property or resources by engaging in prohibited political activity for the benefit of any campaign for elective office or any political organization.

(Source:  Amended at 30 Ill. Reg. 6329 effective April 1, 2006.)

## Section 120.50  Socializing with Committed Persons

a) Employees shall not knowingly socialize with or engage in business transactions with any offender or releasee, or a relative or known close associate of an offender or releasee, except in the performance of an assignment or as approved in writing by the Director.  However, employees shall be permitted to purchase products of offenders, such as arts, crafts, books, etc., that are offered through the facility's commissaries or offered to the general public in a public market place or forum.

b) In determining whether to grant approval, the Director shall consider factors such as whether the employee has direct custodial responsibility for the offender; the nature of the business activity to be conducted; the nature of the relationship or association; the criminal and behavioral history of the offender; and employee history and conduct.

(Source:  Amended at 30 Ill. Reg. 6329 effective April 1, 2006.)

## Section 120.60  Bribes, Gifts, and Gratuities

a) Employees shall not accept or request bribes as an inducement to perform or not to perform any act related to their dealings with the Department.

b) Employees shall not accept any gifts or gratuities or offers of the same from offenders or releasees, persons who are known to the employee to be a relative, close associate, or friend of offenders or releasees, or from anyone who has or expects to have business dealings with the Department.

c) Employees shall not intentionally solicit or accept any gift from any prohibited source in accordance with 5 ILCS 430/10.  This ban applies to spouses of and immediate family living with employees.

d) Such offers shall be reported immediately in writing to the employee's supervisor.

(Source:  Amended at 30 Ill. Reg. 6329 effective April 1, 2006.)

## Section 120.70  Trading or Trafficking

Individuals shall not trade or traffic with, or aid, abet, or solicit unauthorized actions by, offenders or releasees.

(Source:  Amended at 30 Ill. Reg. 6329 effective April 1, 2006.)

4 of 5
Hicks v. Jefferys et al. (20-3099) Document No.:    000018

APPENDIX 072

**Section 120.80  Conflicts of Interest**

a)      Employees shall not engage in conduct that impairs their ability to perform their duties and responsibilities in an impartial manner.  Employees shall notify their supervisor when their job duties may give rise to or be construed as a conflict of interest.

b)      Employees' positions at the Department shall be considered primary employment. Employees shall not accept secondary employment unless the request is approved by the Department.

(Source:  Amended at 30 Ill. Reg. 6329 effective April 1, 2006.)

**Section 120.90  Information to be Reported**

a)      Employees shall immediately report to their supervisor any information indicating a violation or attempted violation of criminal laws, or a threat to the safety and security of the facility, its property or any person, including information regarding a potential escape.

b)      Reports shall be made verbally and, if requested or if required, reports shall be made in writing in the manner directed by the employee's supervisor.

(Source:  Amended at 30 Ill. Reg. 6329 effective April 1, 2006.)

**Sections 120.95 Giving False Information**

Employees who knowingly provide false information shall be subject to disciplinary action, including termination of employment.

(Source:  Amended at 30 Ill. Reg. 6329 effective April 1, 2006.)

**Section 120.100  Violation of Rules**

Failure to comply with any of the foregoing rules of conduct may result in discipline, termination of services, or restriction from entering all or some Department facilities.

(Source:  Amended at 30 Ill. Reg. 6329 effective April 1, 2006.)

*5 of 5*

Hicks v. Jefferys et al. (20-3099) Document No.:    000019

**APPENDIX 073**

| | **Illinois Department of Corrections** |
|---|---|
| | **Administrative Directive** |

| Number: | Title: | Effective: |
|---|---|---|
| 03.02.113 | Personal Use of Social Media | 11/1/2019 |

| Authorized by: | | |
|---|---|---|
| | *[Original Authorized Copy on File]* | **Rob Jeffreys** Acting Director |

| Authority: 730 ILCS 5/3-2-2 820 ILCS 55/10 | Referenced Policies: 01.02.400 | Referenced Forms: |
|---|---|---|

I.  **POLICY**

The Department shall require employees to conduct themselves in a professional manner when engaging in personal use of social media platforms and, whether on duty or off duty, not engage in conduct that is unbecoming of a State employee or that may reflect unfavorably on or impair operations of the Department.

II.  **PROCEDURE**

A.  **Purpose**

The purpose of this directive is to establish written standards for personal use of social media by all employees of the Department.

B.  **Applicability**

This directive is applicable to all employees of the Department.

C.  **Facility Reviews**

A facility review of this directive shall be conducted at least annually.

D.  **Designees**

Individuals specified in this directive may delegate stated responsibilities to another person or persons unless otherwise directed.

E.  **Definitions**

Employee – for purposes of this directive, refers to any full-time, part-time, conditional or temporary, State or contractual staff member of the Department.

Personal use of social media – engagement or participation in any social media platform not related to a person's employment.

