No. 23-1091

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| GARY HICKS, | ) | Appeal from the United States |
| | ) | District Court for the Central |
| Plaintiff-Appellant, | ) | District of Illinois |
| | ) | |
| v. | ) | |
| | ) | No. 3:20-cv-03099-SEM-KLM |
| ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS, MICHELLE | ) | |
| NEESE, JOSH YARGUS, ROB | ) | |
| JEFFREYS, and JOHN EILERS, | ) | The Honorable |
| | ) | SUE E. MYERSCOUGH, |
| Defendants-Appellees. | ) | Judge Presiding. |

**BRIEF OF DEFENDANTS-APPELLEES**

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-3312

**JONATHAN J. SHEFFIELD**
Assistant Attorney General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-2175 (office)
(773) 590-7117 (cell)
Jonathan.Sheffield@ilag.gov

Attorneys for Defendants-Appellees

# TABLE OF CONTENTS

**Page(s)**

JURISDICTIONAL STATEMENT ................................................................. 1

ISSUES PRESENTED FOR REVIEW ........................................................ 3

STATEMENT OF THE CASE ....................................................................... 4

Hicks was a correctional sergeant for the Department when his Facebook posts caught media attention, prompting a Departmental investigation. ............................. 5

The Department investigated and found that Hicks's posts violated its Rules and Standards of Conduct ............................................................................................... 8

The district court granted summary judgment for defendants ................................. 11

SUMMARY OF ARGUMENT ...................................................................... 15

ARGUMENT ................................................................................................... 16

I.     The standard of review is *de novo* ....................................................... 16

II.    Summary judgment for defendants was proper because Hick's First Amendment claim failed on the merits and, alternatively, on qualified immunity grounds. ........................................................... 16

       A.    The district court's *Pickering* balancing rightly conclude that the Department's strong interests as an employer outweighed the limited speech interest in Hicks's Facebook posts. ........................... 19

             1.    This Department's interest in addressing disruption to its mission and operations was strong after Hicks's derogatory Facebook posts garnered negative public attention .................... 20

                   a.    Defendants reasonably concluded that Hicks's Facebook posts impaired and threatened Department operations because they triggered negative media coverage. .............. 21

                   b.    Defendants reasonably concluded that Hicks's posts threatened instructional harmony and security. ............... 28

                   c.    Defendants reasonably concluded that Hicks's posts

reflected an inability to carry out his
supervisory duties. ................................................................ 31

     2.    The speech interests in Hicks's Facebook's posts were weak because they addressed matters of public concern in only a limited sense and did not pertain to his expertise as a public employee. ...................................... 34

  B.    Alternatively, qualified immunity barred Hicks's First Amendment claim. .................................................................... 38

III.  Summary Judgment was proper because Hicks's due process claim failed on the merits and, alternatively, on qualified immunity grounds.......................................................................................... 41

  A.    The Department's standards were not impermissibly vague as applied to Hicks's Facebook posts............................................ 41

  B.    Alternatively, qualified immunity barred Hicks's due process claim. ........................................................................................ 49

CONCLUSION ........................................................................................ 51

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*Arnett v. Kennedy*,
  416 U.S. 134 (1974) ................................................................................ 19, 43, 50

*Ashcroft v. al–Kidd*,
  563 U.S. 731 (2011) ............................................................................................ 39

*Bauer v. Shepard*,
  620 F.3d 704 (7th Cir. 2010) ............................................................................ 49

*Bence v. Breier*,
  501 F.2d 1185 (7th Cir. 1974) ....................................................... 13-14, 46-47, 50

*Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*,
  977 F.3d 530 (6th Cir. 2020) ........................................................................ *passim*

*Breuer v. Hart*,
  909 F.2d 1035 (7th Cir. 1990) .......................................................................... 29

*Brown v. Chicago Bd. of Educ.*,
  824 F.3d 713 (7th Cir. 2016) .................................................................... 42, 45-46

*Burritt v. Ditlefsen*,
  807 F.3d 239 (7th Cir. 2015) ............................................................................ 38

*Calumet River Fleeting, Inc. v. Int'l Union of Operating Engs., Local 150, AFL-CIO*,
  824 F.3d 645 (7th Cir. 2016) ............................................................................ 16

*Campbell v. Towse*,
  99 F.3d 820 (7th Cir. 1996) .............................................................................. 36

*City of San Diego v. Roe*,
  543 U.S. 77 (2004) ...................................................................... 17-18, 30, 37, 45

*Coady v. Steil*,
  187 F.3d 727 (7th Cir. 1999) ............................................................................ 41

*Coates v. City of Cincinnati*,
  402 U.S. 611 (1971) .......................................................................................... 45

*Connick v. Myers*,
  461 U.S. 138 (1983) ...................................................................................... *passim*

iii

*Craig v. Rich Twp. High Sch. Dist. 227*,
　　736 F.3d 1110 (7th Cir. 2013)...................................................................20, 29, 41

*Crowly v. L.L. Bean, Inc.*,
　　303 F.3d 387 (1st Cir. 2019) .......................................................................... 24

*D.C. v. Wesby*,
　　138 S. Ct. 577 (2018) .................................................................................38, 39, 49

*Dodge v. Evergreen School District #14*,
　　56 F.4th 767 (9th Cir. 2022) ........................................................................ 36, 41

*Eberhardt v. O'Malley*,
　　17 F.3d 1023 (7th Cir. 1994)..........................................................................35

*Fenico v. City of Philadelphia*,
　　70 F.4th 151 (3d Cir. 2023)............................................................................35

*Garcetti v. Ceballos*,
　　547 U.S. 410 (2006) ...................................................................................16-18, 37

*Gentile v. State Bar of Nev.*,
　　501 U.S. 1030 (1991) .....................................................................................45

*Graziosi v. City of Greenville Miss.*,
　　775 F.3d 731 (5th Cir. 2015)..........................................................................30

*Grayned v. City of Rockford*,
　　108 U.S. (1972) ........................................................................................42, 45

*Greer v. Amesqua*,
　　212 F.3d 358 (7th Cir. 2000).................................................................30, 42-45, 50

*Gregorich v. Lund*,
　　54 F.3d 410 (7th Cir. 1995)..........................................................................39, 41

*Grutzmacher v. Howard Cnty.*,
　　851 F.3d 332 (4th Cir. 2017)......................................................................*passim*

*Gustafson v. Jones*,
　　290 F.3d 895 (7th Cir. 2002)....................................................................20, 25, 40

*Harnishfeger v. United States*,
  943 F.3d 1105 (7th Cir. 2019)....................................................................*passim*

*Hernandez v. City of Phoenix*,
  43 F.4th 966 (9th Cir. 2022) ...................................................30, 38, 48

*Hernandez v. Foster*,
  657 F.3d 463 (7th Cir. 2011)...............................................................42

*Holcomb v. Freedman Anselmo Lindberg, LLC*,
  900 F.3d 990 (7th Cir. 2018).................................................................16

*Hynes v. Mayor & Council of Oradell*,
  425 U.S. 610 (1976) ...........................................................................45

*Kisela v. Hughes*,
  138 S. Ct. 1148 (2018) .........................................................................39

*Kluge v. Brownsburg Cmty. Sch. Corp.*,
  64 F.4th 861 (7th Cir. 2023) .................................................................47

*Kokkinis v. Ivkovich*,
  185 F.3d 840 (7th Cir. 1999)................................................25, 30, 36

*Lalowski v. City of Des Plaines*,
  789 F.3d 784 (7th Cir. 2015)...........................................................32-33

*Lapka v. Chertoff*,
  517 F.3d 974 (7th Cir. 2008)...............................................................23

*Liverman v. City of Petersburg*,
  844 F.3d 400 ...............................................................31, 37, 41

*Makaeff v. Trump Univ., LLC*,
  715 F.3d 254 (9th Cir. 2013)..................................................................7

*Marks v. United States*,
  430 U.S. 188 (1977) .......................................................................25, 43

*McEvoy v. Spencer*,
  124 F.3d 92 (2d Cir. 1997) ...................................................................28

*Melton v. City of Oklahoma City*,
  879 F.2d 706 (10th Cir. 1989)...............................................................30

*Moser v. Las Vegas Metro. Police Dep't,*
   984 F.3d 900 (9th Cir. 2021)................................................................ 27

*Munroe v. Cent. Bucks Sch. Dist.,*
   805 F.3d 454 (3d Cir. 2015) ......................................................... 30, 45

*Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.,*
   796 F.3d 717 (7th Cir. 2015)................................................................ 16

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC,*
   709 F.3d 109 (2d Cir. 2013) .................................................................. 7

*Oneida Nation v. Vill. of Hobart,*
   968 F.3d 664 (7th Cir. 2020)................................................................ 16

*Parker v. Levy,*
   417 U.S. 733 (1974) ............................................................... 42, 44, 48

*Parungao v. Cmty. Health Sys., Inc.,*
   858 F.3d 452 (7th Cir. 2017).................................................................. 7

*Pearson v. Callahan,*
   555 U.S. 223 (2009) ............................................................................ 42

*Pickering v. Board of Education,*
   391 U.S. 563 (1968) .................................................................... *passim*

*Piggee v. Carl Sandburg Coll.,*
   464 F.3d 667 (7th Cir. 2006)................................................................ 46

*Rankin v. McPherson,*
   483 U.S. 378 (1987) ........................................................... 19, 28, 33, 45

*Reed v. Brex, Inc.,*
   8 F.4th 569 (7th Cir. 2021) ...................................................... 16, 27, 47

*Rivas-Villegas v. Cortesluna,*
   142 S. Ct. 4 (2021) ............................................................................. 38

*Roberts v. United States Jaycees,*
   468 U.S. 609 (1984) ............................................................................ 48

*Sandin v. Conner*,
     515 U.S. 472 (1995) ............................................................. 25

*Schneiter v. Carr,* No. 21-CV-135-JDP,
     2022 WL 1773484 (W.D. Wis. June 1, 2022). ..................................... 19

*Selkridge v. United of Omaha Life Insurance Co.*,
     360 F.3d 155 (3d Cir. 2004) ..................................................... 7

*Snyder v. Phelps*,
     562 U.S. 443 (2011) ............................................................ 17

*Swank v. Smart*,
     898 F.2d 1247 (7th Cir. 1990) .............................................. 46, 50

*Tay Tay v. Dennison*,
     457 F. Supp. 3d 657 (S.D. Ill. 2020) ...................................... 10, 24

*United States v. National Treasury Employees Union*,
     513 U.S. 454 (1995) (*NTEU*) ............................................... 17, 19

*Walker v. Weatherspoon*,
     900 F.3d 354 (7th Cir. 2018) ................................................... 2

*Waters v. Churchill*,
     511 U.S. 661 (1994). .................................................... *passim*

*White v. Pauly*,
     580 U.S. 73 (2017) ............................................................ 39

*Wis. Mut. Ins. Co. v. United States,*
     441 F.3d 502 (7th Cir. 2006) ................................................... 2