Post (noun) – an item inserted in a blog, or an entry to any type of social media platform.

Post (verb) – the act of creating, uploading, editing or adding information to any social media platform. This shall include, but not be limited to, text, photographs, audio, video or any other multimedia file.

Social Media Platform – any electronic communication (such as personal websites and outlets for social networking and microblogging) through which participants utilize online communities to share information, ideas, personal messages and other content through any electronic format including, but not limited to, text, video, photographs, digital documents, audio and other multimedia files. Examples of social media outlets include, but are not limited to, Facebook, Instagram, LinkedIn, Reddit, Tumblr, Twitter, WhatsApp and YouTube.



PLAINTIFF'S EXHIBIT 10

**APPENDIX 074**

| Illinois Department of Corrections<br>Administrative Directive | | Page 2 of 3 |
|---|---|---|
| Number:<br>03.02.113 | Title:<br>Use of Social Media | Effective:<br>11/1/2019 |

**F.**  **General Provisions**

This directive shall address the full breadth and scope of social media rather than any one particular format. The Department recognizes that as technology advances, new methods for social media participation will emerge.

1.  All employees shall be informed of the provisions of this directive and the directive shall be accessible to employees.

2.  Training on the Department's policy on personal use of social media shall be included in pre-service training for new employees and shall be a component of annual training programs.

3.  Nothing in this directive shall prohibit employees from engaging in their constitutional right to express their views under the First Amendment but shall prohibit personal use of social media to disseminate certain content not protected by the First Amendment.

4.  Employees shall not use Department property, including, but not limited to, desktop computers, laptop computers, cell phones, handheld digital or electronic devices and digital media storage, to engage in personal use of social media.

5.  Employees shall have no reasonable expectation of privacy when engaging in personal use of social media.

   a.  Any information employees create, transmit, download, exchange or discuss that is available online in a public forum or that is accessible by the public may be accessed by the Department without prior notice.

   b.  The content of social networking websites may be obtained for use in criminal trials, civil proceedings and Department investigations.

6.  Employees shall respect the confidentiality of information and are prohibited from accessing or disclosing information such as, but not limited to, investigations, offender records and personnel issues, except to the extent needed in the performance of their job duties.

**G.**  **Requirements**

1.  Employees shall obey all Department Rules, Administrative Directives and applicable federal, State and local laws.

2.  Use of any social media platform(s) by an authorized employee in the performance of his or her job duties shall be in accordance with Administrative Directive 01.02.400.

3.  Unless otherwise authorized by the Director, employees shall not suggest or imply that they are:

   a.  Speaking or acting on behalf of the Department; or

   b.  Representing or presenting the interests of the Department.

4.  Employees shall not post, display or transmit:

   a.  Any communications that discredit or reflect poorly on the Department, its mission or goals, or in any way jeopardize or impair the operations of the Department, including the ability of others to perform their duties.

   b.  Any information, including but not limited to rank, title or position, that in any way suggests they are representing themselves as an official spokesperson of the

**APPENDIX 075**

| | Illinois Department of Corrections **Administrative Directive** | Page 3 of 3 |
|---|---|---|
| Number: **03.02.113** | Title: Use of Social Media | Effective: **11/1/2019** |

Department and the State of Illinois without written permission from the Director.

    c.   Any intellectual property of the Department or the State of Illinois without the specific authorization of the Director. Intellectual property shall include, but not be limited to, any depiction or illustration of the State or Department seal, or the Department name, logo, uniform, ID Card or badge, patch, official photographs, audio or video files or any text documents (paper or electronic)..

    d.   Any depiction or illustration of Department issued firearms, restraints or tactical equipment.

    e.   Any references to any other employee's employment by the Department without that person's consent.

    f.   Information, records, documents, video or audio recordings, or photographs belonging to the Department or relating to offenders in the Department's custody to which they have access as a result of their employment without the written permission of the Director, including but not limited to information regarding:

        (1)   Current, past or pending Department investigation, where such post would impede or interfere with said investigation; jeopardize the safety and security of the Department, its employees or offender population; or release confidential information regarding staff or offenders.

        (2)   Current, past or pending criminal or civil proceedings pertaining to or arising from any matter involving the Department, including allegations of misconduct, where such post would impede or interfere in said proceedings.

    g.   Any content that could be viewed as: vulgar; obscene; threatening; intimidating; harassing; as a violation of the Department's polices on discrimination or harassment; or that is otherwise disparaging to a person or group based on race, religion, sexual orientation or any other protected class under federal or State law. Such content shall include, but not be limited to:

        (1)   Use of ethnic slurs, profanity, personal insults, any material that is harassing, defamatory, fraudulent or discriminatory, or other content or communications that would not be acceptable under Department Rules, Administrative Directive, or State or federal law.

        (2)   Use or display of sexually explicit images, cartoons, jokes, messages or other material that would be considered in violation of Department Rules, Administrative Directives and State laws regarding sexual harassment.