## Statutes and Regulations

28 U.S.C. § 1291 .................................................................. 2

28 U.S.C. § 1331 .................................................................. 1

28 U.S.C. § 2107(a) ............................................................... 2

42 U.S.C. § 1983 .................................................................. 1

## Rules

Fed. R. App. P. 4(a)(1)(A) ............................................................ 2

Fed. R. App. P. 4(a)(2) ................................................................. 2

Fed. R. App. P. 4(a)(7)(A)(ii) ..................................................... 2

Fed. R. Civ. P. 56(a) ............................................................... 1, 16

Fed. R. Civ. P. 58 ........................................................................ 1

Fed. R. Evid. 201 ......................................................................... 7

7th Cir. R. 28(b) ......................................................................... 1

## Other Authorities

*About Congresswoman Rashida Tlaib*, https://tlaib.house.gov/about
(visited August 7, 2023) ........................................................... 35

Emily Hoerner, *On Facebook, Illinois prison guards, accused of abuses by
transgender inmates, mocked LGBTQ community*, Chi. Sun Times,
https://chicago.suntimes.com/politics/2019/9/4/20849134/facebook-transgender-
illinois-correctional-officers-abuses-strawberry-hampton-lgbtq-mocked-memes
(visited August 7, 2023) ............................................................. 7

Tatiana Hyman, *The Harms of Racist Online Hate Speech in the Post-Covid Working
World: Expanding Employee Protections,*
89 Fordham L. Rev. 1553 (2021) ................................................. 23

Denise S. Smith & Carolyn R. Bates, *The Evolution of Public Employee Speech
Protection in an Age of Social Media,*
22 Atlantic L.J. 1 (2020) .................................................. 22, 23, 27

Lilli B. Wofsy, *Will I Get Fired for Posting This?:  Encouraging the Use of Social
Media Policies to Clarify the Scope of the Pickering Balancing Test,*
51 Seton Hall L. Rev. 259 (2020) ......................................... 21, 30

# JURISDICTIONAL STATEMENT

The jurisdictional statement of Plaintiff-Appellant Gary Hicks is not complete and correct.  As required by 7th Cir. R. 28(b), Defendants-Appellees Illinois Department of Corrections (Department), Michelle Neese, Josh Yargus, Rob Jeffreys, and John Eilers provide this statement.

Hicks, a Department employee, filed an amended complaint in the district court under 42 U.S.C. § 1983, asserting that his rights under the First and Fourteenth Amendments to the United States Constitution were violated when defendants suspended him over his publicly available Facebook posts that received negative media attention for being "Islamophobic," degrading homosexuals, and discussing overthrowing the government.  Doc. 21.[1]  Because the operative complaint raised federal questions, the district court had subject matter jurisdiction under 28 U.S.C. § 1331.

Defendants and Hicks filed cross motions for summary judgment on both claims under Fed. R. Civ. P. 56, Docs. 33, 35, and the district court granted defendants' motion and denied Hicks's cross-motion on December 13, 2022, Doc. 47, thereby disposing of all claims against all parties.

On January 12, 2023, Hicks filed a notice of appeal, Doc. 48, and the next day, a separate judgment order was entered on the district court's docket under Fed. R. Civ. P. 58, Doc. 50.  No motion to alter or amend the judgment was filed.

---

[1]  This brief cites the record on appeal, which is the district court's docket, as "Doc. __" and cites Hicks's opening brief as "AT Br. __."

When, as here, a notice of appeal is filed after entry of an order disposing of all claims against all parties, but before the entry of judgment, the notice is treated as filed on the date of and after the entry of judgment.  Fed. R. App. P. 4(a)(2); *Wis. Mut. Ins. Co. v. United States,* 441 F.3d 502, 504 (7th Cir. 2006) *see also* Fed. R. App. P. 4(a)(7)(A)(ii) (judgment deemed to be entered on the earlier of the Rule 58 judgment or 150 days after a dispositive order is entered on the civil docket); *Walker v. Weatherspoon*, 900 F.3d 354, 356 (7th Cir. 2018) (same).

Because the notice of appeal was filed within 30 days of the entry of judgment, it was timely under 28 U.S.C. § 2107(a) and Fed. R. App. P. 4(a)(1)(A), and this court has jurisdiction over Hicks's appeal from a final judgment under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.      Whether summary judgment for defendants was proper on Hicks's First Amendment claim because the Department's interests in addressing and preventing harm to its reputation and operations outweighed the limited speech interest in Hicks's social media posts disparaging Muslims and homosexuals and challenging government authority, posts that Hicks placed on a publicly accessible Facebook profile where he identified himself as a Department employee.

2.      Whether, alternatively, summary judgment on Hicks's First Amendment claim should be affirmed on qualified immunity grounds because Hicks failed to show that he had a clearly established right to place posts that were actually or predictably harmful to the Department's reputation and operations on a publicly accessible Facebook profile where he identified himself as a Department employee.

3.      Whether summary judgment was proper on Hicks's vagueness claim under the Due Process Clause because public employers, by necessity, must use broad and general terms when regulating employee conduct, and reasonable employees in Hicks's position would have understood that the Department's standards for off-duty conduct could apply to Hicks's posts on his publicly accessible Facebook profile where he identified himself as a Department employee.

4.      Whether, alternatively, summary judgment on Hicks's vagueness claim should be affirmed on qualified immunity grounds because Hicks offered no authority clearly establishing that the Department's standards were impermissibly vague as applied to his Facebook activity.

## STATEMENT OF THE CASE

In 2019, Hicks kept a publicly accessible Facebook profile on which he identified himself as a correctional sergeant with the Department.  Doc. 35-1 at 5; Doc. 35-2 at 5.  In September of that year, a reporter with the Chicago Sun-Times contacted the Department about certain Facebook posts Hicks had published in mid-2019.  Doc. 34-2 at 9-10.  That same day, the newspaper published an article that described Hicks's posts as "Islamophobic," "derogatory" toward homosexuals, and referencing government overthrow.  Doc. 35-4 at 3.  Based on the media contact and the article, the Department conducted an investigation into Hicks's Facebook posts and, at the conclusion of the investigation, deemed his posts a violation of its Rules and Standards of Conduct for employees and suspended him for ten days without pay.  Doc. 34-2 at 9-10; Doc. 35-11 at 11.

Hicks filed this action asserting that the suspension violated his First Amendment right to free speech and Fourteenth Amendment right to due process, specifically to notice that his online speech could be punished under the Department's standards.  Doc. 21 at 9-10.  He sought damages and an injunction.  *Id*. Following discovery, the parties filed cross motions for summary judgment on both claims.  Docs. 34, 35.  The district court granted defendants' motion, ruling that Hicks's First Amendment claim failed on the merits and, alternatively, that defendants were entitled to qualified immunity, and that his due process claim also was barred by qualified immunity.  Doc. 47.  The following evidence presented at summary judgment was undisputed.

**Hicks was a correctional sergeant for the Department when his Facebook posts caught media attention, prompting a Departmental investigation.**

Throughout 2019, Hicks worked at Robinson Correctional Center as a correctional sergeant, a mid-level supervisor who oversaw staff and inmates.  Doc. 35-2 at 9-12; Doc. 35-5 at 9.

Every year Department employees underwent training requiring them to review policies that prohibited off-duty conduct that could reflect unfavorably on the Department or impair its operations.  Doc. 35-2 at 25.  Section 120.30 of the Department's Rules of Conduct prohibited employees from conduct that is "unbecoming of an employee," could "reflect unfavorably" on the Department, or could "impair" its operations.  Doc. 35-9 at 2.  Administrative Directive 03.02.108, titled Standards of Conduct, required the same, stating that "whether on duty or off duty," employees must not engage in conduct "unbecoming of a State employee or that may reflect unfavorably on or impair operations of the Department."  Doc. 35-7 at 1.  Robinson had a corresponding Institutional Directive that prohibited the same conduct.  Doc. 35-8 at 1, 11, 14.  Robinson's Institutional Directives further prohibited discrimination against staff or inmates based on religion, national origin, sexual orientation, and other characteristics.  *Id.* at 15.  Both the Administrative and Institutional Directives also stated that a failure to comply with these standards may result in discipline.  Doc. 35-7 at 1; Doc. 35-8 at 1.  Hicks was aware that the standards applied to his off-duty conduct.  Doc. 35-2 at 25-26.

In mid-2019, Hicks shared five posts on his publicly accessible Facebook page that expressed hostility toward individuals based on their religion, national origin,

and sexual orientation, and that stated his desire to participate in potential government overthrow.  One post he shared featured an image of United States Representative Ilhan Omar with text reading:  "Musslamic [sic] Democrat, Ilhan Omar, has threatened Members of Congress.  She's told several Republicans that she'll send them 'shawarma,' to give them a taste of her culture.  Share to say arrest her now!"  Doc. 34-2 at 1.  Another post featured an image of United States Representative Rashida Tlaib edited to depict her wearing a sombrero with the word "Mexico" on the brim and text reading:  "Mexican word of the day:  Tlaib.  If you don't like the USA you are welcome Tlaib."  *Id.* at 4.  Yet another post stated:  "The devil is a liar.  Abortion is murder homosexuality is sin and Allah is not God!"  *Id.* at 7.  The fourth post read:  "Things We Don't See Jews Doing.  1. Flying Planes Into Buildings.  2. Supporting Terrorism.  3. Forcing Young Girls To Marry Old Men.  4. Mutilating Females [sic] Genitalia.  5. Beheading People.  6. Trying To Dominate The World.  7. Stonings.  8. Canings.  9. Lashings.  10. Trying To Destroy America."  *Id.* at 6.  And in his fifth post Hicks said:  "Dear Lord, if there must be a civil war or a government overthrow, please let it happen before I am dead or too old to fight in it. Amen."  *Id.* at 2.

Hicks's Facebook profile was publicly viewable, not set to private, identified him as both a Department employee and correctional sergeant, Doc. 35-1 at 5; Doc. 35-2 at 5, and featured a photograph posted in 2014 or 2015 showing him in his Department uniform, Doc. 35-1 at 4; *see also* Doc. 40 at 24; Doc. 40-1 at 3.

On September 4, 2019, the Chicago Sun-Times published an article that described Hicks's Facebook posts, along with those of two other Department employees.  Doc. 35-3.  The article noted that Hicks identified himself on Facebook as a Department employee, and the article characterized Hicks's posts as "Islamophobic," "derogatory" toward homosexuals, and showing interest in participating in government overthrow; the article included a screen shot of Hicks's government overthrow post.  *Id.* at 3.  An initial version of the article incorrectly identified Hicks as a defendant in a lawsuit brought by a transgender prisoner against a different sergeant Hicks, among others.  *Id.*; Doc. 35-4; *Tay Tay v. Dennison*, S. D. Ill. Nos. 3:19-cv-501-NJR-MAB, No. 3:16-cv-92-NJR-MAB.[2]  The article was amended at some point to remove this inaccuracy and remains online.[3]

The same day the article was published, the reporter emailed Hicks's posts to Eilers, Doc. 35-11 at 11, who was both the Department's Chief of Operations,

---

[2]  This court may take judicial notice of "court filings and other matters of public record when the accuracy of those documents reasonably cannot be questioned." *Parungao v. Cmty. Health Sys., Inc.*, 858 F.3d 452, 457 (7th Cir. 2017); Fed. R. Evid. 201.

[3]  *See* Emily Hoerner, *On Facebook, Illinois prison guards, accused of abuses by transgender inmates, mocked LGBTQ community*, Chi. Sun Times, https://chicago.suntimes.com/politics/2019/9/4/20849134/facebook-transgender-illinois-correctional-officers-abuses-strawberry-hampton-lgbtq-mocked-memes (visited Aug. 7, 2023).  Courts may take judicial notice of a newspaper article's existence and the fact that press coverage contained certain information, without relying on the truth of the article's contents.  *See Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 259 n.2 (9th Cir. 2013); *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 127 n.11 (2d Cir. 2013); *Selkridge v. United of Omaha Life Insurance Co.*, 360 F.3d 155, 162, n. 5 (3d Cir. 2004).

responsible for safety and security at all adult male facilities, and the temporary Chief of Staff, responsible for approving or denying discipline of employees, *id.* at 7. Eilers called Neese, the acting warden of Robinson, and instructed Neese to place Hicks on paid administrative leave while the Department investigated whether the posts violated the Department's standards. *Id.* at 10-11. The next day, September 5, Jeffreys sent an email to all Department staff reminding them to follow the Department's standards while using social media. Doc. 34-6 at 14.

**The Department investigated and found that Hicks's posts violated its Rules and Standards of Conduct.**

The Department's internal affairs office investigated whether Hicks's Facebook posts violated the Department's Rules and Standards of Conduct. Doc. 34-2 at 9. Hicks was interviewed and admitted to making the posts, which he said reflected his personal views. *Id.* The investigator noted that Hicks's posts had nonetheless resulted in a news article that described his posts as "derogatory." *Id.* Based on Hicks's interview and the article, the investigator found that Hicks's posts had reflected negatively on the Department and its mission. *Id.* at 9-10.

The Department's chief of investigations and intelligence subsequently concluded in a memorandum to Neese that Hicks's posts violated the Department's Rules and Standards because they reflected negatively on the Department and its overall mission. *Id.* at 7. Yargus, a lieutenant in Robinson's internal affairs office, also authored a memo to Neese reiterating this finding and conclusion, and noting that Hicks's Facebook posts violated the Department's Rules of Conduct Section 120.30 and Administrative and Institutional Directives 03.02.108. *Id.* at 12. Neese

8

concurred and issued a memorandum to Hicks informing him of the investigation's results and advising him that a disposition would follow a disciplinary hearing. *Id*. at 11-15. Before the hearing, Hicks was notified of the charges and his opportunity to offer witnesses and have a personal representative present. Doc. 34-1 at 6, 8-27; Doc. 34-2 at 13-15.

At the disciplinary hearing, testimony was provided by a Department representative, Hicks, and his union representative. Doc. 34-2 at 14-15. The Department relied on the investigator's report. *Id*. at 15. Hicks offered no witnesses and instead said he had not intended the posts to "offend anyone"; his representative attacked the news article for singling out Hicks. *Id*.

The hearing officer found that Hicks's Facebook posts violated the Department's Rules and Standards of Conduct and recommended that he be suspended for 10 days without pay. Doc. 34-2 at 15. Neese concurred, *id*., resulting in a suspension from November 4 to 14, 2019, Doc. 34-6 at 1.

During this litigation, Jeffreys was asked to further explain, in his view as the Department's Director, how Hicks's posts violated the Department's Rules and Standards of Conduct and impacted its operations. *Id*. at 8-9. Jeffreys stated that employee social media posts disparaging others based on their religious views, sexuality, or other protected characteristics reflected negatively on the Department and its mission. *Id*. He also said that Hicks's posts were "disparaging" to Muslims and noted the Department has Muslim employees and inmates. *Id*. Jeffreys further explained that employees posting derogatory statements toward protected groups

could "sow mistrust and unrest among the offender population, thereby threatening the safety and security of the facility and [Department]," and he added that Hicks's posts "reflect[ed] an inability for him to carry out the duties required equally and regardless of religious affiliation of others."  *Id.*

Jeffreys also explained why, the day after receiving information from the reporter about the Facebook posts, he sent the email to all Department staff reminding them to follow the Department's standards while using social media.  Doc. 35-10 at 7-10, 14.   He was concerned about "litigation" against the Department stemming from the Department's "work force" being "on social media" and "posting things derogatory about the people we have in custody . . . along the lines of religion, race, [and] sexuality."  *Id.* at 7-10.

At the time of Jeffreys's email, the Department was defending itself in the *Tay* litigation from claims that Department officials were deliberately indifferent to harassment and discrimination against the plaintiff and other transgender inmates. Doc. 35-4 at 18-24.  Later, the district court in *Tay* referenced Facebook posts by Department employees other than Hicks when entering a preliminary injunction against the Department.  Doc. 35-20 at 21-22, 26, 48, 61; *Tay Tay v. Dennison*, 457 F. Supp. 3d 657, 663 (S.D. Ill. 2020).  The court found that the employees' posts "reflect[ed] ignorance, sexism, and racism," and that a "deep-seeded culture of ignorance, harassment, and discrimination" existed within the Department.  Doc. 35-20 at 22 n. 8, 48.

Hicks retired from the Department in 2021.  Doc. 18.

10

**The district court granted summary judgment for defendants.**

Following discovery, Hicks moved for partial summary judgment, Doc. 34 (seeking judgment on merits of First and Fourteenth Amendment claims but withholding request as to damages), and defendants cross moved, seeking summary judgment in full, Doc. 35. The parties agreed that the only contested element of Hicks's First Amendment claim was whether his posts were protected speech. Doc. 34 at 22; Doc. 35 at 10. On that issue they disputed both prongs of the test for public employee speech claims, beginning with whether Hicks's posts reflected matters of public concern and, if so, whether the Department's interest in avoiding disruption to its mission and operations outweighed the speech interest in the posts. Doc. 34 at 21-31; Doc. 35 at 10-15.

Defendants argued that Hicks's posts did not touch on matters of public concern because they attacked people based on their national origin and religious beliefs and did not advance political or religious discourse. Doc. 35 at 11. In addition, defendants argued, their interest in promoting effective and efficient government services outweighed any speech interest in Hicks's posts. *Id.* at 11-15. Defendants noted that Hicks's posts had resulted in negative press coverage that harmed the Department's reputation and threatened its operations. *Id.* at 11. And, defendants explained, disparaging posts like Hicks's could be used by inmates to support discrimination and harassment claims against the Department. Doc. 35 at 9, 11-12, 14; Doc. 40 at 9, 11-12, 14. Defendants cited the *Tay* litigation and injunction as an example. Doc. 35 at 9, 11-12, 14; Doc. 35-20; Doc. 40 at 9, 11-12, 14. Finally,

11

defendants explained that Hicks's role as a supervisor required a "great deal of public trust" and thus his conduct, even off-duty, had to be appropriate; yet Hicks's posts had "called into question" his ability to oversee both inmates and staff, many of whom could reasonably be reluctant to work with based on the posts. *Id.* at 13.

For his part, Hicks argued that his posts addressed matters of public concern because they reflected his views on politics and religion. Doc. 34 at 25; Doc. 40 at 37-42. In addition, Hicks asserted, defendants had not shown that the Department's interests as an employer outweighed his speech interest because, he argued, defendants presented no evidence that his posts created disharmony among staff or inmates or showed that he could not fulfill his duties. Doc. 34 at 26-29; Doc. 40 at 43-44, 52-59. Hicks also argued that the Chicago Sun-Times article mischaracterized his Facebook posts and that the initial version of the article inaccurately identified him as a defendant in *Tay*. Doc. 40 at 49-50. And he asserted that defendants' reliance on the preliminary injunction order in *Tay* was improper because (1) the order itself could not have motivated the Department's concerns over Hicks's speech, as it was entered in 2020 and he was disciplined in 2019, and (2) although the order relied on Department employees' off-duty social media posts, the posts at issue referred to specific inmates, while Hicks's posts were targeted at groups to which those inmates happened to belong. *Id.* at 18-19, 48. Finally, Hicks argued, his Facebook posts warranted the highest level of First Amendment protection because they were not "terribly offensive" and addressed politics. Doc. 35 at 25; Doc. 40 at 37-38, 42, 51, 58.

12

Defendants replied that the court was not obligated to accept Hicks's characterization of his Facebook posts.  *See* Doc. 41 at 14.  They also noted that the article's initial misidentification aside, the reporter nonetheless had easily identified Hicks as a Department employee by using the information Hicks put on Facebook.  *Id.* at 15.  And, defendants responded, the *Tay* litigation supported the decision to discipline Hicks because Jeffreys had cited then-ongoing litigation over posts like Hicks's when sending the staff-wide email the day after the reporter contacted the Department.  *See* Doc. 40 at 10.

On Hicks's due process claim, defendants asserted that Hicks's Facebook activity disparaging protected groups and the government while also announcing his status as a Department supervisor violated the Department's standards prohibiting off-duty conduct that may reflect unfavorably on the Department or impair its operations.  Doc. 35 at 16.  In response, Hicks largely relied on a decision of this court from nearly 50 years ago, specifically a portion of the decision where a divided panel held that an employer's policy prohibiting conduct as unbecoming of a police officer was unconstitutionally vague on its face.  *See* Doc. 34 at 30-35 (discussing *Bence v. Breier*, 501 F.2d 1185 (7th Cir. 1974)).  Defendants responded that Hicks's authorities were inapplicable and outdated.  Doc. 41 at 16.

Defendants also asserted that qualified immunity shielded them from liability on Hicks's claims.  Doc 35 at 19.  Hicks responded that it was clearly established in 2019 that the First Amendment is violated by disciplining public employees for off-

duty speech, and that the vagueness of applying employment standards like the Department's was established in *Bence*.  Doc. 40 at 64-65.

The district court entered summary judgment for defendants on both claims. Doc. 47.  First, the court held that Hicks's suspension did not violate the First Amendment because his posts were not on a matter of public concern, *id.* at 14, and because he had taken deliberate steps to link himself and his posts to his government employment, *id.* at 17.  The court ruled, alternatively, that the posts were unprotected because the Department's interest as an employer outweighed Hicks's interest in speaking as a private citizen.  *Id.* at 18.  The court also held that defendants were entitled to qualified immunity because Hicks's right to share such posts publicly while identifying himself as a Department employee was not clearly established.  *Id.* at 21.  And the court held that Hicks's due process claim failed on qualified immunity grounds because it was not clearly established that the Department's standards were impermissibly vague as applied to Hicks's posts.  *Id.* at 22.

## SUMMARY OF ARGUMENT

The district court's entry of summary judgment should be affirmed because Hicks's claims under the First and Fourteenth Amendments fail on both the merits and qualified immunity grounds. Hicks's speech claim fails under *Pickering* balancing, as the district court correctly concluded, even assuming that his Facebook posts were made as a private citizen on matters of public concern and not deliberately linked to his employer. The district court's *Pickering* analysis struck the proper balance: The Department's interest in addressing and preventing harm to its reputation and operations, and disciplining speech reasonably likely to disrupt harmony among staff and inmates as well as undermine staff job performance, outweighed any speech interest in Hicks's derogatory posts. Regardless, the court also rightly concluded that defendants are entitled to qualified immunity because Hicks had no clearly established right to make statements actually or predictably harmful to his public employer on a publicly viewable social media profile where he identified himself as a Department employee.

Hicks's vagueness claim fails on the merits because public employers, by necessity, use broad and general terms to regulate employee conduct, and the Department's standards for off-duty conduct clearly applied to Hicks's derogatory Facebook posts. And in any event, defendants are entitled to qualified immunity because Hicks points to no authority clearly establishing that the Fourteenth Amendment is violated by applying standards like the Department's to an employee's public social media posts that harmed the employer and threatened future harm.

# ARGUMENT

## I.  The standard of review is *de novo*.

This court reviews *de novo* a district court's entry of summary judgment,

*Holcomb v. Freedman Anselmo Lindberg, LLC*, 900 F.3d 990, 992 (7th Cir. 2018), and

may affirm on any ground presented to the district court and supported by the record

and law, *Oneida Nation v. Vill. of Hobart*, 968 F.3d 664, 686 (7th Cir. 2020).  "The

general standards for summary judgment do not change" in resolving cross-motions.

*Calumet River Fleeting, Inc. v. Int'l Union of Operating Engs., Local 150, AFL-CIO*,

824 F.3d 645, 647-48 (7th Cir. 2016).  Thus, summary judgment is appropriate if no

genuine dispute exists as to any material fact and the movant is entitled to judgment

as a matter of law.  Fed. R. Civ. P. 56(a); *Nat'l Am. Ins. Co. v. Artisan & Truckers*

*Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015).  In resolving summary judgment motions,

this court should construe the record and draw all reasonable inferences in favor of

the non-movant.  *Holcomb*, 900 F.3d at 992.

## II.  Summary judgment for defendants was proper because Hicks's First Amendment claim failed on the merits and, alternatively, on qualified immunity grounds.

The test for public employee speech claims is a two-part legal question.  *See*

*Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), and *Connick v. Myers*, 461

U.S. 138, 147 (1983).

The threshold inquiry asks whether the plaintiff was speaking as a private

citizen on a matter of public concern.  *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).

"Speech deals with matters of public concern when it can be fairly considered as

relating to any matter of political, social, or other concern to the community."

16

*Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (cleaned up). However, where the plaintiff's speech was on a matter of public concern, was neither at work nor about work, and was addressed to a public audience, the speech will not be protected if the speech harmed the employer and the plaintiff deliberately linked his speech to the employer's "mission, purpose, or image." *See City of San Diego v. Roe*, 543 U.S. 77, 82 (2004) (distinguishing *United States v. National Treasury Employees Union*, 513 U.S. 454, 465 (1995) (*NTEU*), where speech unrelated to employer had no effect on employer's mission or purpose); *Harnishfeger v. United States*, 943 F.3d 1105, 1113-14 (7th Cir. 2019).

      If this threshold inquiry is satisfied, the court moves to the second step, and "balance[s]" the plaintiff's interests "as a citizen, in commenting upon matters of public concern" against the State's interest "as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568; *see also Roe*, 543 U.S. at 81. The *Pickering* balancing test "requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Connick*, 461 U.S. at 147. Because public employees "often occupy trusted positions in society," their expressed views sometimes "impair the proper performance of governmental functions." *Garcetti*, 547 U.S. at 413. *Pickering* balancing thus recognizes that "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Id.*

17

Under *Pickering*, courts should consider the speech's context and several non-exhaustive, non-dispositive factors, including: (1) "whether the speech would create problems in maintaining discipline or harmony among co-workers"; (2) "whether the employment relationship is one in which personal loyalty and confidence are necessary"; (3) "whether the speech impeded the employee's ability to perform [job] responsibilities"; and (4) whether the matter was one on which debate was vital to informed decisionmaking. *Harnishfeger*, 943 F.3d at 1115. Courts need not discuss every factor. *Id.* at 1114. The public employer bears the burden of showing that the balance weighs in favor of the disciplinary action. *Id.* at 1115-16. The justification offered for disciplining employee speech must be "stronger than mere speculation," *Roe*, 543 U.S. at 80, and track the employer's actual concerns when it acted, *Harnishfeger*, 943 F.3d at 1116.

Even assuming that Hicks's Facebook posts were as a private citizen addressing public concerns, *Garcetti*, 547 U.S. at 413, and that his posts were not deliberately linked to his employer's image or mission, *Harnishfeger*, 943 F.3d at 1116, Hicks's speech claim fails under the *Pickering* balancing test, as the district court rightly concluded, Doc. 47 at 18. *See Bennett v. Metro. Gov't of Nashville & Davidson Cnty.* 977 F.3d 530, 533 (6th Cir. 2020) (addressing *Pickering* balancing where public concern in speech was presumed by government).[4]

_____

[4] Similarly, a federal district court in Wisconsin held that a prison supervisor's First Amendment claim failed because even assuming that his degrading Facebook posts were protected speech, the Department of Corrections' interest in a safe and effective

**A.**     **The district court's *Pickering* balancing rightly concluded that the Department's strong interests as an employer outweighed the limited speech interest in Hicks's Facebook posts.**

The district court correctly ruled that *Pickering* balancing required summary judgment for defendants, Doc. 47 at 18, because the Department had strong interests in (a) addressing actual and potential harm to its reputation and operations, (b) avoiding predictable disharmony among staff and inmates, and (c) correcting employee performance. Those concerns outweighed any speech interest in Hicks's posts.

"The state interest element of the [*Pickering*] test focuses on the effective functioning of the public employer's enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). "Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." *Id.* Thus, public employers have a "legitimate purpose" in "promoting efficiency and integrity" in their services and in "maintain[ing] proper discipline," *Connick*, 461 U.S. at 150; *see also NTEU*, 513 U.S. at 473 (characterizing efficiency interest as "vital"), and they have "wide discretion and control over the management of [their] personnel and internal affairs," *Arnett v. Kennedy*, 416 U.S. 134, 168 (1974). Failing to correct "disruptive or otherwise

---

prison system outweighed the supervisor's interest in posting them. *Schneiter v. Carr*, No. 21-CV-135-JDP, 2022 WL 1773484, at *9 (W.D. Wis. June 1, 2022). That case is currently pending before this court awaiting a decision after oral argument. *See* 7th Cir. No. 22-2137.

unsatisfactory employee[s] can adversely affect discipline and morale . . . , foster disharmony, and ultimately impair the efficiency of an office." *Id.*

Accordingly, public employers may discipline employees for speech if, as here, the employer reasonably concludes that the speech either caused disruption to the employer's mission or operations or is likely to do so if left unaddressed. *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1113 (7th Cir. 2013); *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002).

> **1.      The Department's interest in addressing disruption to its mission and operations was strong after Hicks's derogatory Facebook posts garnered negative public attention.**

Social media amplifies the speech of public employees in ways that can create greater disruptions for public employers than other channels of speech by, *e.g.*, increasing the likelihood of reputational damage, liability, and institutional disharmony. *See Bennett*, 977 F.3d at 533; *Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 336 (4th Cir. 2017).

This amplification occurs for several reasons. First, "spreadability," or "the ease with which content  can be shared" on social media, coupled with "wide-spread adoption" of social media, means that public employees' statements may quickly become "widely known." Denise S. Smith & Carolyn R. Bates, *The Evolution of Public Employee Speech Protection in an Age of Social Media*, 22 Atlantic L.J. 1, 2-4 (2020). Second, "visibility," or "the potential audience" for that speech, means that social media speech, more than traditional communication channels, allows public employees' "language to be shared and questioned" beyond the employee's immediate circle. Lilli B. Wofsy, *Will I Get Fired for Posting This?:  Encouraging the Use of*

*Social Media Policies to Clarify the Scope of the Pickering Balancing Test*, 51 Seton Hall L. Rev. 259, 266 (2020); Smith & Bates, *supra* at 32-33.  Third, "searchability," or "the ability to find content," allows the media and public to search publicly available social media.  Smith & Bates, *supra* at 1-2, 32.  Finally, "persistence," or "the durability of online expressions and content," means that statements that "at one time could have been seen as a merely distasteful comment overheard between individuals" have "instead become a perpetual representation of beliefs enshrined through a momentary posting on a social media platform."  Smith & Bates, *supra* at 2-4.

As the district court correctly recognized, Doc. 19-21, each of these employer concerns was present here:  (1) Hicks's derogatory posts were highlighted in a news article that cast the Department and its employees in a negative light, required an internal investigation, and exposed the Department to potential further public scrutiny and litigation; (2) Hicks's posts threatened to create disharmony among staff and inmates because they came from a Department supervisor and could be reasonably viewed as degrading to Muslims and homosexuals; and (3) for similar reasons, Hicks's posts "reflect[ed] an inability for him to carry out the duties" as a Department supervisor.  *See* Doc. 34-2 at 9-10; Doc. 34-6 at 8-9.

    a. **Defendants reasonably concluded that Hicks's Facebook posts impaired and threatened Department operations because they triggered negative media coverage.**

Defendants presented undisputed evidence that they reasonably concluded that Hicks's Facebook posts reflected negatively on the Department, impaired its operations, and was likely to further impair operations if left unaddressed.  For

starters, the Department had to devote limited resources to investigating the posts. *See* Doc. 34-2 at 9-15. After the Chicago Sun-Times raised concerns that Hicks's posts could reasonably be viewed as "Islamophobic," "derogatory" to homosexuals, and supportive of overthrowing the government, the Department had a strong interest in conducting an investigation and taking corrective action if it found that the posts violated Department rules or otherwise compromised its goals and mission. *See Bennett*, 977 F.3d at 530 (Gibbons, J., concurring) (legitimacy and credibility of public employer would have been put at risk had it failed to discipline an employee who publicly used racist language). And investigations like the one caused by Hicks's posts create "substantial disruption" to a public employer by requiring it to shift its resources "from the goal of the organization to deal with the fallout of [investigating] these reports." Smith & Bates, *supra* at 37.

Then, at the conclusion of the investigation, the investigator's report made clear that the Department reasonably was concerned about the negative publicity caused by Hicks's Facebook posts. Doc. 34-2 at 9. The investigator noted that the Chicago Sun Times article referred to Hicks's posts as "derogatory" toward Muslims and homosexuals and included a screenshot of the post in which Hicks "pray[ed]" about participating in a potential government overthrow. *Id.* And in turn, defendants reasonably determined that this adverse public exposure violated the Department's standards prohibiting conduct reflecting negatively on the Department or impairing its operations. *Id.* at 7; *see Bennett*, 977 F.3d at 542 (member of public who complained about public employee's racial slur on Facebook provided employer

22

reasonable ground to believe that public perception would impact its operations);
*Grutzmacher*, 851 F.3d at 336 (supervisor's racist Facebook comment threatened
community trust). Indeed, Hicks's posts remain publicly available in a corrected
version of the article for the foreseeable future. *See supra* p. 7; Smith & Bates, *supra*
at 2-4 (durability of speech occurring on social media).

Defendants also had reasonable concerns that Hicks's Facebook posts could
further impair its operations by increasing the Department's exposure to public
scrutiny and lawsuits. *See* Tatiana Hyman*, The Harms of Racist Online Hate Speech
in the Post-Covid Working World: Expanding Employee Protections*, 89 Fordham L.
Rev. 1553, 1584 (2021) (relying on Seventh Circuit and other circuits' cases
considering conduct outside of physical workplace as part of hostile work
environment claims to argue that employees' social media posts on personal accounts
may be evidence that employer knew of yet permitted abusive work environment);
*see also Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008) ("[H]arassment does not
have to take place within the physical confines of the workplace to be actionable; it
need only have consequences in the workplace."). Jeffreys testified that in
September 2019 he was concerned about "litigation" associated with derogatory
social media posts by Department employees. Doc. 34-10 at 7-10. And at that time,
the Department was defending itself in *Tay*, in which the plaintiff, relying in part on
social media posts by Department employees, alleged that Department officials were
deliberately indifferent to harassment and discrimination against her and other
transgender inmates. Doc. 35-4 at 18-24. Because of that ongoing litigation, it was

reasonable for Jeffreys to believe that the Department could be exposed to further public scrutiny, including additional lawsuits, if Hicks's derogatory posts went unaddressed. *Cf. Crowly v. L.L. Bean, Inc.*, 303 F.3d 387, 409 (1st Cir. 2019) (social media posts created outside workplace may be evidence of severity and pervasiveness of hostility in workplace).

The *Tay* injunction, despite being issued after Hicks's discipline, was properly offered by defendants at summary judgment to show that Jeffreys's concern about liability from employee social media posts was reasonable and not conjectural. Doc. 35 at 5; Doc. 41 at 10. In *Tay*, the district court relied on, in part, employees' Facebook posts (not Hicks's) to order preliminary relief against the Department. *See* 457 F. Supp. 3d at 662. Because *Tay* shows that derogatory social media posts by Department employees may result in liability for the Department, defendants properly identified the *Tay* injunction as evidence that Jeffreys's litigation concerns were reasonable. Moreover, contrary to Hicks's suggestion, AT Br. 50; Doc. 40 at 8, 18-19, 48, it was reasonable for Jeffreys to conclude that Hicks's derogatory social media posts could subject the Department to litigation, even though the posts were not directed at specific inmates, because they nonetheless targeted groups of people based on their religion and sexual orientation. *See supra* pp. 21-22 (relying on *Bennett*, 977 F.3d at 542; *Grutzmacher*, 851 F.3d at 336).

For his part, Hicks argues that his Facebook posts were not "inherently" or "terribly offensive," and cannot be reasonably understood to include a statement that he wanted to overthrow the government. AT Br. 39-40, 48. Yet "courts [must] look

24

to the facts as the employer reasonably found them to be," not as viewed by the employee, a court, or a jury. *Waters v. Churchill*, 511 U.S. 661, 677 (1994) (plurality); *see also Weicherding v. Riegel*, 160 F.3d 1139, 1143 (7th Cir. 1998) (*Waters's* plurality statement is "opinion of the Court under the approach adopted in *Marks v. United States*, 430 U.S. 188, 193 (1977)"). And Hicks's opinion that his Facebook posts were benign is at odds with defendants' reasonable conclusion that the posts harmed its reputation and threatened its operations because members of the public might view the posts in the negative manner described by the Chicago Sun-Times article — that is, as derogatory to individuals who are Muslim or homosexual, and as praying to participate in potential government overthrow. *See supra* pp. 8-10.

Indeed, Defendants' view of Hicks's speech is entitled to deference for two related reasons. First, Hicks worked in a prison, and "wide" deference to the employer's judgment with respect to how employee speech may impact operations is appropriate where, as in paramilitary organizations like prisons, "close working relationships are essential" to the public employer's services. *Connick,* 461 U.S. at 151-52; *see also Gustafson*, 290 F.3d at 906 (noting deference due to public employers' predictions about how employee speech may impact operations in paramilitary organizations); *Kokkinis v. Ivkovich*, 185 F.3d 840, 845 (7th Cir. 1999) (same); *Breuer v. Hart*, 909 F.2d 1035, 1039-41 (7th Cir. 1990) (same); *Gillis v. Miller*, 845 F.3d 677, 684–85 (6th Cir. 2017) (deference owed to jail officials); *see also Sandin v. Conner*, 515 U.S. 472, 482 (1995) (deference owed to officials managing volatile prison environment).

Second, the Department conducted a reasonable investigation before concluding that Hicks's Facebook posts had harmed the Department and threatened its operations. The Department's investigation was reasonable because officials reviewed Hicks's posts, considered the reporter's characterization of them, interviewed Hicks, found potential violations of Department standards, and held a disciplinary hearing at which Hicks had an opportunity — with a union representative — to present information to counter the charges. *See* Doc. 34-2 at 7-15; *Waters*, 511 U.S. at 680 (investigation reasonable where employer relied on "word of two trusted employees," endorsement of those employees' reliability, and "face-to-face meeting" with fired employee; "no further time needed to be taken" for investigation); *Bennett*, 977 F.3d at 533 (investigation reasonable where employee had opportunity to contest evidence). Where, as here, the employer has performed a reasonable internal investigation into an employee's speech, the Supreme Court has deferred "substantial[ly]" to the employers' factual findings and predictions. *See Waters*, 511 U.S. at 677 (plurality) (looking to employer's understanding of speech following reasonable investigation, rather than jury's determination, even where employer's understanding was inaccurate); *see also Weicherding*, 160 F.3d at 1143 (deciding that *Waters* plurality is binding opinion of Court on this point as well). Thus, defendants' view of Hicks's Facebook posts and their likely impact on its operations was reasonable and, for that reason, entitled to deference.

Hicks also argues that reversal is warranted because "on Facebook . . . he doesn't reference his position with the [Department] nor does he mention the

[Department]."  AT Br. 56.  If Hicks is referring to his Facebook profile as it existed when he was disciplined, he is mistaken.  It was undisputed in the district court that, at the time of his discipline, Hicks's Facebook profile announced his position as correctional sergeant with the Department, and that his profile was set to public, not private.  *See* Doc. 40 at 10.  Hicks may not dispute these facts for the first time on appeal.  *See Reed v. Brex, Inc.*, 8 F.4th 569, 578 (7th Cir. 2021).

Relatedly, Hicks notes that his posts did not mention his work at the Department, *see* AT Br. 37, yet he cannot escape, and his brief does not address, his other decisions about how to maintain his Facebook account that allowed the reporter to easily identify him as a Department employee:  On his profile, he identified his employer as the Department and disclosed his position as correctional sergeant, Doc. 35-1 at 5; he kept his profile publicly accessible instead of private, *id.,* allowing his posts to be read by any Facebook user, *see* Smith & Bates, *supra* at 32-33; and he even posted a picture of himself in a Department uniform, Doc. 35-1 at 4.  Each of these choices made it reasonably foreseeable to Hicks that his Facebook posts might be understood as connected to his status as a public employee.  Had Hicks kept his profile private, or not disclosed his work for the Department, the Department's interest in disciplining his disruptive speech may not have been "as strong."  *Bennett*, 977 F.3d at 541; *cf. Moser v. Las Vegas Metro. Police Dep't*, 984 F.3d 900, 910 (9th Cir. 2021) ("most people" would not have known that Facebook speaker was "SWAT sniper" because nothing in his Facebook profile confirmed his employment).  But Hicks took neither precaution.

Finally, Hicks suggests that his discipline may have been based on confusion between his Facebook posts and those of a defendant in the *Tay* litigation. *See* AT Br. 20, 24. But the Department's decision to suspend Hicks was supported by his own admission that he authored the Facebook posts cited by the investigator as support for the charges against him. *See supra* p. 8. Thus, Hicks's discipline was based on his own posts no one else's.

### b. Defendants reasonably concluded that Hicks's posts threatened institutional harmony and security.

Defendants also presented undisputed evidence that they reasonably concluded that institutional harmony and security were threatened by Hicks's Facebook posts, *supra* pp. 9-10, especially given his role as a supervisor, *supra* p. 5.

When an employer claims that its mission has been, or predictably may be, "undermine[d]" by an employee's speech, "some attention must be paid to the responsibilities of the employee." *Rankin*, 483 U.S. at 390. "The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." *Id.* "The expressive activities of a highly placed supervisor[]" will be "more disruptive" to the employer's operation than similar activity by a "low-level employee with little authority or discretion." *McEvoy v. Spencer*, 124 F.3d 92, 103 (2d Cir. 1997). Given Hicks's role as a correctional sergeant who supervised staff and inmates, *see* Doc. 35-2 at 9-12; Doc. 35-5 at 9-10, he had a higher "burden of caution" when making statements, *see Rankin*, 483 U.S. at 390, especially statements that foreseeably could be attributed to

his status as a supervisory public employee.  Yet he failed to meet that higher burden.
*See supra* pp. 21-27.

 And given Hicks's supervisory role, defendants reasonably predicted that his derogatory posts, if not addressed, could further threaten Department operations by causing disharmony among staff and inmates.  As Jeffreys explained, Hicks's posts degrading Muslims could deter correctional officers who were Muslim from working with him.  *See* Doc. 34-6 at 8-9; *Craig*, 736 F.3d at 1110 (female students would be especially reluctant to seek counseling services from public employee who wrote book expressing sexist views).  Indeed, employees belonging to either of the groups that Hicks disparaged would have little confidence in his ability to make impartial decisions concerning them.  *See Bennett*, 977 F.3d at 533 (employee's use of racial slur in Facebook post supported coworkers' concern over whether they could rely on her); *Grutzmacher*, 851 F.3d at 336 (supervisor who made racist comment on Facebook no longer trusted by employees).  And because correctional sergeants have an "inordinate amount of trust and authority" over inmates, one can "easily see" how inmates who were Muslim or homosexual might recoil at orders from Hicks, given his statements disparaging groups to which they belong.  *Cf. Craig,* 736 F.3d at 1110.  Thus, Jeffreys reasonably predicted that Hicks's unaddressed statements could "sow mistrust and unrest" among inmates, "thereby threatening the safety and security of the facility."  Doc. 34-6 at 8-9.

 Contrary to Hicks's argument, AT Br. 50, defendants did not need to show that prison operations were actually disrupted before they could address his

Facebook posts.  Public employers may discipline speech before "allow[ing] . . . disruption of the office and the destruction of working relationships."  *Connick*, 461 U.S. at 147.  And employers' "reasonable predictions of disruption" must be "given substantial weight," even "when the speech involved is on a matter of public concern."  *Waters*, 511 U.S. at 673 (plurality); *Greer v. Amesqua*, 212 F.3d 358, 370–71 (7th Cir. 2000).  Thus, this court and others have held that public employers may impose discipline based on a reasonable prediction that an employee's speech is likely to disrupt operations.  *See Kokkinis*, 185 F.3d at 844; *Hernandez v. City of Phoenix*, 43 F.4th 966, 972-73 (9th Cir. 2022); *Bennett*, 977 F.3d at 533; *Grutzmacher*, 851 F.3d at 336;  *Moss v. City of Pembroke Pines*, 782 F.3d 613, 622 (11th Cir. 2015); *Graziosi v. City of Greenville Miss.*, 775 F.3d 731, 737 (5th Cir. 2015); *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 466 (3d Cir. 2015); *Locurto v. Giuliani*, 447 F.3d 159, 182–83 (2d Cir. 2006)*; but see Melton v. City of Oklahoma City*, 879 F.2d 706, 715-16 (10th Cir. 1989) (requiring evidence of "actual disruption of [employer's] services resulting from [employee's] speech" to prevail under *Pickering*); *see also* Wofsy, *supra* at 260 (explaining that Tenth Circuit sits alone in requiring actual disruption).  Hence, defendants were not required to show past disruption to its mission or operations to justify the decision to discipline Hicks.

And in any event, even if a showing of actual disruption were required, it was present here:  as explained *supra* pp. 21-23, the undisputed evidence showed that Hicks's Facebook posts triggered adverse media attention that required an internal investigation and cast the Department in a negative light to the public.  Hence,

contrary to Hicks's argument, defendants' concerns were not "theoretical," and they

did not rely on "speculative generalizations." *Liverman v. City of Petersburg*, 844

F.3d 400, 408-09 (4th Cir. 2016); *see* AT Br. 48, 50 (relying on *Liverman*).

### c. Defendants reasonably concluded that Hicks's posts reflected an inability to carry out his supervisory duties.

Finally, and for similar reasons, defendants presented undisputed evidence

showing that they reasonably concluded that Hicks's posts disparaging Muslims and

homosexuals, and showing disrespect for governmental authority, "reflect[ed] an

inability for him to carry out [his] duties" as a supervisor.  Doc. 34-6 at 8-9.

Effective prison services "presupposes respect for the members of those

communities" that Hicks was responsible for serving yet had publicly disparaged on

Facebook. *Bennett*, 977 F.3d at 533; *Locurto*, 447 F.3d at 182-83.  Hicks's ability to

effectively supervise individuals in these groups, whether staff or inmates, was put in

jeopardy because such individuals would reasonably be wary of working with him and

following his orders. *See supra* p. 29.  Moreover, Hicks's posts disparaging Muslims

and homosexuals supported a reasonable conclusion that he might make decisions

unfairly disadvantaging staff or inmates in those groups, whether he realized it or

not. *See Bennett*, 977 F.3d at 533 (racist speech by public employee who fielded

emergency calls led employer to reasonably question whether plaintiff had judgment

necessary for job, whether she would act fairly on calls for help, and whether co-

workers could rely on her); *Grutzmacher*, 851 F.3d at 336 (supervisor's speech "led to

concerns regarding [his] fitness as a supervisor and role model, and concerns that

[his] subordinates would not take him seriously if [he] tried to discipline them in the

31

future"); *Locurto*, 447 F.3d at 179, 183 (disruption likely where police officers expressed bias against people they were hired to protect).

In addition, as a supervisor, good judgment was a prerequisite for Hicks's job. *See, e.g.*, *Grutzmacher*, 851 F.3d at 336. Yet by publicly attacking these groups, Hicks not only compromised trust in his impartiality, and likely the impartiality of the Department's supervisory employees, *Lalowski v. City of Des Plaines*, 789 F.3d 784, 792 (7th Cir. 2015), but also demonstrated poor judgment by failing to exercise precautions in his online speech. Relatedly, Hicks's reference to overthrowing the government not only showed poor judgment, but also conflicted with the Department's expectation of loyalty from supervisors in a paramilitary organization. *See Lalowski*, 789 F.3d at 791-93 (importance of loyalty to employer supported finding of potential disruption). Hicks asserts that his government overthrow post was not a basis for the decision to discipline him, AT Br. 48, yet he misstates the record. The investigator expressly relied on that post when finding that Hicks's Facebook activity had harmed the Department's reputation. *See* Doc. 34-2 at 9-10. Hence, the Department reasonably concluded that Hicks's posts reflected an inability to perform the duties of a supervisor, and that corrective discipline was needed as a corrective measure.

Although Hicks had not previously been disciplined, no one had complained that Hicks was overtly biased, and his performance reviews did not mention bias, *see* AT Br. 49-50, the "First Amendment does not require a Government employer to sit idly by while its employees insult those they are hired to serve and protect." *Locurto*,

447 F.3d at 182–83.  Instead, again, the government may act before disruption occurs to address matters likely to cause disruption.  *Waters*, 511 U.S. at 675 (plurality); *Connick*, 461 U.S. at 147; *Lalowski,* 789 F.3d at 792; *see also supra* pp. 29-30.

Hicks inaptly compares his case to *Harnishfeger*, 943 F.3d 1105, *see* AT Br. 36, where this court held that no harm could have come from the speech of the plaintiff, a clerical employee, with the result that the employer's side of the *Pickering* balancing was "empty."  *Harnishfeger*, 943 F.3d at 1113.  *Harnishfeger* is distinguishable from this case in at least three respects.  First, the plaintiff's duties in *Harnishfeger* were materially different from Hicks's responsibilities.  In *Harnishfeger*, this court explained that the plaintiff's duties were so routine and ministerial that her speech could not reasonably be viewed by the public as coming from the employer on any matter.  *See id.* at 1113; *see also Rankin*, 483 U.S. at 379–80 (similar clerical employee).  Hicks, by contrast, was a supervisor of both staff and inmates.  *See supra* p. 5.  Second, Hicks's posts were publicly viewable and, as such, generated negative press for the Department, unlike in *Harnishfeger*.  Doc. 35-3.  There, the employer learned of the plaintiff's posts only because, although her Facebook profile was private, the plaintiff had accepted her supervisor's "friend request" after feeling compelled to do so.  943 F.3d at 1110-11.  Third, unlike in *Harnishfeger*, Hicks was not suspended over a "single" instance of problematic speech.  *See id.* at 1118 (one Facebook post linked plaintiff to book employer deemed problematic).  Instead, Hicks was disciplined because he shared five posts that were

reasonably viewed as disparaging Muslims and homosexuals, as well as government authority.

In short, and contrary to his argument, Hicks was not disciplined because "[d]efendants simply d[id]n't like the views Hicks expressed," AT Br. 52-53, or because Jeffreys and Eilers were not "concerned about Hicks' First Amendment rights," *id.* at 60. Instead, the undisputed evidence showed that Hicks was disciplined because his posts disparaging minority groups and government authority on a public Facebook profile where he identified himself as a Department employee harmed the Department's reputation and operations, threatened further public scrutiny and potential litigation, risked sowing discord among staff and inmates, and raised serious concerns about Hicks's ability to fulfill his supervisory responsibilities fairly and effectively. The interests in the effective functioning of the Department thus weigh strongly in defendants' favor under *Pickering*.

> ## 2. The speech interests in Hicks's Facebook's posts were weak because they addressed matters of public concern in only a limited sense, if at all, and did not pertain to his expertise as a public employee.

Hicks asserts that his posts were "entitled to the highest rung of First Amendment protection" because in this litigation he explained their supposed political and religious underpinnings. *See* AT Br. 37, 44; Doc. 34 at 27; Doc. 40 at 8, 29-37. Yet his Facebook posts "touched upon matters of public concern in only a most limited sense," *Connick*, 461 U.S. at 154, if at all. Thus, contrary to Hicks's argument, AT Br. 50, the Department was not required to wait until that speech actually "disrupt[ed] [its operations], undermine[d] [its mission], and destroy[ed]

34

close working relationships" between staff and inmates.  *Connick*, 461 U.S. at 154*;
see also Fenico v. City of Philadelphia*, 70 F.4th 151, 164 (3d Cir. 2023) ("[N]ot all
speech of some public concern has equal value under the First Amendment," and
"the degree of public concern raised dictates the government's burden to show likely
disruption."); *Bennett*, 977 F.3d at 538 (in applying *Pickering* balancing, courts
should "determine[e] the degree of protection the speech warrants, *i.e.*, the level of
importance the speech has in the community because "the state's burden . . . varies
depending upon the nature of the employee's expression"); *see also Eberhardt v.
O'Malley*, 17 F.3d 1023, 1027 (7th Cir. 1994) ("The less serious, portentous, political,
significant the genre of expression, the less imposing the justification that the
government must put forth.").

On their face, Hicks's Facebook posts did not address public corruption,
Department operations, or even contribute to public discourse on the political or
religious issues he raises in his brief on appeal.  *Contra* AT Br. 37.  Hicks's posts
attacked members of Congress, but only for their religion (Muslim), Doc. 34-2 at 2,
culture (shawarma), *id.*, and misperceived national origin (Mexico),[5] *id.* at 1; his
other posts stereotyped people based on their religion (Jewish) and accused others
(homosexuals) of sin*, id.* at 5-6.  The closest he came to expressing a political view

---

[5]  One post described Representative Tlaib's last name as a "Mexican Word of the
Day," Doc. 32-2 at 2, yet she was born in Detroit and is of Palestinian descent, *About
Congresswoman Rashida Tlaib*, https://tlaib.house.gov/about (visited Aug. 7, 2023);
*see Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (judicial notice appropriate
for information on government websites).

was referencing potential government overthrow.  *See id.* at 2.  Yet expressions reasonably viewed as disobedient or insubordinate in a paramilitary organization, *supra* pp. 24-26, can be an appropriate basis for discipline, *see Kokkinis*, 185 F.3d at 846; *Campbell v. Towse*, 99 F.3d 820, 829-30 (7th Cir. 1996); *Grutzmacher*, 851 F.3d at 347.  Thus, on their face, Hicks's posts were unconnected to politics or policy and did not state a political view or add to any civic debate, not without the further explanation Hicks has offered in his briefing to show how these posts related to his "political views" and religious beliefs, *see, e.g.,* AT Br. 14-19; Doc. 40 at 29-37; *see Bennett*, 977 F.3d at 533 (speech "couched in terms of political debate" nonetheless "was not purely political").

Although Hicks asks this court to take his posts at face value when it serves his argument that they were not offensive or disloyal, *see supra* pp. 24-26, he also asks the court to look past their surface when deciding whether they expressed political or religious views, *see* AT Br. 37, 39-40, 48.  The inconsistency of his arguments aside, the Department is entitled to deference in its conclusion that the message of Hicks's posts reasonably could be understood by the public, Department staff, and inmates as derogatory toward minority groups and government authority. *See supra* pp. 25-26.  Thus, Hicks's posts cannot be compared to obviously political statements such as wearing a hat emblazoned with a political slogan like MAGA (Make America Great Again).  *See* AT Br. 47 (relying on *Dodge v. Evergreen School District #14*, 56 F.4th 767, 777 (9th Cir. 2022)).

Likewise, Hicks's posts did not address a matter within his "informed" view as a Department employee, and thus without his posts the public would not be "deprived" of "opinions on important public issues." *Roe*, 543 U.S. at 82; *see Bennett*, 977 F.3d at 538-39 (public's interest in employee's speech less where it does not relate to special insights of public employee, even if it otherwise addresses public concerns). The First Amendment interests at stake include not only the individual's interest in disseminating information, but also "societal interests" in "receiving the well-informed views of government employees." *Garcetti*, 547 U.S. at 419-20. Yet Hicks's posts were not informed opinions as to the operations of his public employer and, instead, merely degraded people's religion, national origin, and sexual orientation, and expressed interest in participating in potential government overthrow. Hence, preventing him from sharing such posts on a publicly accessible Facebook page where he identified himself as a Department employee would not "deprive[ ]" the community "of informed opinions on important public issues" related to the Department's operations. *Cf. Liverman*, 844 F.3d 408-09 (plaintiff's Facebook posts regarding suitability of police officers for certain assignments implicated his expertise as police officer).

For his part, Hicks wrongly predicts that affirming the district court's judgment would mean that "anytime" public employees mention their employer when speaking, their employer can "restrict[ ] that speech" on matters of public concern. AT Br. 38. Instead, the district court's decision, and defendants' argument on appeal, rest on the settled principle that a public employer necessarily has

discretion to discipline an employee for speech that is, at best, tangentially related to public concerns, and that harms and threatens the employer's mission and operations. *See supra* pp. 21-24, 28-29, 31-32, 34-36. Because the First Amendment value of Hicks's speech was relatively "low," defendants' burden in justifying his discipline was not "particularly onerous." *Hernandez*, 43 F.4th at 979. As explained *supra* pp. 21-24, 28-29, 31-32, defendants easily met that burden by pointing to evidence of the Department's strong interests in addressing the disruption caused by Hicks's Facebook posts and evidence supporting reasonable predictions that Hicks's posts would cause further disruption if left unaddressed. Accordingly, as the district court held, Hicks's First Amendment claim failed as a matter of law.

## B.    Alternatively, qualified immunity barred Hicks's First Amendment claim.

In any event, the district court correctly concluded that qualified immunity barred Hicks's First Amendment claim, Doc. 47 at 21-22, because he pointed to no case clearly establishing a public employee's right to post statements disparaging minorities and government authority on a publicly accessible social media page where he identified himself as a public employee.

"Qualified immunity attaches when an official's conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (internal quotation marks omitted). Once raised, the plaintiff bears the burden of showing that the asserted right was clearly established at the relevant time. *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015). "Clearly established means that, at the time of the

officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (cleaned up). "In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate." *Id*. at 589 (cleaned up).

The "'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011)). Instead, "the clearly established law must be 'particularized' to the facts of the case." *Id.* (internal quotation marks omitted). Particularity is especially important where the existence of a right depends on a fact-intensive inquiry. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). This fact-intensive inquiry includes application of *Pickering's* multi-factor balancing test. *See Gregorich v. Lund*, 54 F.3d 410, 414-15 (7th Cir. 1995). Thus, the balance struck by a public employer will be entitled to qualified immunity unless a "very closely analogous" case exists showing that *Pickering* balancing goes the other way. *See id.*

Hicks has not demonstrated that defendants violated any First Amendment right that was clearly established when he was suspended in 2019. A right is clearly established if it has been dictated by "controlling authority" or "a robust consensus of cases of persuasive authority." *Wesby*, 138 S. Ct. at 589-90 (internal quotation marks omitted). For starters, Hicks has pointed to no Supreme Court decision clearly establishing the right he asserts. Nor could he. The Court has never held that public employees have a First Amendment right to make public statements disparaging religious and sexual minority groups, and government authority, on a

social media account that announces their public employer and supervisory position. Instead, the Court has noted the "enormous variety of fact situations" in which statements by public employees may "be thought by their superiors" to furnish grounds for discipline, making it not "appropriate or feasible" to "lay down a general standard against which all such statements may be judged." *Pickering*, 391 U.S. at 569.

And Hicks has pointed to no decision of this court clearly establishing his claimed right. At most, this court's clearly established law in 2019 held that a public employer must support its decision to discipline an employee's speech on a matter of public concern "with evidence of actual disruption, or at least the articulation of a reasonable belief in future disruption plus evidence of its reasonableness at the time." *Harnishfeger*, 943 F.3d at 1121. Defendants met that burden. *See supra* pp. 33-34 (explaining that, unlike in *Harnishfeger*, defendants presented evidence of disruption and predictable harms to its mission and operations). Furthermore, this court had explained that balancing tests like *Pickering*'s "'produce a wide gray area between the clearly legal and the clearly illegal, and the rules of qualified immunity require giving the benefit of the doubt to the reasonable public official if the particular case falls within that gray area.'" *Harnishfeger*, 943 F.3d at 1120 (quoting *Gustafson*, 117 F.3d at 1021). At the very least, the decision to suspend Hicks — which defendants reached only after an investigation determined that his posts caused reputational harm, threatened future operations, and raised concerns over Hicks's ability to do his job — fell within that "gray area." Indeed, "government

40

officials are not expected to be prescient and are not liable for damages simply because they legitimately but mistakenly believed that the balancing of interests tipped in the State's favor." *Gregorich*, 54 F.3d at 415.

For his part, Hicks asserts that in *Coady v. Steil*, 187 F.3d 727 (7th Cir. 1999), this court "made it clear that political speech made by a governmental employee when off duty was protected under the First Amendment." AT Br. 59. Yet Hicks overstates *Coady*, which did not broadly prohibit restricting a public employee's off-duty speech on matters of public concern, *see Coady*, 187 F.3d at 731, and instead other decisions have held that such speech may be limited if *Pickering* balancing weighs in the employer's favor, *see, e.g.*, *Craig*, 736 F.3d at 1118-19. Hicks also cites two out-of-circuit cases, AT Br. 59 (discussing *Liverman*, 844 F.3d at 407, and *Dodge*, 56 F.4th at 784), but neither clearly establishes that a public employee's speech rights include placing posts disparaging minorities and government authority on a publicly accessible social media page announcing his government employment and supervisory position.

Accordingly, summary judgment for defendants on Hicks's First Amendment claim should be affirmed based on qualified immunity as well.

## III. Summary Judgment was proper because Hicks's due process claim failed on the merits and, alternatively, on qualified immunity grounds.

### A. The Department's standards were not impermissibly vague as applied to Hicks's Facebook posts.

Hicks's Fourteenth Amendment claim failed on the merits because the Department's standards were not impermissibly vague as applied to Hicks's

derogatory Facebook posts.  Although the district court had no need to address this argument, having decided that defendants were entitled to qualified immunity on Hicks's due process claim, *see* Doc. 47 at 25; *Pearson v. Callahan,* 555 U.S. 223, 236 (2009), defendants raised it in the district court, Doc. 35 at 15, and thus it may serve as a basis for affirming the judgment, *Hernandez v. Foster*, 657 F.3d 463, 484 (7th Cir. 2011).

The Fourteenth Amendment's Due Process Clause generally requires laws to place individuals on fair notice before their conduct may be punished by the government.  *Parker v. Levy*, 417 U.S. 733, 752-57 (1974); *Brown v. Chicago Bd. of Educ.*, 824 F.3d 713, 716-17 (7th Cir. 2016).  Laws applicable to the public at large are impermissibly vague under this standard "if people of common intelligence must necessarily guess at [the law's] meaning and differ as to its application."  *Greer*, 212 F.3d at 369 (citing *Grayned v. City of Rockford*, 108 U.S. 108-09 (1972)).

Yet unlike laws applicable to the general public, "the government acting in the role of employer enjoys much more latitude in crafting reasonable work regulations for its employees."  *Greer*, 212 F.3d at 369.  Thus, rules of conduct applicable to public employees are held to a lower vagueness standard, *see Waters*, 511 U.S. at 673 (plurality); *Greer*, 212 F.3d at 369, and need not be as tightly defined as laws applicable to private citizens, *Brown,* 824 F.3d at 716-17; *see also Greer*, 212 F.3d at 369 ("The Department need not have adopted 'a quasi-criminal code' in establishing employment regulations.").  Under this lesser standard, a code of conduct for public employees is impermissibly vague only if it fails to "convey adequate warning" to

"reasonable employee[s]" as to a "sufficiently define[d] [ ] range of inappropriate conduct" that may result in discipline. *Greer*, 212 F.3d at 369.

Prohibited conduct may be defined by public employers in "broad and general" standards. *See Arnett*, 416 U.S. at 158-62 (Rehnquist, J., plurality opinion joined by Burger, C.J., and Stewart, J.) (rejecting vagueness challenge to "cause" standard for terminating public employees); *id.* at 164 (Powell and Blackmun, JJ., concurring and agreeing with plurality's "reasons" for rejecting vagueness challenge); *see also Marks*, 430 U.S. at 193 (when fragmented Supreme Court decides case, courts look for single rationale that enjoys assent of five justices). For instance, the Supreme Court has explained that prohibiting employees "from being 'rude to customers,' a standard almost certainly too vague when  applied to the public at large," nonetheless "surely . . . may" be applied to public employees "consistent with the First Amendment." *Waters*, 511 U.S. at 673 (plurality) (citing *Arnett*, 416 U.S. at 158-62). Broad and general standards for public employees are acceptable, even necessary, due to the "infinite variety of factual situations in which public statements by Government employees might reasonably justify" discipline. *Arnett*, 416 U.S. at 161.

Hence, this court in *Greer* rejected a firefighter's vagueness challenge to fire department policies that were substantially similar to the Department's standards. The court upheld as sufficiently clear policies that prohibited public employees from conduct that would "bring the [d]epartment into disrepute" or constitute "harassment on the basis of" protected categories like race, religion, national origin, and sexual orientation. *Greer,* 212 F.3d at 369. "Although written in general

language," the court explained, "these rules . . . sufficiently define[d] a range of inappropriate conduct which a reasonable employee would understand to . . . convey adequate warning" that certain conduct would result in discipline.  *Id*.

Under *Greer*, the Department's standards were sufficiently clear to reasonably alert Hicks that the range of conduct prohibited by those standards included making posts disparaging minority groups and government authority on a publicly accessible Facebook page where he identified himself as a Department supervisor.  Like the policies in *Greer*, the standards prohibited conduct, whether on or off duty, that may "reflect unfavorably on or disrupt the operations of [the Department]," and conduct "unbecoming of a Department employee."  Doc 35-7 at 1; *see also* Doc. 35-8 at 1; Doc. 35-9; *Greer*, 212 F.3d at 369; *see also Parker*, 417 U.S. at 752-57 (rejecting vagueness challenge to standard prohibiting conduct "unbecoming an officer and a gentleman").  Robinson's Institutional Directives repeated this prohibition, and as in *Greer*, provided employees further guidance by further prohibiting discrimination based on religion, national origin, and sexual orientation.  Doc 35-7 at 1; *see also* Doc. 35-8 at 1; Doc. 35-9; *Greer*, 212 F.3d at 369.  Hicks was trained on these policies annually and knew that violations could result in discipline.  Doc. 35-2 at 25.

Thus, like the policies in *Greer,* the Department's standards provided "fair warning" to Hicks that he could be disciplined for any off-duty public statements that reasonably could be viewed as both coming from a Department employee and disparaging groups of people based on their religion, national origin, or sexual orientation or government authority generally.  Reasonably cautious supervising

employees in Hicks's position would have been aware that their public statements against minority groups and government authority could reflect negatively on their law-enforcement employers, if members of the public knew who employs them. *See Rankin*, 483 U.S. at 390 (burden of caution employees bear over their speech will vary with extent of authority and public accountability employee's role entails); *Brown,* 824 F.3d at 716-17 (policies against impairing educational operations that incorporated anti-discrimination provisions put teacher on notice that use of N-word could be punished even if used in educational context); *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 466 (3d Cir. 2015), *amended* (Oct. 25, 2019) ("[I]nvective directed against the very persons that the governmental agency is meant to serve could be expected to have serious consequences for the performance of the speaker's duties and the agency's regular operations.").

Hicks attempts to distinguish *Greer* by pointing to cases involving laws that applied to the general public.  AT Br. 53-58 (relying on *Roberts v. United States Jaycees*, 468 U.S. 609, 629 (1984); *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *Hynes v. Mayor & Council of Oradell*, 425 U.S. 610, 620 (1976); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048–49 (1991); *Coates v. City of Cincinnati*, 402 U.S. 611, 615 (1971)).  As explained *supra* pp. 42-43, these cases are inapplicable where, as here, the government acts as an employer.  In this scenario, the government may, and by necessity must, use broad and general terms to regulate its employees' conduct and effectively carry out its operations, just like a private employer.

45

Hicks also relies on *Bence v. Breier*, 501 F.2d 1185 (7th Cir. 1974), *see* AT Br. 55, a divided decision from nearly 50 years ago, but *Bence*'s holding has been implicitly overruled in relevant part and is otherwise inapplicable here. In *Bence*, the panel majority applied the vagueness standard for criminal laws to strike down as facially vague a police department's employment regulation that proscribed conduct "unbecoming a member" or "detrimental to the service." 501 F.2d at 1193. As noted by the dissenting judge, the proper standard for assessing a public employer's code of conduct against a vagueness challenge is "less stringent" than for criminal codes*, id.* at 1194 (Jameson, J., dissenting), a view that has carried the day in decisions of the Supreme Court and this court since *Bence* was decided, *see supra* pp. 42-43; *see also Brown*, 824 F.3d at 717 ("an employee code of conduct need not be as clear as a criminal law").

In fact, this court effectively abandoned *Bence*'s holding with respect to the plaintiff's facial challenge when it decided *Swank v. Smart*, 898 F.2d 1247 (7th Cir. 1990). In *Swank*, the court explained that "[v]ague, catch-all standards for discipline do not violate due process" rights of public employees, and held that "conduct unbecoming an officer" was not vague as applied to a police officer who had taken a teenager for a midnight ride on his motorcycle. 859 F.2d at 1250, 1253; *see also Piggee v. Carl Sandburg Coll.,* 464 F.3d 667, 673-74 (7th Cir. 2006) (vagueness challenge failed where sexual harassment policy was used to discipline public university instructor for discussing sexual orientation and religion in class). Thus,

*Bence's* holding that the "conduct unbecoming" standard on its face is impermissibly vague is no longer an accurate statement of the law.

Hicks does not explicitly rely on *Bence*'s alternate holding that the "unbecoming" standard was vague as applied to the plaintiffs there, and instead relies on and quotes at length only the facial holding portion of the opinion. *See* AT Br. 56-57. He thus has waived any argument relying on *Bence's* as-applied holding. *Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861, 897 n.21 (7h Cir. 2023).

In any event, both the regulation and conduct at issue in this case are materially different from the regulation and conduct in *Bence*. In *Bence*, all three judges agreed that the Milwaukee police department's "conduct unbecoming" policy was vague as applied to the plaintiffs' preparation of letters in furtherance of their collective bargaining duties. 501 F.2d at 1193, 1195. Here, by contrast, the Department's standards more specifically identified what was prohibited: Department and Robinson Directives, together, prohibited not only conduct unbecoming of a Department employee but also any conduct, even off duty, that may "reflect unfavorably on or disrupt the operations of [the Department]," as well as discrimination based on religion, national origin, sexual orientation, and other statuses. *See supra* p. 5. And Hicks's posts disparaging Muslims, homosexuals, and government authority are unlike letters furthering collective bargaining duties. Because these cases are incomparable, *Bence* does not support Hicks's assertion that the Department's standards were vague as applied to his Facebook posts.

47

Hicks relies on immaterial evidence in arguing that Jeffreys's deposition testimony shows that the Department's standards were "impossible to understand." *See* AT Br. 24-27 (noting that Jeffreys did not definitively answer whether certain hypothetical statements would violate Department standards), 55-57; Doc. 34 at 16-17 (same). First, Hicks has waived any facial challenge to the standards by asserting only that they were vague "as applied" to his Facebook posts, *see* AT Br. 53-57; after limiting his claim to an as-applied challenge, Hicks cannot attack "imprecision[s]" in the language of the standards as they "might be applied to hypothetical situations outside" his own conduct. *See Parker*, 417 U.S. at 755; *see also id.* at 756 ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."). Second, Jeffreys's decision not to opine on whether hypotheticals offered by Hicks would violate Department standards, *see* Doc. 34 at 16-17, showed no vagueness in the standards, and instead exhibited respect for the process the Department uses to make disciplinary decisions, *see Hernandez*, 43 F.4th at 983. Jeffreys's answers merely reflected that "deciding whether any given social media post violates the policy involves a heavily fact- and context-dependent exercise that often cannot be performed with only the bare content of a hypothetical post." *Id.*

Relatedly, Hicks postulates that the Department's standards "seem[ ] to be that if you post something about politics or religion that subjectively offends anyone in the State of Illinois you are subject to discipline." AT Br. 57; *see also id.* at 26, 49, 57. Yet Hicks ignores the Department's investigation and oversimplifies the application of the Department's standards; the Department investigated whether

Hicks's online speech spotlighted in a news article violated Department's standards for employees, and found that Hicks's speech did violate these standards by harming and threatening the Department's reputation and operations. *See supra* pp. 7-10. Regardless, this court need not guess at how the standards may be applied outside of Hicks's case and, instead, should permit the standard's broad terms to be interpreted by the Department on a case-by-case basis. *See Bauer*, 620 F.3d at 716-17.

Finally, Hicks notes that the Department promulgated a social media policy after he was disciplined, AT Br. 27, but the Department's prophylactic decision to provide greater specificity in its standards for employee conduct has no bearing on whether those standards were sufficient to place Hicks on notice in the first place. As explained, *supra* pp. 44-45, the standards were permissibly written in the broad terms necessarily used by public employers.

Accordingly, Hicks's vagueness claim failed on the merits, and summary judgment was properly entered for defendants on this claim.

**B.  Alternatively, qualified immunity barred Hicks's vagueness claim.**

Defendants are entitled to qualified immunity on Hicks's vagueness claim because they did not violate a clearly established right, as the district court properly concluded. Doc. 47 at 25. Again, a point of law is clearly established if it has been dictated by "controlling authority" or "a robust consensus of cases of persuasive authority." *Wesby*, 138 S. Ct. at 589-90 (internal quotation marks omitted). No binding authority clearly established that general rules like the Department's standards are too vague to support discipline for a government employee's

49

disparaging social media posts like Hicks's, made on a publicly accessible account that listed his public employer and supervisory position.

Hicks points to no Supreme Court decision clearly establishing the vagueness of applying general rules like the Department's to an employee's public comments that harmed the employer and threatened its future operations.  On the contrary, the Court has explained that the "propriety" of disciplinary policies and procedures for public employee speech "must turn on the particular context in which the question arises," *Waters*, 511 U.S. at 671 (plurality), and has rejected vagueness challenges to standards as broad as discipline "for cause," *Arnett*, 416 U.S. at 158-62.

Hicks likewise points to no decision of this court clearly establishing the vagueness of applying the Department's standards to his Facebook posts.  Hicks again relies on *Bence*, *see* AT Br. 59-60, but as explained *supra* pp. 43-46, this court in *Swank* and *Greer* abandoned *Bence*'s facial holding, and *Bence*'s as-applied holding is factually distinguishable from Hicks's case.  Thus, even if the court found the Department's standards impermissibly vague as applied here, that point of law would not have been clearly established at the time of Hicks's discipline.

Accordingly, summary judgment for defendants should be affirmed for the additional reason that defendants were entitled to qualified immunity on Hicks's due process claim.

## CONCLUSION

For these reasons, this court should affirm the district court's judgment for Defendants-Appellees.

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-3312

Attorneys for Defendants-
Appellees

/s/ Jonathan J. Sheffield
**JONATHAN J. SHEFFIELD**
Assistant Attorney General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-2175 (office)
(773) 590-7117 (cell)
Jonathan.Sheffield@ilag.gov

August 7, 2023

**CERTIFICATE OF COMPLIANCE WITH PAGE LIMIT, TYPEFACE
REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

I hereby certify that this brief complies with the typeface requirements of

Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32 and the type style

requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has

been prepared in proportionally spaced typeface using Microsoft Word for Microsoft

365, in 12-point Century Schoolbook BT font, and complies with Seventh Circuit

Rule 32(c) in that the brief contains 13,042 words.

/s/ Jonathan J. Sheffield
JONATHAN J. SHEFFIELD
Assistant Attorney General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-2175 (office)
(773) 590-7117 (cell)
Jonathan.Sheffield@ilag.gov

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on August 7, 2023, I electronically filed the foregoing

Brief of Defendants-Appellees with the Clerk of the Court for the United States Court

of Appeals for the Seventh Circuit by using the CM/ECF system.

I further certify that the other participants in this appeal, named below, are

CM/ECF users and will be served by the CM/ECF system.

John Baker
bms@bbklegal.com

/s/ Jonathan J. Sheffield
JONATHAN J. SHEFFIELD
Assistant Attorney General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-2175 (office)
(773) 590-7117 (cell)
Jonathan.Sheffield@ilag.gov